**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BARBARA CHANDLER, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:18-cv-01577 |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | Honorable Robert M. Dow, Jr. |
| ULTA BEAUTY, INC., ULTA SALON, COSMETICS & FRAGRANCE, INC., MARY N. DILLON, and SCOTT M. SETTERSTEN, | |
| Defendants. | |

**<u>AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

SUMMARY OF THE ACTION .................................................................................. 1

JURISDICTION AND VENUE ............................................................................... 7

THE PARTIES ............................................................................................................ 8

I.   PLAINTIFFS ..................................................................................................... 8

II.   DEFENDANTS ................................................................................................. 8

    A.  Ulta .............................................................................................................. 8

    B.  The Individual Defendants ...................................................................... 10

III.  RELEVANT NON-PARTIES ....................................................................... 13

STATEMENT OF FACTS ....................................................................................... 16

I.   COMPANY OVERVIEW ............................................................................ 16

    A.  Retail ......................................................................................................... 17

    B.  Ulta Salon Services ............................................................................... 18

    C.  Ulta.com .................................................................................................. 19

II.  ULTA'S BUSINESS IS OPERATED AND MANAGED CENTRIALLY AT THE COMPANY'S CORPORATE HEADQUARTERS UNDER DEFENDANT MARY DILLON ........................................................................................................... 20

    A.  Ulta's Business Is Centrally Managed From The Top Down ......................... 20

    B.  Ulta's "Senior Executives" Approve The Company's Inventory And Sales Forecasts On A Weekly Basis Through A Centrally Managed Company-Wide Database and Network ......................... 23

III.  ULTA'S RAPID GROWTH COUPLED WITH ITS LIBERAL RETURN POLICY CAUSES EXCESSIVE PRODUCT RETURNS THROUGHOUT THE CLASS PERIOD ........................................................................................ 26

IV.  ULTA'S GROWTH AND EXCESSIVE RETURNS CAUSE THE COMPANY'S LOSSES FROM INVENTORY SHRINKAGE TO DOUBLE ......................... 29

V.  ULTA INCENTIVIZES EMPLOYEES TO PARTICIPATE IN ITS UNSANITARY PRACTICES BY OFFERING A "SHRINK" BONUS TO THOSE WHO MAKE THEIR SHRINK GOAL AND BY COERCING EMPLOYEES THROUGH FEAR OF RETALIATION FOR FAILING TO DO SO .................................................. 35

    A.  Shrink Bonuses ....................................................................................... 35

    B.  Ulta Threatened Employment for Non-Compliance ............................ 37

VI. IN ORDER TO REDUCE INVENTORY "SHRINK" THROUGHOUT THE CLASS PERIOD ULTA SECRETLY ENGAGES IN THE UNETHICAL AND UNSANITARY PRACTICE OF RESELLING USED PRODUCTS AS NEW ............... 38

   A.   Ulta Adopts A Company-Wide Policy To Re-Shelve And Resell Used Product .......... 38

   B.   Numerous Former Ulta Managers Confirm Ulta's Unsafe And Unsanitary Practices Were Widespread In Ulta's Stores Across The Country ................................................. 40

      1.   The Northwest Region ................................................................................ 40

      2.   The Southeast Region ................................................................................ 44

      3.   Southcentral Region ................................................................................. 47

      4.   Southwestern Region ................................................................................ 48

VII. ULTA'S LOSS PREVENTION DEPARTMENT TEAM PRESSURED ULTA MANAGERS TO RESELL USED PRODUCTS ............................................................... 49

VIII. ULTA FORMER EMPLOYEES BLOW THE WHISTLE ............................................. 50

IX. ULTA CHANGES ITS POLICY ...................................................................................... 56

DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ........................................................................................ 57

   I.   MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S COMPLIANCE WITH THE COMPANY'S BUSINESS CODE OF CONDUCT .......... 58

   II.   MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S COMPENSATION PROGRAM ..................................................................................... 59

   III.   MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S FINANCIAL PERFORMANCE ..................................................................................... 60

   IV.   MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S PRODUCT QUALITY ................................................................................................. 71

   V.   MATERIAL MISSTATEMENTS AND OMISSIONS CONCERNING ULTA'S INTERNAL CONTROLS OVER FINANCIAL REPORTING ....................................... 74

   VI.   MATERIAL MISSTATEMENTS AND OMISSIONS CONCERNING ULTA'S COMPLIANCE WITH INTERNAL POLICIES RELATED TO SALES RETURNS, INVENTORY AND THE SHRINK RESERVE ............................................................. 78

THE TRUTH IS REVEALED THROUGH A SERIES OF PARTIALLY CORRECTIVE DISCLOSURES ...................................................................................................................... 80

   VII. INJURED CONSUMERS FILE SUIT ............................................................................ 85

ADDITIONAL SCIENTER ALLEGATIONS ............................................................................ 90

I.   THE INDIVIDUAL DEFENDANTS INTENTIONALY, KNOWINGLY AND/OR
     RECKLESSLY MADE FRAUDULENT REPRESENTATIONS ................................... 91

     A.   The Widespread and Pervasive Extent of Defendants' Fraud Supports an
          Inference of Scienter ...................................................................................... 91

     B.   The "Planogram" On Ulta's Internal Website Is An Admission That Defendants
          Were Aware of Ulta's Pervasive Practice of Reselling Used Products At the
          Direction of Top Executives .......................................................................... 91

     C.   Ulta's Ultanet Reported on Damages and Shrink on the Dashboard, Which
          Defendants Dillon and Settersten Admit to Reviewing On A Weekly Basis ............... 92

     D.   Defendants Created a Corporate Culture That Rewarded Employees Who
          Followed the Unsanitary Practice By Paying Them A "Shrink" Bonuses,
          Approved by Defendant Dillon ...................................................................... 93

     E.   The Directive By Dave Carrol and Regional RVPs, and Sanctioned by Steelman,
          Supports an Inference of Corporate Scienter ................................................. 93

     F.   The Material Impact of Shrink and Damages on Ulta's Bottom Line Supports an
          Inference of Scienter ...................................................................................... 94

II.  THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE FRAUDULENT
     REPRESENTATIONS ..................................................................................... 95

     A.   Defendant Dillon's Suspicious Sales ......................................................... 96

     B.   Defendant Settersten's Suspicious Sales ................................................... 98

     C.   Additional Insider Sales by Ulta's Officers and Directors ............................ 99

LOSS CAUSATION .................................................................................................... 101

CLASS ACTION ALLEGATIONS ............................................................................... 102

NO STATUTORY SAFE HARBOR ............................................................................. 104

APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE .......................................... 105

COUNT I ................................................................................................................... 106

COUNT II .................................................................................................................. 109

PRAYER FOR RELIEF ............................................................................................... 110

JURY DEMAND ......................................................................................................... 111

Court-appointed Lead Plaintiffs Lawrence Banker, Danny Hurlbut, Marlene Hurlbut, and Cynthia Busse ("Plaintiffs") bring this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired securities of Ulta Beauty, Inc. and its wholly owned subsidiary Ulta Salon, Cosmetics, Fragrance, Inc. (collectively "Ulta" or the "Company") between April 20, 2016 and February 23, 2018, inclusive (the "Class Period").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of (i) Ulta's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Ulta's other public statements, including press releases; (iii) interviews with individuals who are former employees of Ulta; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Ulta; and (v) review of pertinent court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Headquartered in Bolingbrook, Illinois, Ulta purports to be the largest beauty products retailer in the United States, operating in over 1,000 retail stores during the Class Period. Ulta's entire success depends upon the Company's ability to draw customers into its retails stores

by providing a better "customer experience" than its competitors through a diverse variety of quality beauty products.

2.      At all relevant times, Ulta's retail stores were divided into six to seven regions comprised of several states per region.  Each region was overseen by a Regional Vice President ("RVP") responsible for managing store operations.

3.      One of the key ways in which Ulta differentiates itself from competitors is by maintaining one of the most liberal return policies of any cosmetics retailer.  Throughout the Class Period, Ulta customers could return products, regardless of whether they were used, within sixty days of purchase for a full refund.  Ulta even allowed customers to return products after the sixty-day period and/or without a receipt for store credit.  This liberal return policy encouraged customers to "rent" products in which they used the product once and then returned it and inspired "dumpster diving," where individuals would go through Ulta's trash bins and return used products for store credit.

4.      Ulta's liberal return policy caused the Company to incur significant losses on inventory from damaged products that were returned.  Such losses from returns, or things like theft and in-store damage, are known in retail as inventory "shrinkage." Inventory shrinkage is the difference between the values of inventory recorded in a company's accounting records and its physical inventory. When the value of physical inventory is less than what is recorded in the accounting records, retailers like Ulta must write off the difference, which directly reduces earnings.  Accordingly, shrink is a major focus amongst all retailers and costs the retail industry an estimated $49 billion per year.

5.      As a result of Ulta's liberal return policy, the Company's inventory shrinkage **doubled** during the Class Period with customers returning more used products than ever before, a problem exacerbated by Ulta's rapid growth.

6.      In order to get its inventory shrinkage under control and improve Ulta's bottom line, throughout the Class Period, Defendants implemented an undisclosed Company-wide practice of requiring store managers to touch-up and resell returned, used beauty products as new to unsuspecting purchasers.  This unsanitary policy applied to all products and included, for example, treating eye shadow palettes with alcohol to make it appear as if the product had not been used, retouching and reshaping lipstick with alcohol and removing hair from hair curlers and brushes.  Moreover, as discussed below, Ulta's practice was a health risk and caused numerous consumers to suffer physical injury.

7.      As a result of its undisclosed practice of reselling used beauty products, Ulta was able to reduce its shrink reserve by more than 20% in 2017, alone.

8.      Ulta engaged in this unsanitary practice despite the critical importance of providing quality beauty products to distinguish itself from competitors. Yet, during the Class Period, Defendants falsely represented that "***Ulta Beauty's policy does not permit the resale of used, damaged or expired products***" and touted to investors that Ulta's growth was the direct result of "what we sell in the store . . . and the guest experience" as well as the "performance of newness, of new brands and ***newness within existing brands***."[1]

9.      Moreover, throughout the Class Period, Defendants falsely assured investors that Ulta complied with its Business Code of Conduct, which requires the "[i]nformation we supply to customers" "be accurate and complete to the best of our knowledge" and prohibits employees from

---

[1] All emphasis added unless otherwise indicated.

3

"deliberately misrepresent[ing] information to customers" when, in violation of the code, Ulta was secretly misleading consumers by reselling used products. Ulta also falsely claimed that its reduction in "shrink" was a "key factor" in Ulta's improved bottom line, when Ulta's purported improved bottom line was actually the result of an unsustainable practice.

10.     Although Defendants never disclosed their scheme of reselling used products, they went to great lengths to perpetuate it – including by offering employees perverse compensation incentives in the form of "shrink bonuses" and creating a corporate culture where employees were threatened that they would not advance in the Company and/or would lose their jobs if they did not comply.

11.     The truth began to emerge on January 9, 2018 when, after the market closed, a former Ulta employee and Twitter.com user tweeted "whenever a customer would return a product, [Ulta employees] were told by managers to repackage/reseal the item and put it back on the shelf." According to this former employee, Ulta would restock and resell used cosmetics, among many other products.

12.     Upon the news, Ulta's share price fell from a closing price of $232.92 on January 9, 2018 to a closing price of $230.45 on January 10, 2018 after news outlets began to report about Defendants' conduct. The decline in Ulta's stock price was tempered by Ulta's simultaneous denials of reselling used beauty products.

13.     On February 9, 2018, after the market closed, it was reported that a consumer fraud class action had been commenced against Ulta on behalf of injured consumers across the country,

further elaborating on the extent and specific details of Ulta's "widespread and surreptitious" practice of reselling used products.[2]

14.     Upon this news, Ulta's stock price fell $9.07 per share to close at $209.48 per share on February 12, 2018.

15.     Then, on February 23, 2018, *CBS News* published a story on its website entitled "Former Ulta Beauty employee says she felt pressured to resell used products," further detailing the alleged scheme initially reported on Twitter and confirming that Ulta store managers and above frequently pressured the Company's employees to clean and resell used products. The article stated in relevant part:

> "We were told by managers to repackage / reseal the item and put it back on the shelf" the social media post reads. "They would resell EVERYTHING. (makeup, hair care, skincare, fragrance, hair tools, etc.)," the associate wrote in another post.
>
> The former employee included photos of products. In one example, she alleges that Ulta employees would clean a used foundation stick with a Q-Tip and resell it. Other people joined in, posting their experiences from around the country. "I felt duped," Brown said. "For somebody to come forward like that is a pretty big deal, it sends a big red flag in my book."
>
> ***
>
> But former Ulta Beauty store operations manager Brittany Ludwig says at one store she saw them "cleaning" lip products and eye shadows. At another, she said, shampoos, lotions, and other items in bottles were put back on the shelf.
>
> She says some of that she did herself because higher-level managers pressured the stores to keep the dollar amount for damaged or returned goods down. "We had other managers come in from other stores and they were saying 'OK, yeah, you need to clean all these returns, you need to clean this, this is how you're going to get your numbers down,' and it was all a numbers game," she said. "I don't feel so great about doing it now, but at that time that's what I was told to do my job."

---

[2] The consumer class action is captioned *Smith Brown v. Ulta Beauty, et. al.*, Case No. 1:18-cv-610 (N.D. Ill.) (the "Consumer Class Action").

16.     On this *CBS News* report, Ulta's share price fell $8.18 per share to close at $198.93 on February 26, 2018.

17.     After the truth was revealed, Ulta quickly changed its shrink bonus policy to exclude damaged goods.

18.     As set forth below, former Ulta employees from across the country have confirmed for regions representing the overwhelming majority of Ulta's retail stores during the Class Period, that they received a directive to resell used products from the RVP of their region in order to reduce shrinkage.  Several former employees also recounted store visits from Vice President of Stores, Dave Carroll ("Carroll"), who was responsible for between 400 and 500 of Ulta's stores during the Class Period, where Carroll instructed these witnesses to resell used products or else they would not be promoted at Ulta or may even be fired.  One former employee recounted a visit from this witnesses' RVP, Carroll and Kecia Steelman, Ulta's current Chief Store Operations Officer who reports directly to Defendant Dillon, during which Carroll instructed this witness in front of Steelman to resell used products.

19.     Ulta maintained an internal "Ultanet" website accessible by employees that reported on a "Dashboard" reports of damages and shrink by store, district and region, on a daily basis.  The Dashboard also contained a "planogram" instructing stores how their damages bins area should be set up, which included several bins for damaged products by category, paper towels and alcohol. Ulta's planogram is effectively an admission that Ulta's returned products practice existed and was being implemented across the country.

20.     Accordingly, as set forth above, and alleged in more detail herein, Defendants were well aware of the Company's undisclosed pervasive practice of reselling used products.

21. As a result of the alleged fraud, during the Class Period, the Individual Defendants were able to personally reap over *$28.3 million* in proceeds from selling their Ulta stock at artificially inflated prices. Defendants' Class Period sales were highly suspicious as neither Defendant Dillon nor Defendant Settersten had sold a single share of Ulta stock prior to the Class Period. Further, these profits amounted to between *3.5 and 7 times the amount of the Individual Defendants' annual salaries* during the respective years the sales were made.

22. Through this action, Plaintiffs seek to recoup hundreds of millions of dollars that Ulta shareholders incurred as a result of the fraud alleged herein.

## JURISDICTION AND VENUE

23. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Ulta trades in an efficient market on the NASDAQ Global Select Market ("NASDAQ").

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Defendants conduct business and maintain offices in this Judicial District, and Ulta is headquartered in this Judicial District, with its principal place of business located at 1000 Remington Boulevard, Suite 120, Bolingbrook, Illinois.

## THE PARTIES

### I.   PLAINTIFFS

26.     Lead Plaintiff Lawrence Banker, as previously set forth in his certification supporting his motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Ulta securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

27.     Lead Plaintiff Danny Hurlbut, as previously set forth in his certification supporting his motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Ulta securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

28.     Lead Plaintiff Marlene Hurlbut, as previously set forth in her certification supporting her motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Ulta securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

29.     Lead Plaintiff Cynthia Busse, as previously set forth in her certification supporting her motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Ulta securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

### II.   DEFENDANTS

#### A.   Ulta

30.     Defendant Ulta Salon, Cosmetics & Fragrance, Inc., is a Delaware corporation headquartered in Bolingbrook, Illinois.   Accordingly, Defendant Ulta Salon, Cosmetics & Fragrance, Inc. is a citizen of Illinois and Delaware.   Defendant Ulta Salon, Cosmetics &

Fragrance, Inc. is a wholly-owned subsidiary of Defendant Ulta Beauty, Inc. Defendant Ulta Salon, Cosmetics & Fragrance, Inc., was incorporated on January 9, 1990 and became a wholly owned subsidiary of Defendant Ulta Beauty, Inc. on or about January 29, 2017.

31. Defendant Ulta Beauty, Inc., is a Delaware corporation headquartered in Bolingbrook, Illinois. Accordingly, Defendant Ulta Beauty, Inc. is a citizen of Illinois and Delaware. The most recent Annual Report for the 2017 fiscal year ended February 3, 2018 filed by Ulta Beauty, Inc. on SEC Form 10-K on April 3, 2018 (hereinafter "2017 Form 10-K"), states as follows: "References in this Annual Report on Form 10-K to 'we,' 'us,' 'our,' 'Ulta Beauty,' the 'Company' and similar references mean Ulta Beauty, Inc. and its consolidated subsidiaries, unless otherwise expressly stated or the context otherwise requires." 2017 Form 10-K at 1.[3] As such, Defendant Ulta Beauty, Inc. does not generally distinguish between itself and its consolidated subsidiaries, including Defendant Ulta Salon, Cosmetics & Fragrance, Inc., and refers to them all collectively with itself. Indeed, the Company admits that Ulta Beauty, Inc., is the "successor" to Ulta Salon, Cosmetics & Fragrance, Inc. *Id.* at 2.

32. Furthermore, the 2017 Form 10-K filed by Defendant Ulta Beauty, Inc., states, at 2, "We were founded in 1990," referring to the incorporation date of Defendant Ulta Salon, Cosmetics & Fragrance, Inc. Additionally, Defendant Ulta Salon, Cosmetics & Fragrance, Inc. does not appear to have a CEO, Chairman of the Board, or Board of Directors separate from Defendant Ulta Beauty, Inc. Indeed, the Company issued a press release on January 27, 2017 in *Business Wire*, widely-circulated national business-oriented wire service, stating that as a result of the reorganization "[t]here is no change to the directors and executive officers of the Company as

---

[3] *Id.* at 52 ("As used in these notes and throughout this Annual Report on Form 10-K, all references to 'we,' 'us,' 'Ulta Beauty,' or the 'Company' refer to Ulta Beauty, Inc. and its consolidated subsidiaries.").

a result of the creation of the holding company." As a result, there is no separate decision-making apparatus for Defendant Ulta Salon, Cosmetics & Fragrance, Inc., rather, the Board of Directors and officers of Ulta Beauty, Inc., exert direct control over Defendant Ulta Salon, Cosmetics & Fragrance, Inc.

33. Moreover, prior to the January 29, 2017 reorganization, Defendant Ulta Salon, Cosmetics & Fragrance, Inc. did not have a parent corporation and was the operating entity for all of its stores, and the maker of all of Ulta's statements. As a result, for part of the Class Period, Defendant Ulta Salon, Cosmetics & Fragrance, Inc., had total operating authority of Ulta, including the public dissemination of any statements, while after the reorganization, Defendant Ulta Beauty, Inc. acquired Ulta's direct operating authority.

34. Thus, in this Action, Plaintiffs adopt Ulta's own terminology, and hereby allege that any references to "Ulta" mean "Ulta Beauty, Inc. and its consolidated subsidiaries [including Ulta Salon, Cosmetics & Fragrance, Inc.], unless otherwise expressly stated or the context otherwise requires." *See* 2017 Form 10-K (at 1).

**B.    The Individual Defendants**

35. Individual Defendant Mary N. Dillon ("Dillon") has been the Company's Chief Executive Officer ("CEO") and a Member of the Company's Board since July 2013. Moreover, as stated in a letter to the SEC dated July 20, 2018 that was filed on EDGAR, Dillon serves as Ulta's Chief Operating Decision Maker ("CODM"). In the role of CODM Dillon "regularly reviews" Ulta's financial information "[f]or purposes of making operational decisions and assessing financial performance."

36. Individual Defendant Scott M. Settersten ("Settersten") has been the Company's Chief Financial Officer ("CFO") and Assistant Secretary since March 2013. Prior to his

appointment as CFO, Settersten held multiple positions at Ulta: Acting Chief Financial Officer and Assistant Secretary from October 2012 through March 2013; Vice President of Accounting from 2010 through October 2012; and Director of Financial Reporting from 2005 through 2010.

37.     Dillon and Settersten are collectively referred to herein as the "Individual Defendants." Ulta and the Individual Defendants are collectively referred to herein as the "Defendants."

38.     Each of the Individual Defendants:

> (a)     directly participated in the management of the Company;

> (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

> (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

> (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

> (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

> (f)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

> (g)     approved or ratified these statements in violation of the federal securities laws.

39.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Ulta's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

40.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

41.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ulta's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants

12

knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

42. Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ulta securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Ulta's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiffs and other shareholders to purchase Ulta securities at artificially inflated prices.

## III.    RELEVANT NON-PARTIES

43. Brittany Ludwig ("Ludwig") was employed at Ulta in the Company's Carlsbad, California store as an Associate Manager of Operations from February 2017 until September 2017. Ludwig initially reported to her store's General Manager, Kristina Voorhees ("Voorhees"), for the first three or four months until Voorhees was replaced by "Julie." In the interim, numerous General Managers were assigned to oversee the Carlsbad store. Both Voorhees and Julie reported to District Manager Michelle Kurgan ("Kurgan").

44. Tammy Geier ("Geier") was employed at Ulta from 2006 until February 2016. From January 2015 until February 2016, Geier held the position of General Manager of Store 80 in Georgia at The Mall of Georgia. According to Ulta, General Managers are responsible for training, developing and leading all of the staff at their store and they "oversee all aspects of store

operations with an emphasis on meeting/exceeding budgeted sales, expense, and profit goals."[4] Geier reported to District Manager Sara Ramsey who reported to Chrissie Mollicone ("Mollicone"), Regional Vice President ("RVP") for the Southeast Region.

45.     Kami Turner ("Turner") was employed at Ulta from 2010 to July 2015.  From July 2014 to July 2015, Turner held the position of General Manager at the Chattanooga, Tennessee store.  Turner, like all General Managers was responsible for "all aspects of the store operations" at her store.  Turner was also a Prestige Market Trainer from January 2015 to July 2015, and therefore "responsible for delivering top-line sales growth . . . within the prestige category (including high-end beauty including color cosmetics, skincare, and fragrance)" as well as "oversee[ing] all aspects of the prestige business . . . ."[5]  Turner reported to District Manager Sara Ramsey, who reported to Mollicone.

46.     Ella Soto ("Soto") was employed at Ulta from 2015 until October 2017.  At the time she left, Soto was the Prestige Advisor in the Bluffton, South Carolina.  At Ulta, the Prestige Advisor position is a client-facing role that "maximize[s] sales" by working with clients to select and purchase prestige merchandise by performing makeup applications, skincare analyses, and product demonstrations.[6]  Mollicone was the Regional VP for Soto's region during the time she was employed by Ulta.

47.     Laura Hornick ("Hornick") was employed at Ulta from June 2012 to April 2014 as a Prestige Manager in the Brandon, FL for the majority of her employment.  Hornick reported to General Manager Pamela Cox, who reported to District Manager Natalie Lakritz.

---

[4] *See* http://careers.ulta.com/retail-stores/, last visited September 10, 2018.
[5] *Id.*
[6] *Id.*

48. CW1 was employed at Ulta as a District Manager from 2014 to 2018 in Ulta's Southcentral region responsible for overseeing the operations of 14 stores, including shrink.

49. CW2 was a District Manager at Ulta from 2012 through April 2016. CW2's District was comprised of Oregon, Southwest Washington, Idaho and Montana in the Pacific Northwest Region in which CW2 oversaw 28 stores at the end of CW2's employment. During CW2's tenure, CW2 was supervised by the Regional Vice President for Pacific Northwest Region – originally a woman named Colleen Morse ("Morse"), until Morse was replaced Kelly Meyer ("Meyer") in October 2015. Thereafter, CW2 reported to Meyer for the remainder of CW2's employment at Ulta.

50. CW3 was employed at Ulta from 1997 until July 2016 as the Director of Loss Prevention responsible for all aspects of loss prevention, including shrinkage, theft, safety and risk management. CW3 reported to Chief Store Operations Officer until about November 2015 and then to Julie Giblin, the Vice President of Loss Prevention, from November 2015 until CW3's departure in July 2016. Julie Giblin reported to Defendant Settersten, the Chief Financial Officer.

51. CW4 was employed as a District Manager in Ulta's Southwestern Region from 1993 to May 2016. CW4's district, Number 3503, was comprised of the Fort Worth, Texas and West Texas areas. CW4 reported to RVP Yvonne Stewart until December 2015 and after that, to Dave Carroll ("Carroll"), Senior Vice President of Stores - West. As a District Manager CW4 was responsible for overseeing all operations at stores within CW4's district.

52. CW5 was employed at Ulta in Lakewood, Colorado from 2009 through 2016, first as a Market Trainer and then as a General Manager. CW5 reported to District Manager Jaquie Prince ("Prince"), who reported to RVP Kelly Meyer. As a General Manager, CW5 was respoinsble for maintaining CW5's store and as a Market Trainer, CW5 was responsible for

teaching Ulta employees how to implement the Company's programs at Store No. 95, as well as stores throughout the district.

53.     CW6 was employed at Ulta from 2007 until May 2018.  From approximately 2013 until CW6 left the Company, CW6 held the position of District Manager based out of Nashville, Tennessee.  From 2013 to 2017, the stores in CW6's district included those in Nashville, Kentucky, Arkansas, and multiple stores in Indiana and Mississippi. During that time, CW6 reported to RVP Natalie Lakritz, who oversaw Ohio, Kentucky, Mississippi, Tennessee, Alabama, Missouri, South Carolina and Arkansas.  For the last year of CW6's tenure, CW6 oversaw stores in Chicago and reported to RVP Ariel dela Cruz, who was responsible for Michigan, Wisconsin, Minnesota, Illinois and Indiana. CW6 recalled that Dela Cruz reported to Aimee Bayer-Thomas who, in turn, reported to Kecia Steelman ("Steelman"), the Chief Store Operations Officer.

## STATEMENT OF FACTS

### I.     COMPANY OVERVIEW

54.     Ulta was founded in 1990 as a beauty supply retailer at a time when prestige cosmetics (*i.e.*, premium), mass  cosmetics (*i.e.*, value), and salon products were sold through distinct channels – department stores for prestige products, drug stores and mass merchandisers for mass products, and salons and authorized retail outlets for professional hair care products.  Ulta, whose slogan is "All Things Beauty.  All In One Place," was developed under the concept that beauty supply consumers would be enticed by the convenience of a store that brought prestige, mass, and salon products all under the same roof.  Ulta became a publicly traded company on October 25, 2007.  Today, Ulta purports to be "the largest beauty retailer in the United States and the premier destination for cosmetics, fragrance, skin care products, hair care products, and salon services."  2017 Form 10-K at 1.

55.     The Company divides its portfolio of business across five categories: (1) cosmetics; (2) skincare, bath and fragrance; (3) haircare products and styling tools; (4) salon services; and (5) other, which includes nail products and accessories.  Ulta sells all of its products in its retail locations as well as online at Ulta.com.  The following table sets forth the approximate percentage of net sales attributed to each category for the periods indicated:

| | Fiscal year ended | | |
| --- | --- | --- | --- |
| | February 3, 2018 | January 28, 2017 | January 30, 2016 |
| Cosmetics | 51% | 51% | 46% |
| Skincare, Bath & Fragrance | 21% | 20% | 23% |
| Haircare Products & Styling Tools | 19% | 20% | 22% |
| Salon Services | 5% | 5% | 5% |
| Other | 4% | 4% | 4% |
| | 100% | 100% | 100% |

### A.  Retail

56.     Throughout the Class Period, the Company operated in 48 States and the District of Columbia.  Over the same time, Ulta grew exponentially – starting at 874 stores in 2015 and ultimately reaching 1,074 stores by 2017, representing approximately 20% of its growth in only 7% of the Company's lifespan.

57.     As set forth below, Ulta opened more than 100 stores every year from 2015 through 2017:

| | 2015 | 2016 | 2017 |
| --- | --- | --- | --- |
| New Stores Opened | 103 | 100 | 116 |

58.     At the Company's Analyst and Investor Day on October 13, 2016, Defendant Settersten informed guests that "the punchline" of Ulta's growth strategy was to eventually expand to between 1,400 and 1,700 stores.

17

59.     Ulta stores are predominantly located in convenient, high-traffic, locations such as power centers,[7] and generally measure 10,000 square feet.  Approximately 99% of Ulta's stores share the same design.  A typical Ulta store carries more than 20,000 products from approximately 500 well-established and emerging beauty brands across all categories and price points, including Ulta's own private label – the Ulta Beauty Collection.  Ulta claims that its stores are "differentiated" from competitors' because of Ulta's "distinctive and personalized guest experience" which offers a "broad array of categories, brands and price points, [and] high quality services."  2017 Form 10-K at 2.  According to Ulta, by offering such an "array" it is able to appeal to a wider range of consumers that span different ages, demographics, and lifestyles.

60.     Net retail sales for the years ended February 3, 2018, January 28, 2017, and January 30, 2016, respectively, are as set forth in the table below:

| February 3, 2018: | $5,038,406,000 |
| January 28, 2017: | $4,268,337,000 |
| January 30, 2016: | $3,493,816,000 |

**B.  Ulta Salon Services**

61.     Approximately 950 square feet of every Ulta Store is dedicated to a full-service salon.  Ulta's salon services are important to the Company not only because of the revenue they generate, but also because they differentiate Ulta from its retail and e-commerce competitors, and because having salon patrons in the stores amplifies Ulta's retail operations.

---

[7] "Power center" is a term in real estate meaning "[a] large (250,000 to 750,000 square ft.) outdoor shopping mall that usually includes three or more 'big box' stores … [as well as] smaller retailers and restaurants that are either free-standing or located in strip plazas, surrounded by a shared parking lot."  *See* https://www.investopedia.com/terms/p/power-center.asp, last visited September 10, 2018.

62.     Net salon services sales for the years ended February 3, 2018, January 28, 2017, and January 30, 2016, respectively, are as set forth in the table below:

| February 3, 2018: | $277,400,000 |
| January 28, 2017: | $241,100,000 |
| January 30, 2016: | $209,200,000 |

### C. Ulta.com

63.     In addition to its retail sales and salon services operations, Ulta sells products through its website Ulta.com. Ulta's e-commerce represented 7% of the Company's net sales in fiscal year 2016, and 9.7 % of the Company's consolidated net sales in fiscal year 2017. Settersten informed investors on the Company's March 15, 2018 earnings call that e-commerce sales grew to 12.8% of the Company's overall sales in the fourth quarter of 2017. Like Ulta's stores, Ulta.com offers over 20,000 products from over 500 brands. Ulta executives discussed Ulta.com at the Company's 2016 Analyst and Investor Day and described it as "our biggest store – our biggest individual store. It is one that is open 24 hours a day, and so we need to make sure that it is growing and representative of the full experience."

64.     Accordingly, Ulta.com is tailored towards Ulta's key demographic – a segment of consumers it calls "beauty enthusiasts," who are customers that are driven by a personal interest in beauty and beauty products. Ulta describes beauty enthusiasts as individuals who are driven by new trends and trying new products, regardless of price point, brand, or channel of distribution. Beauty enthusiasts keep abreast of current beauty trends and products through magazines, blogs, videos, social media, and other resources. Through Ulta.com, the Company offers guests access to product and store information, beauty trends, in-depth product reviews, techniques, tips, tutorials, videos, user generated content, and social content.

65.     Ulta's e-commerce sales for the years ended February 3, 2018, January 28, 2017, and January 30, 2016, respectively, are as set forth in the table below:

| | |
|---|---|
| February 3, 2018: | $568,700,000 |
| January 28, 2017: | $345,300,000 |
| January 30, 2016: | $221,100,000 |

## II.   ULTA'S BUSINESS IS OPERATED AND MANAGED CENTRIALLY AT THE COMPANY'S CORPORATE HEADQUARTERS UNDER DEFENDANT MARY DILLON

### A.   Ulta's Business Is Centrally Managed From The Top Down

66.     Unlike retailers that utilize corporate structures such as franchises, or regional sub-entities, Ulta's reporting structure is centralized and flows in direct succession from the CEO (Dillon) all the way down to store level employees.  As stated in the Company's Annual Report for the 2016 fiscal year ended January 28, 2017 filed on SEC Form 10-K on March 28, 2017 ("2016 Form 10-K"):

> Our current Ulta Beauty store format is staffed with a general manager, a salon manager, two associate managers, a part-time manager and approximately twenty full and part-time associates; including approximately four to eight prestige consultants and eight to ten licensed salon professionals. The management team in each store reports to the general manager. The general manager oversees all store activities including salon management, inventory management, merchandising, cash management, scheduling, hiring and guest services. Members of store management receive bonuses depending on their position and based upon various metrics. Each general manager reports to a district manager, who in turn reports to a Regional Vice President of Operations, who in turn reports to the Senior Vice President of Store Operations, who in turn reports to our Chief Store Operations Officer, who in turn reports to the Chief Executive Officer.[8]

---

[8] The reporting structure in 2017 only changed marginally in that the Prestige Managers were changed from part-time to full time, and by correcting the misstated, singular "Senior Vice President of Store Operations" to the plural "Senior Vice Presidents of Store Operations."  As set forth in the 2017 Form 10-K:

67.     Throughout the Class Period, Ulta stores were divided into six to seven sales regions – Northwest, Northeast, Southeast, Southcentral, Southwestern and Central -- each of which was headed by an RVP, as follows:

i.  <u>Northwest Region</u> (includes California, Oregon, Washington, Montana, Idaho, Nevada, Utah, Wyoming and Colorado), overseen by RVP Kelly Meyer during the Class Period.

ii.  <u>Southeast Region</u> (includes Florida, Georgia, Alabama, and parts of Tennessee), overseen by RVP Chrissie Mollicone throughout the Class Period.

iii.  <u>Southcentral Region</u> (includes Kentucky, Arkansas, Indiana, Mississippi, parts of Tennessee, Missouri, South Carolina Kentucky and Ohio), overseen by RVP Natalie Lakritz during the Class Period.

iv.  <u>Central Region</u> (includes Michigan, Wisconsin, Minnesota, Indiana and Illinois), overseen by RVP Ariel dela Cruz during the Class period – a fact admitted by Ulta in other litigation. *See Hemsworth v. Ulta Salon, Cosmetics, and Fragrance, Inc., et al.*, Docket No. 2:18-cv-00122-MJP ("*Hemsworth*"), Doc. 11 at ¶ 3.10, (W.D. Wash, April 20, 2018).

v.  <u>Southwestern Region</u> (Texas, Arizona, New Mexico, North Dakota, South Dakota, Kansas, Nebraska, Oklahoma, and parts of California), at all times during the Class Period, Ulta had one to two regions comprised of such states that were overseen by one or more of: RVP Yvonne Stewart until December 2015, SVP Dave Carroll from December 2015 until September 2016, Aimee Bayer-Thomas ("Bayer-Thomas") from September 2016 until March 2017, RVP Alyssa Shaw from April 2017 through the present, and/or RVP Cindy Edwards throughout the Class Period.

---

Our current Ulta Beauty store format is staffed with a general manager, a salon manger, two associate managers, a full time prestige manager, and approximately twenty full and part-time associates; including approximately four to eight prestige consultants and eight to ten licensed salon professionals. The management team in each store reports to the general manager. The general manager oversees all store activities including salon management, inventory management, merchandising, cash management, scheduling, hiring, and guest services. Members of store management receive bonuses depending on their position and based on upon various metrics. Each general manger reports to a district manager, who in turn reports to a Regional Vice President of Operations, who in turn reports to the Senior Vice Presidents of Store Operations, who in turn reports to our Chief Store Operations Officer, who in turn reports to the Chief Executive Officer.

vi. <u>Northeast</u> (includes New York, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia), at all times during the Class Period, Ulta had one to two regions comprised of such states that were overseen by one or more of: RVP Tom Tobin throughout the Class Period, and RVP Keri Thomson-Yhlen from January 2017 through the present.

68. Regional Vice Presidents are responsible for overseeing all facets of operations within their given region, including employee training, implementation of Company policies, and overseeing events affecting sales, profit, and expenses. According to RVP Kelley Meyer, RVPs "ensure the company priorities and objectives are clearly defined, understood and executed; delivering a consistent brand experience . . ."[9] by operations staff.

69. During the Class Period, each RVP reported to one of two to three Vice Presidents of Stores – Carroll, who oversaw 43 districts encompassing more than 400 stores in the central and western portion of the country, Cusick-Dropchinski, who oversaw approximately 400 stores in the eastern United States and Bayer-Thomas (as of March 2017), who oversaw a team of 4 Regional Vice Presidents that encompassed approximately 560 stores in the southwest reported. Each VP of Stores was responsible for overseeing all issues (including shrink) relating to operations over multiple regions and reported to Steelman who, in turn, reported to Dillon. Upon information and belief, Cusick-Dropchinski and Carroll were employed as SVPs of Stores throughout the Class period, whereas Bayer-Thomas was promoted to the position in March 2017, thereby expanding the SVP regions from two to three. According to CW4, prior to Bayer-Thomas' promotion, Carroll supervised RVPs for all stores near Chicago and west, whereas Cusick-Dropchinski supervised RVPs east of Chicago. *See also* Hemsworth, Doc. 11 at 3.10.

---

[9] *See* https://www.linkedin.com/in/kelly-meyer-486b8924/, last visited September 10, 2018.

70.     Each region was then divided into a number of districts comprised of approximately 20 to 30 stores and managed by a District Manager, who was responsible for all operational aspects of the stores within his or her district.  Each individual store had a General Manager responsible for running and managing a particular store's day-to-day operations.

**B. Ulta's "Senior Executives" Approve The Company's Inventory And Sales Forecasts On A Weekly Basis Through A Centrally Managed Company-Wide Database and Network**

71.     According to Ulta's 2017 Form 10-K, the Company's "merchandising team works with [Ulta's] *centralized* merchandize planning and forecasting group to ensure a consistent execution across our store and e-commerce platform."  Ulta's inventory is centrally managed at the Company's corporate headquarters and all inventory purchases and sales forecasts are approved by Ulta's "senior executives" on a weekly basis:

> We *centrally manage* product replenishment to our stores through our merchandise planning group.  This group serves as a strategic partner to, and provides financial oversight of, the merchandising team.  The merchandising team creates a sales forecast by category for the year.  Our merchandise planning group creates an open-to-buy plan, *approved by senior executives*, for each product category.  The open-to-buy plan is updated weekly with point-of-sale (POS) data, receipts and inventory levels and is used throughout the year to balance buying opportunities and inventory return on investment. We believe this structure maximizes our buying opportunities *while maintaining organizational and financial control*. . .  To ensure our inventory remains productive, our planning and replenishment group, *along with senior executives, monitor* the levels of clearance and aged inventory in our stores on a weekly basis. . . .

72.     At all relevant times, Ulta's merchandising team consisted of David Kimbell, Chief Merchandising and Marketing Officer, who oversaw two Senior Vice Presidents who in turn oversaw a team of category Vice Presidents, Divisional Merchandise Managers and their team of buyers.

73.     Ulta's "technology also includes a Company-wide network that connects all corporate users, stores and our distribution center infrastructure and provides communications for

credit card and continual polling of sales and merchandise movement at the store level." 2017 Form 10-K at 9.

74.     In 2016, Ulta implemented a new merchandizing planning and forecasting system called the store warehouse inventory fulfillment tool ("SWIFT") to improve the Company's in-stock rates. At the Company's Analyst and Investor Day on October 13, 2016, Defendants described SWIFT as a "foundational or catch up kind of capabilit[y]" that was necessary because of Ulta's substantial growth.

75.     Another software tool the Company implemented and considered "foundational or catch up" was the product information management ("PIM") system. The PIM system centrally maintains all of the information about all of the products that Ulta sells.[10]

76.     Ulta's centrally accessible and managed inventory infrastructure gave senior executives visibility into what was occurring with the Company's sales down to every last item of inventory. Indeed, at the October 13, 2016 Analyst and Investor Day, Steelman boasted that Ulta had "improved inventory visibility that is actually *real time*," and that with respect to task management she could "stand here and tell you where execution is across the country in any store in any state across the board."

77.     In addition, according to Ludwig and CW5, Ulta maintained an internal, Company-wide internet site accessible by all of its employees with varying levels of access depending on their position, called the "Ultanet." The Ultanet contained a "Dashboard" which reported sales numbers and statistics for damaged products (the "Damages Report") on a weekly basis. The "Damages Report" was broken down by product type (e.g., prestige, personal care appliance

---

[10]  *See* https://www.salmon.com/en/what-we-think/blogs/what-is-a-pim-system/, last visited September 10, 2018.

("PCA"), etc…). The Dashboard also reported on shrink after each physical inventory (the "Shrink Report"), which typically occurred every six months. According to CW5, Ulta employees were supposed to monitor the Dashboard on a daily basis.

78.     CW3 corroborated CW4 and CW5's accounts that there was a Company report that contained information on shrink that was updated after every six-month physical count. As part of CW3's roll in loss prevention, CW3 instructed stores to conduct daily cycle counts, which involved counting a specific type of product on the store shelf. The Dashboard was updated weekly for the cycle counts.

79.     Ludwig similarly recalled that Ulta performed a physical inventory count every six months. Additionally, Ludwig confirmed that stores received a cycle count "every week." Ludwig, stated that while doing the physical counts and the cycle counts, she (or whichever manager was doing the count) would scan each item with an iPod that would update Ulta's internal inventory count.

80.     CW5 recalled that General Managers could access this data for all stores within their district, while District Managers could access data for all districts in their region. CW3 stated that all of this information was reported and available on Ulta's internal website (Ultanet) for at least district-level managers and above.

81.     According to Ludwig, CW4 and CW5, the stores and regions were in constant competition with one another to decrease damages and shrink. Thus, the main purpose of publishing these statistics regarding damages and shrink was to intimidate and embarrass employees into implementing the unsanitary practice of reselling used products.

82.     Ulta's distribution centers also employ highly developed equipment, IT systems, and processes to replenish Ulta's stores and fulfill Ulta.com orders. Inventory is shipped from

Ulta's suppliers to the distribution centers and then to stores in precise quantities called eaches (*i.e.*, less-than-case quantities), which allows Ulta to ship less than an entire case when only one or two of a particular product is required. Ulta's distribution centers use distribution management and distribution control software systems to maintain and support product purchase systems. Store replenishment order selection is performed using advanced systems such as pick-to-light processing technologies.[11]

83. Accordingly, Ulta's senior management, including the Individual Defendants, had "*real time*" visibility of all key metrics involving sales, inventory, damages and shrink throughout the Class Period.

## III. ULTA'S RAPID GROWTH COUPLED WITH ITS LIBERAL RETURN POLICY CAUSES EXCESSIVE PRODUCT RETURNS THROUGHOUT THE CLASS PERIOD

84. In an age dominated by e-commerce and easily accessible information, it is vital for Ulta, like all retailers, to have a return policy that is comparable to its competitors' policies.[12] Customer-friendly return policies foster relationships with clients and promote brand loyalty.[13] Experts suggest that for some consumers, a favorable return policy will even trump attractive

---

[11] Pick-to-light processing employs alphanumeric displays, buttons, barcodes, and similar technology at storage locations for particular items within the distribution center that guide the operator to the right storage location and indicate the exact number of items to be picked for distribution. *See* https://searcherp.techtarget.com/definition/pick-to-light, last visited September 10, 2018.

[12] *See* https://www.shopify.com/retail/why-facilitating-product-returns-can-spell-more-sales, last visited September 10, 2018.

[13] *Id.*

prices.[14]  Consequently, many beauty product retailers offer generous return policies that allow for long return periods, and even the ability to return items that have been used.[15]

85.     Throughout the Class Period, Ulta maintained a very liberal return policy to remain competitive.  Ulta's policy allowed customers to return products, *regardless of whether they were used*, within sixty days.  At all relevant times, Ulta's website stated "Ulta Beauty is dedicated to bringing you an unparalleled shopping experience from start to finish!  If you're not completely satisfied with a product for any reason, just return the product to us for a full refund."  Moreover, if items were returned beyond the sixty day deadline, or without a receipt, customers could still return the products for a store credit.

86.     According to Ludwig, throughout the Class Period, Ulta customers could return any product they purchased, either at an Ulta store or online, by bringing the item to a cash register at any Ulta store.  Alternatively, customers who purchased online could ship a returned product back to Ulta.

87.     Ludwig described the return process in detail. The cashier at the store received the product being returned at the register.  The cashier then determined whether the item was salvageable to be resold and designated "Return to Shelf" or if it was irreparable and designated "Damaged."  If an item was designated Return to Shelf, it would be placed in a "Return to Shelf bin" or simply reshelved immediately.

88.     If the cashier designated the item as Damaged, the employee working the register would inquire why it was being returned.  In the beginning of Ludwig's employment, the cashier

---

[14] *See* https://www.inc.com/ilan-mochari/pricing-online-shoppers.html, last visited September 10, 2018.
[15]  *See*  https://fashionista.com/2015/08/where-to-return-opened-beauty-products,  last  visited September 10, 2018.  Upon information and belief, the retailers identified in this article maintained substantially similar return policies throughout the Class Period.

would then fill out a card containing: the date of return, the product's SKU, and a description of why the item was returned. The cashier would then initial the card and tape it to the returned product. Ludwig explained that in approximately June or July of 2017, Ulta replaced the hand written cards with computer generated receipts. Ulta cashiers could simply scan a Universal Product Code ("UPC") located on the product's packaging, input the same information into their computer system as was previously filled in on the card, and a receipt would print out containing the information. After initialing the receipts, cashiers would place damaged items into a "Damaged bin." Ulta maintained several Damaged Bins according to product category. CW5 corroborated Ludwig's account of the above return process.

89. Moreover, according to Ludwig and CW5, every night the closing manager for the store was required to go through the Damaged Bins and inspect the products. If the product was considered damaged to the point it could not be touched up and resold, the manager would initial the tag, confirming it was damaged, and relocate the product to a "Damages Area" located outside of the shopping floor.

90. Ludwig also recalled that once per week she would perform a final review of all the items in the Damages Area. Products would either be removed for reshelving or damaged out (disposed of). If they were disposed of, Ludwig would scan the item with her iPod which would remove it from Ulta's internal inventory count. Doing so, in turn, would update the store's shrink numbers on the Shrink Report.

91. The directive from the RVP level, including CW5's RVP, Kelly Meyer, throughout the Class Period, was to "keep our damages clean." When RVPs issued this directive, they intended employees to reduce as many returns as possible by retouching, reshelving, and reselling them.

92. The natural and inevitable consequence of maintaining a liberal return policy is that Ulta received an abundance of product returns. Moreover, as a Company that actively targeted "beauty enthusiasts," who Ulta at its 2016 Analyst and Investor Day defined as individuals who are interested in "trying out" new products, Ulta was prone to a significant portion of its products being returned. Indeed, CW5 confirmed that, as a result of Ulta's liberal return policy, many customers would simply "rent product," which meant they purchased it, used it one time and returned it for a full refund. According to CW5, Ulta's liberal return policy also frequently inspired individuals to "dumpster dive," a practice where a person will snoop through Ulta's trash, retrieve disposed items, and return such products for store credit.[16]

93. As discussed below, Ulta's increased returns caused its inventory "shrink" to **more than double** during the Class Period.

## IV. ULTA'S GROWTH AND EXCESSIVE RETURNS CAUSE THE COMPANY'S LOSSES FROM INVENTORY SHRINKAGE TO DOUBLE

94. Inventory shrinkage is the difference between the inventory recorded in the accounting records on the balance sheet and the physical inventory. Inventory shrinkage is comprised mainly of losses on inventory from used and/or damaged goods and theft. Retail companies like Ulta are concerned with shrinkage because it represents lost sales.

95. Indeed, the 2017 National Retail Federation Survey ("2017 NRF Survey") found shrinkage losses in the retail industry are approximately $49 billion a year.[17] Thus, even a one percent shrinkage rate can cost a company millions of dollars per year.

---

[16] *See* https://www.consumerreports.org/consumerist/dumpster-diving-for-beauty-products-is-it-legal-and-safe/, last visited September 10, 2018.

[17] *See* https://nrf.com/system/tdf/Documents/NRSS-Industry-Research-Survey-2017.pdf?file=1&title=National%20Retail%20Security%20Survey%202017, last visited September 10, 2018.

96.     According to the 2017 NRF Survey, the average shrink percentage for the retail industry in 2016 was over 1.4%.[18]  The average shrink percentage for the make-up industry for 2017 was .7-1.4% (depending on distribution channel).  As shown below, Ulta's shrink in 2015 and continuing throughout the Class Period was well above industry averages.

97.     As a result of fierce competition, profit margins in retail can be razor thin, making shrinkage a potent and sometimes critical, factor in profitability.  Accordingly, shrinkage "is one of the biggest enemies of profitability in the retail business."[19]

98.     CW4 stated that each year, Ulta management provided individual District Managers and General Mangers with annual shrink goals, as well as a store-wide shrink goal, which CW4 recalled was around 1%.  The shrink goals would vary depending on factors unique to the particular store or district.  CW4 said that all shrink goals would be memorialized in documents or emails which were delivered to the respective District or General manager.  The shrink goals would be a specified level of shrink as a percentage of sales.  However, CW5 explained that inventory shrink is also calculated "by total loss" so that if there were supposed to be, say, 10 items on hand but only 8 could be physically located, then the shrink percentage for inventory was 20%.

99.     CW4 believes there were store, district and regional shrink goals.

100.    Ulta records an estimate for shrinkage losses in its financial statements as a decrease to net inventory and an increase to cost of sales.  According to Ulta's 2017 Form 10-K:

> Inventories are adjusted for the results of periodic physical inventory counts at each of our locations.  We record a shrink reserve representing management's estimate of inventory losses by location that have occurred since the date of the last physical

---

[18] The shrink percentage is determined in the industry as a percentage of inventory loss (shrink) to net sales.

[19] *See*      https://www.thenation.com/article/former-managers-allege-pervasive-inventory-fraud-walmart-how-deep-does-rot-go/, last visited September 10, 2018.

count. This estimate is based on management's analysis of historical results and operating trends.

101. Thus, shrinkage losses directly impact Ulta's bottom line by reducing profits.

102. Ulta reported a gross profit margin of 35.6%, 36% and 35.3% for the periods ending February 3, 2018, January 28, 2017 and January 30, 2016, respectively. This compares to the cosmetic industry average of 35%-40%. Accordingly, Ulta lagged behind its competition in profitability margins and increasing its profitability was critical.

103. Several former Ulta employees confirmed that, as a result of the Company's significant growth and liberal return policy, product returns and, consequently, losses on inventory, "shrinkage" significantly increased in 2015 and continued throughout the Class Period.

104. For example, CW4, an Ulta District Manager, recalled that in 2015 and continuing up to CW4's departure in May 2016, Ulta was "getting hammered on shrink." CW4 recalled that the shrink percentage in many of the stores in CW4's district was near 2%. CW4 believed that shrink was increasing as a result of new store openings and an upsurge in break-in thefts.

105. CW5 similarly confirmed that at the end of CW5's tenure with Ulta in early 2016, shrink was a chronic problem. One reason for the increase in shrink, according to CW5, was Ulta's liberal return policy. It had been the case that all six of the damage bins at CW5's store were routinely "overflowing" prior to the damaged items being disposed of or reshelved on a nightly basis. Thus, CW5 confirmed, returned or damaged items could definitely "count for a lot" when it came to shrink. This is not only because of the lost sales and product cost, CW5 stated, but also due to the payroll and other administrative costs to process the returns.

106. Another major contributor to shrink, according to CW5, was theft. However, it was explained to CW5 by RVP Meyer and SVP Stores Dave Carroll during a walkthrough of CW5's store in November 2015 that retouching and reshelving damaged returns was "the most

controllable way to control shrink" without expending significant money to hire additional security personnel, which Ulta management was simply not willing to do. In other words, the cost of rehabilitating returned, used products was considerably less than hiring more personnell and adding a security guard to deal with theft.

107.    CW5 recalled that at this witness' store, shrink was approximatley 3% for 2015 whereas the shrink goal set by Ulta was around 1%. District Manger CW2 similarly recalled that Ulta's was trying to get the Company's overall shrink rate well below 3%, consistent with CW5 and other witness accounts that Ulta's store-wide shrink rate was 3% or higher.

108.    Tammy Geier, a General Manager at Store 80 at the Mall of Georgia, stated that she was transferred to this store in January 2015 as a result of the "massive shrink" at that store to help reduce the shrink percernage. Geier stated that the shrink at her store reached 3.9% in 2015 but that she was able to reduce it to 1.45% at the time of her departure in February 2016 as a result of reselling used products.

109.    Ludwig similalry recalled that the shrink rate in her store was among the highest in her district. By engaging in the practice of reselling used products, Ludwig was able to reduce the shrink in her store by approximatey 50%. Indeed, in an effort to put pressure of Ludwig to reduce shrinkage, Kurgan directed Ludwig to send her a nightly email setting forth how much Ludwig had been able to save by retouching and reshelving damaged goods. The emails were also required to contain pictures of the returned products that were being taken out of Damaged Bins and placed back on shelves. These nightly emails included the store's sales, what the sales goals had been, and the volume of returns. The weekly processing was also still done, which included another email of how much of the returned/damaged goods had been saved and made available to be resold.

110.    CW3 corroborated other witness accounts recalling that shrink had been getting worse in the years leading up to CW3's departure. According to CW3, shrink overall and the components that comprised shrink represented "a huge expense" for Ulta.  In that regard, CW3 stated, damaged items were a huge expense, returned products were a huge expense, and the majority of damaged products were due to customer returns (as opposed to "in-store" damage).

111.    CW3 recalled that most vendors extended less than 50% credit to Ulta for returns and some vendors "gave [Ulta] no credit" for returns.  According to CW3, some vendors frequently pressured Ulta to reduce the volume of returns, threating to renegotiate the return arrangement to afford Ulta less credit for returns if Ulta did not reduce return.  Thus, Ulta was unable to recoup much of its losses on damaged products.

112.    Consistent with the above confidential source accounts, as demonstrated below, over the last few years Ulta's shrink has more than tripled, representing nearly 10% of net income every year except 2017 when the alleged misconduct was at its height, resulting in an overall reduction to the Shrink Reserve of approximately $4 million, or more than 20% in one year.

113.    As demonstrated in the chart below, losses from shrink from 2013 to 2017 amounted to approximately $126.4 million and that does not even consider lost sales or personnel costs such as distribution chain activities related to handling inventory that was ultimately never sold.  Ulta's historical shrink write-offs are set forth below as follows:

| (in millions) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Shrink Write-offs | $10.96 | $20.13 | $26.23 | $31.70 | $37.35 |
| Percentage of Net Income | 5% | 8% | 8% | 8% | 7% |
| Shrink Reserve Balance | $9.4 | $11.6 | $15.3 | $19.1 | $15.1 |

114.    Shrinkage and the significant upward trend throughout the Class Period was of such import to Ulta that the Company maintained a "Shrink Committee." According to CW3, Shrink Committee meetings, which CW3 attended, occurred at least monthly and were in-person meetings held at Ulta's corporate headquarters. The purpose of Shrink Committee meetings was to discuss how to decrease and control shrink. The Shrink Committee was comprised of representatives from a majority of departments within Ulta, including loss prevention, store operations, merchandising, finance, supply chain, and human resources. Defendant Settersten, Ulta's CFO, also attended Shrink Committee meetings.

115.    According to CW2, CW4, CW5, Geier, Turner and others, shrink and damages were discussed during nearly every weekly call among General Manager, District Managers and the RVP prior to and during these individuals' employment. For example, CW4 recalled that every week the District Managers in CW4's region would participate in a joint conference call that included the Regional Vice President. CW4 futher noted that an employee from Ulta's corporate offices would participate in the conference call about once every fiscal quarter. References to needing to "control damages" was the term by which Ulta management meant that damaged/returned products should be cleaned up and put back out for sale. CW4 confirmed that needing to "control damages" was discussed weekly on the district calls.

116.    CW2 similarly confirmed that during the conference calls for District Managers in CW2's region, shrink was a major topic and was discussed in virtually every meeting of District Managers.

117.    CW5 similarly recalled that the issue of shrink generally, as well as the specific issue of returns/damages, were major topics and were discussed on virtually every weekly conference call with CW5's District Manager. Tammy Geier and Kami Turner participated in

34

such conference calls with "Ulta management" during their employment as General Managers during which there were discussions on how to reduce shrink by touching up and reselling used products.

118.     CW4 also confirmed that Ulta held a Genearl Manager conference annually during the month of February in Chicago until February 2016 when it was moved to Florida.  The conference was typically a four day event that would be attended by General Managers, District Managers, Senior Vice Presidents of Operations, salon professionals, buyers, venders, and corporate officers, including Steelman and Defendants Dillon and Settersten.  CW4 attended the conference every year and confirmed that the need to reduce shrink and damages was always discussed.   CW5 similarly recalled attending the annual conference during this witness' employment and confirmed that shrink and damages were discussed every year.

119.     As a result of excessively high shrink levels beginning around 2015 and continuing during the Class Period, Defendants instructed Ulta personnel to retouch used and dirty returned products and resell them as new in order to reduce inventory losses. Because their raises, bonuses and chances for promotion were dependent upon reducing shrink, RVPs and District Managers put immense pressure on Genearl Managers and retail store personnel to comply with this unsanitary practice.

## V.     ULTA INCENTIVIZES EMPLOYEES TO PARTICIPATE IN ITS UNSANITARY PRACTICES BY OFFERING A "SHRINK" BONUS TO THOSE WHO MAKE THEIR SHRINK GOAL AND BY COERCING EMPLOYEES THROUGH FEAR OF RETALIATION FOR FAILING TO DO SO

### A.  Shrink Bonuses

120.     CW4 explained that reducing shrink was one of the key metrics that Regional Vice Presidents, District Managers and General Managers were required to focus on.  According to CW4, meeting shrink goals was a component of a manager's overal bonus package.  The shrink

bonus was performance based, such that an employee could increase the size of his or her shrink bonus by beating their shrink goals by wider margins.

121. Ulta's policy of paying a "shrink bonus" was documented in its SEC filings prior to the Class Period, wherein Ulta specifically stated "[m]embers of store management receive bonuses depending on their position and on sales, *shrink*, payroll, or a combination of these three factors." Curiously, starting in 2013 to the present, Ulta changed its disclosure to state: "[m]embers of store management receive bonuses depending on their position and based upon various metrics." In reality, as numerous former Ulta employees confirmed, the "metrics" referred to was shrink.

122. Throughout the Class Period a "shrink bonus" was paid to employees RVP and below who reduced the amount of shrink in their stores by retouching and reshelving as many returns as possible.

123. CW5 recalled that there was a minimum shrink level that had to be achieved to get a bonus at all and then a "scalable" escalation of increasing bonus amounts depending on what shrink levels were achieved. CW6 confirmed CW5's account that shrink bonuses were paid to employees who met specific goals based upon overall shrink rates. According to CW6, this witness recalled that as a General Managers, CW6 was eligible for a shrink bonus of up to $900 twice year; and as a District Manager, CW6 was eligible for a shrink bonus of $5,000 twice a year.

124. Geier and Turner confirmed that Ulta paid a "shrink bonus" to General Managers if their store's "shrink percentage" was below a certain threshold set by Ulta. Further, as explained below, CW3 confirmed that Regional and Area loss prevention personnel were eligible for shrink bonuses. Therefore, loss prevention employees had incentive to, and did, coerce operations employees to reduce shrink.

125.    CW4 recalled that defendant Dillon approved the shrink bonuses.

**B.    Ulta Threatened Employment for Non-Compliance**

126.    Defendants also threatened employees that if they did not get their shrink down, they would not get promoted and may even lose their jobs. CW4 recalled that Ulta employees were terminated for failing to meet their shrink goals.  Several former Ulta employees confirmed that they feared for their jobs if they were unable to reduce shrink, including Tami Geier, who signed a sworn declaration stating she feared for her job and Ella Soto, who stated in a sworn declaration "I was concerned during my employment at Ulta that if I did not follow the policy of returning used items to the shelf, I would be terminated."

127.    Other former Ulta employees explained that they were threatened that they would not advance unless they reduced shrink.  For example, according to CW5, achieving the shrink goals was important and it was made "very clear" that any chance of promotion or for bonuses depended on meeting the shrink goals.  Furthermore, if an employee wanted to be acknowledged for awards or special recognition, "it depended on shrink."  CW5 was told by Carroll and RVP Meyer that "you want to control shrink" if she wanted to be promoted to District Manager "or the next the level" and that she would not be promoted if she did not have her "numbers under control."

128.    Because employee raises, bonuses, prospects for promotion, and even continued employment at the Company was dependent upon reducing shrink, and managers could only realistically control the customer returns aspect of shrink, Ulta's executive management put significant pressure on employees to reduce shrink by the unethical means of touching up and reshelving used product for resale.

## VI. IN ORDER TO REDUCE INVENTORY "SHRINK" THROUGHOUT THE CLASS PERIOD ULTA SECRETLY ENGAGES IN THE UNETHICAL AND UNSANITARY PRACTICE OF RESELLING USED PRODUCTS AS NEW

### A. Ulta Adopts A Company-Wide Policy To Re-Shelve And Resell Used Product

129. As discussed above, Ulta management put immense pressure on RVPs and below to reduce shrink and meet unreasonable shrink rate goals. Left with no other choice and faced with the very real threat of losing their jobs, Ulta employees engaged in unethical manipulation and concealment of inventory shrinkage.

130. In this regard, Defendants perpetrated an undisclosed Company-wide scheme of supplementing Ulta's inventory with dirty used returns commingled with new products for resale to reduce shrink.

131. According to a sworn declaration by Kami Turner, employees were trained to re-shelve used products as part of Ulta's "policy," which "applied to essentially all products in the store that were returned." Similarly, Ella Soto stated in her sworn declaration that "[w]hen I questioned this unsanitary activity, the managers told me that it was '*Ulta's policy*' and what everyone was required to do." Laura Hornick likewise recalled that "Pamela Cox informed me that, as per the District Manager, Natalie Lakritz, it was *Ulta's policy* that if a customer returned a beauty product, it should be returned to the shelf and resold as if new even if it was used unless it was impossible to clean or fix it up." CW5 stated that it was also this witness' understanding that reselling used products was Ulta's policy.

132. CW5 and Ludwig all confirmed that, in furtherance of this Company policy, Ulta maintained on the Ultanet, a "Damages Planogram," which provided a detailed description of how the damages area in the back of the retail store was to be organized and what materials were to be

kept. During the Class Period, the Damages Planogram required each Ulta retail store to maintain damages bins, paper towels and alcohol to clean damaged products so they could be resold.

133. Thus, throughout the Class Period, Ulta's own policy required its management team to consistently instruct and pressure employees to designate as many items "Return to Shelf" as possible, even if such items were used. Under Ulta's policy, the fact that a product had been previously used did not disqualify it from being designated as Return to Shelf. Indeed, Ulta employees regularly designated products as Return to Shelf, even after the employees were informed by customers that the products were previously used.

134. Throughout the Class Period, according to Geier and Ludwig, if the product did not look acceptable enough to blend in with other new products on Ulta's shelves, but could be altered such that the product would blend in with new products, Ulta's policy required employees to manipulate the cosmetic appearance of the product, designate the product as being Return to Shelf, and resell the product to other consumers. Employees regularly cleaned and altered used products to conceal the fact that the product had been used. For example, according to Turner, if a customer had returned lipstick that was misshapen because it had been used by a customer, Ulta employees were instructed to "get rid of any indentations" and resell it.

135. By returning the products to the shelves, Ulta's plan was designed to surreptitiously comingle the returned items with new products such that customers could not distinguish between new products or used products that were being resold.

136. Even if an item had not been used at the time it was placed in a Damaged Bin, it would inevitably be comingled with used, unsanitary, and potentially unsafe products that were also placed in the Damaged Bin. Therefore, all of the items in the Damaged Bins would

undoubtedly have been exposed to germs, bacteria, and other contamination by the time Damaged Bins were processed at the end of the night and the end of the week.

137.    Depending on the item and the jurisdiction, damaged items were required to be categorized as "hazardous waste" by Ulta employees and disposed of accordingly.[20]  Therefore, Ulta's policy of retouching and reshelving used products not only dangerously exposed the consuming public to unsanitary products, which could and did cause customers to suffer physical injuries, but also violated waste disposal laws.

138.    As discussed above and below, prior to and throughout the Class Period, Ulta SVPs, RVPs and District Managers company-wide instructed employees to touch-up and resell used products as new.

### B. Numerous Former Ulta Managers Confirm Ulta's Unsafe And Unsanitary Practices Were Widespread In Ulta's Stores Across The Country

139.    As discussed below, Lead Plaintiffs have been able to confirm that RVPs from four of Ulta's six to seven Regions during the Class Period accounting for the overwhelming majority of Ulta's retail stores instructed the stores in their regions to resell used products and threatened managers that if they did not comply with the practice, they would not advance at Ulta and/or be terminated.

### 1.    The Northwest Region

140.    According to CW2 and CW5, the Northwest Region included the states of California, Oregon, Washington, Idaho, Montana, Wyoming, Utah and Colorado and accounted for approximately 240 of Ulta's stores.  During the Class period, Kelly Meyer, was the RVP for the Northwest Region.  As discussed below, several former Ulta employees in this region have

---

[20] *See generally* http://www.retailcrc.org/RegGuidance/Pages/regulatory-area.aspx?s=Hazardous%20Waste#, last visited September 10, 2018.

confirmed that Meyer instructed them to touch up, reshelf and resell used products as new throughout the Class Period.

141.    For example, according to CW2 who was a District Manager based in the Northwest, District Managers at Ulta, including CW2, were directed by Meyer to: travel to stores within their district; inspect damaged products located at those stores; ask store personnel why those products had not been returned to the shelves; pressure individual store personnel to retouch and reshelf the products; and, show employees how to actually perform the process of retouching the used products.  CW2 personally observed employees who cleaned up returned products for resell.  CW2 confirmed that perfoming these tasks was a focus at Ulta as a way to reduce overall shrink and District Managers were instructed to encourage and engage in the practice.

142.    CW2 stated that the practice of reselling returned products was "not isolated to our region" and was "discussed frequently."  CW2 knew this because the topic was discussed amongst District Managers who were both "in and out" of the region in which CW2 worked.  CW2 further recalled the practice being discussed during District Manager calls in CW2's region, during which shrink was also discussed at virtually every meeting

143.    CW5, who was the General Manager of an Ulta store in Colorado as well as a Market Trainer for CW5's district, confirmed CW2's account.  According to CW5, Defendants' practice of reselling used products was not an "alleged" practice, but rather, was the directives that CW5 received in "very clear" terms by CW5's superiors – including CW5's District Manager (Julie Prince), Regional Vice President (Kelly Meyer), and Dave Carroll, Senior Vice President of Stores who works out of Ulta's corporate offices in Chicago, Illinois.

144.    CW5 first received instructions to retouch and reshelf used products by CW5's District Manager, Prince, about nine to twelve months before CW5 left Ulta in March 2016.  CW5

41

recalled occasions where Prince went through the Damaged bins in CW5's store and directed CW5 to return items that Prince called "essentially new." In reality, these "essentially new" products were actually used products. CW5 understood Prince to be under immense pressure from Meyer and Carroll to reduce shrink.

145.    Prince asked CW5 to take pictures of CW5's empty damages bin to send around to other managers in the district to show how much shrink had been reduced by reselling used products.

146.    Around November 2015, Carroll, Meyer and Kecia Steelman took a "corporate walkthrough" of CW5's store. CW5 recalls both Carroll and Meyer rifling through CW5's store's Damaged bins, observing clearly used returns and telling CW5 that CW5's shrink was "out of control." Both Carroll and Meyer unequivocally told CW5 that this witness needed to "find ways" to "clean up" returned products and put them back on the store shelves. In the presence of Steelman, Carroll and Meyer further instructed CW5 as to how the Company expected employees to "clean up" used returned products, including by using spray bottles of alcohol so that products could then be resold.

147.    According to CW5, Meyer visited CW5's store to conduct walkthroughs at least three to four times per year. The store walkthroughs always included damaged product reviews and a directive to resell used products. CW5 stated that this witness spoke with other General Managers in the district and they confirmed that they were also cleaning up and reselling damaged/returned products.

148.    Other former Ulta managers in the Northwest Region were similarly instructed by their superiors to resell used products. For example, Brittany Ludwig was a former Associate Manager of Operations of an Ulta store located in Carlsbad, California from February 2017 until

September 2017. During her tenure, Ms. Ludwig was supervised by her store's General Manager – originally a woman named Kristina Voorhees, until Voorhees was replaced by an individual named "Julie." The General Manager reported to Michelle Kurgan, the District Manager for the greater San Diego area. Kurgan was promoted to "Senior District Manager" in February of 2017.

149. About one month into Ludwig's employment, Kurgan visited the Carlsbad store and observed how Ludwig handled items in the Damaged bin. Voorhees was also present at this time. Kurgan went into the Damaged bin herself, pulled out a visibly damaged item and instructed Ludwig that it should be returned to the shelf. The purpose of Kurgan's visit was specifically to discuss the shrink numbers for the the Carlsbad store. Kurgan visited Ludwig's store for this purpose approximately once every two weeks. After pressuring Ludwig to reduce the amount of returns that were damaged out, Kurgan directed Ludwig to take pictures during her nightly routine of emptying the damage bins and send the pictures to Kurgan using the Company email address for the Carlsbad store.

150. Moreover, throughout Ludwig's tenure, Kurgan would circulate a weekly email to employees throughout the district that contained the shrink percentages of the different stores in that district in an effort to embarrass and put pressure on store employees. These shrink numbers would be printed out and placed on display on a clipboard in the damages area (a practice Ludwig believed to be the case at every store). By coming to the Carlsbad store and pressuring employees such as Ludwig to resell items from the Damaged bin, Kurgan was attempting to force employees to reduce the store's shrink. Ludwig estimated that prior to Kurgan's visit, the Carlsbad store's shrink was approximately $6,000 per month, and that after the visit, the shrink was reduced to about $3,000 to $4,000 per month (a decline of 50 to 60%).

151.    In addition to the Carlsbad store, Ludwig occasionally was assigned to work at other locations, including the store in 4S Ranch, California.  While at the 4S Ranch store Ludwig observed the store's cashiers and the Prestige manager "clean up" various products to be resold using q-tips, alcohol, and a blow-dryer.  Ludwig was told that some products should be "smoothed out" to look like new.  When Ludwig inquired about what the Prestige manager was doing, she replied "what Michelle [Kurgan] expects of us."

152.    In between the time Voorhees left Ulta and "Julie" was hired, an interim General Manager directly informed Ludwig that she needed to "clean" (*i.e.*, retouch and reshelf) more Damaged items in order to reduce shrink.  According to Ludwig, Ulta employees would routinely retouch and reshelf the following items: shampoos, lotions, foundations, concealers, fragrances, lipsticks, various "squeeze tube" products, and "hair tools" such as curlers.  Ludwig recalled one occasion where a customer returned hair curlers that had visibly been used, the curlers were returned to the shelf again, and the same customer ended up puchasing the same curlers a second time.

### 2.    The Southeast Region

153.    During the Class Period, the Southeast Region was comprised of the states of Florida, Georgia, parts of Tennessee and Alabama, accounting for approximately 150 of Ulta's retail stores.  According to declarations submitted by Tammy Geier and Kami Turner in the Consumer Action, as well as CWs 1 and 2's accounts, prior to and throughout the Class Period, Chrissie Mollicone was RVP for the Southeast Region. During the Class Period, Mollicone reported to Cusick-Dropchinski. Upon information and belief, Ms. Mollicone is still employed as RVP for the Southeast Region at Ulta.

154. Prior to and during the Class period, Ms. Mollicone instructed District Managers, General Managers and store employees to resell used products. For example, according to Geier, she was transferred to Store 80 at The Mall of Georgia as a General Manager in January 2015 because "it had a massive 'shrink'" in order to reduce the shrink. Ms. Geier stated that Ms. Mollicone and the District Manager for District 3501, Sara Ramsey, visited her store often and their visits were focused on shrink from customer returns. Ms. Ramsey and Ms. Mollicone both "frequently" took Ms. Geier to the damage bins and showed her how to make products look new again and put them back on the shelves to be re-sold.

155. Ms. Geier further stated that throughout her employment as a General Manager at Store 80, which was a "very busy store," she had frequent communications with Ms. Mollicone and Ms. Ramsey via conference calls, in-person meetings and emails where she was instructed to put returned beauty products back on the shelves for sale. They provided Geier with directions and "tips and tricks" on how to make damaged products look new. These "tips and tricks" were also discussed during regular conference calls for the District amongst General Managers and the District Manager (Ramsey). The written agenda for these weekly calls often listed the tips and tricks as a topic for discussion.

156. According to Geier, in the spring of 2015, Ms. Sadler replaced Ms. Ramsey as District Manager while Ramsey was on maternity leave. Ms. Sadler similarly instructed Geier to touch up and resell used products and informed Geier that this was also the practice she enforced in her district in Florida. At the end November and into December 2015, Ms. Sadler was visiting Geier's store "weekly" and reminding Geier of the directive to resell used products.

157. A "Gold" District Manager, Alyssa Shaw, also visited Geier's store and similarly instructed her to resell used products. According to Shaw's LinkedIn profile, she has been

employed as a Regional Vice President in the Sacramento, California area since April 2017. Upon information and belief, Shaw continued to direct (her now much more numerous) subordinates to engage in these practices as a Regional Vice President.

158.     One week before Geier left Ulta, she received a surprise visit from Ms. Sadler, Ms. Shaw, Ms. Mollicone and Elizabeth Allen, the Atlanta District manager, who berated her for not reselling used products in the damage bins, despite the fact that Geier had reduced her overall shrink in Store 80 from 3.9% to 1.45%.

159.     Kami Turner, a General Manager at Ulta's Chattanooga, Tennessee store, was similarly instructed by Mollicone and Ramsey to resell used products. Turner also received at least one in-store visit from Ramsey and Mollicone where they took Turner to the damage bin, pulled out used, returned products and directed Turner to clean them up and resell them as new. During that visit, Ramsey threatened to write Ms. Turner up if she did not comply with Mollicone's and Ramsey's directives.

160.     Ms. Turner also stated that she participated in regular conference calls and received emails from her superiors directing Turner to resell used products. For example, Turner received an email around the Christmas holiday in 2014 that contained "tips and tricks" for returning used items onto the shelf to be resold. The email was sent as preparation for a conference call with Ulta management, and on the call Turner's superiors directed her, and upon information and belief, all of the General Managers in her district, to review the "tips and tricks" with all of the employees at their stores.

161.     Turner states that Ulta's policies, as directed to her by Mollicone and Ramsey, applied to "essentially all products in the store that were returned." For example, Mollicone and Ramsey instructed her to use a shrink wrap gun to re-wrap and reshelf returned perfumes. For

items such as lipstick, Mollicone and Ramsey instructed Turner to use alcohol to get rid of any indentations.  Turner was also instructed to reshelf eye shadow and foundation.

### 3.  Southcentral Region

162.  The Southcentral Region included Missouri, Arkansas, parts of Tennessee, Mississippi, South Carolina, Kentucky, Indiana and Ohio, comprising approximately 130 Ulta retail stores.  Upon information and belief, Natalie Lakritz and Chrissie Mollicone were the RVPs for this region during the Class Period.

163.  CW1, a District Manager in the St. Louis, Missouri area from 2014 through May 2018, recalled that around June or July 2015, Ms. Mollicone accompanied CW1 on a visit to one of the stores in CW1's district.  During the visit Mollicone instructed CW1 and the other employees present that used products were to be resold.  Ms. Mollicone proceeded to rifle through the damaged goods bin to see how many items could be put back on the shelf and resold.  This demonstration was clearly designed to intimidate and make an example of the employees who had failed to return damaged items on their own. One item Mollicone retrieved from the damaged goods bin was a used hairbrush.  Mollicone told CW1 and other store personnel present to remove the hair and resell it.

164.  According to CW1, Lakritz endorsed the practice of employees decreasing the amount of returns that were damaged out.  In this regard, CW1 recalled that, during 2016 and 2017, Ms. Lakritz, among other RVPs, took pictures of how many products had been in the damaged goods bin of a store and how few remained following their inspection and then circulated those pictures to all the District Managers in the region, including CW1, using the GroupMe app.[21]

---

[21] GroupMe is a free group messaging app.  Among other capabilities, users can instantaneously send text messages, photos, and videos.  *See* https://groupme.com/en-US/, last visited September 10, 2018.

Moreover, the RVPs circulated the pictures to other regional managers, human resources representatives for the region, and Loss Prevention representatives for the region, to tout how much shrink had been reduced at that store.

165.   CW1 further recalled hearing that SVP Dave Carroll had been instructing District managers to engage the practice of reselling used products.

### 4.   Southwestern Region

166.   During the Class Period, the Southwestern region inlcuded the states of Texas, Arizona, New Mexico, Nevada and Oklahoma, accounting for approximately 175 stores. According to CW4, the RVP for this region prior to the Class Period was Yvonne Stewart until the end of 2015.  From 2015 until when this witness left the Company in May 2016, Dave Carroll acted as the RVP.  Then, in September 2016, Amiee Bayer-Thomas became the RVP.

167.   According to CW4, numerous former colleagues from CW4's over 20 years at Ulta reported to CW4 regarding the pervasive extent of these disgusting practices that occurred during the Class Period.  According to CW4, one contact, who was a Regional Vice President, confirmed the alleged reshelving policy to CW4.  CW4 said that some contacts reported to CW4 that the alleged reshelving practices continued even occurred after the fraud was exposed.

168.   Moreover, as detailed in Section VIII of the Statement of Facts, *infra*, numerous former Ulta employees came forward on Twitter in January 2018 reporting similar experiences in their stores in Texas.[22]

---

[22] The Northeast Region accounted for about 165 stores.

## VII. ULTA'S LOSS PREVENTION DEPARTMENT TEAM PRESSURED ULTA MANAGERS TO RESELL USED PRODUCTS

169. According to several former Ulta managers, each geographical region had a loss prevention representative. As discussed above, CW1 recalled loss prevention representatives frequently visiting CW1's stores to ensure Ulta's practice of reselling returned products was being followed.

170. Similarly, CW3, the Director of Loss Prevention until July 2016, confirmed that store managers were held accountable for shrink. Loss prevention made routine visits to Ulta retail stores, which were prioritized according to the level of shrink. For example, CW3 stated that Loss Prevention representatives may visit stores with high shrink as many as eight or more times per year. CW3 admitted that CW3 was aware that the alleged practice of reselling used products occurred during the Class Period and was not surprised by the practice.

171. CW1 stated that Loss Prevention representatives for this witnesses' region were "very hard and heavy" about reducing the number of damaged returned products during CW3's employment. Moreover, CW1 said that Julie Giblin, Ulta's Vice President of Loss Prevention, who was in charge of Ulta's entire loss prevention team, communicated to personnel that "the number one" method of reducing shrink was to "reduce damages." According to CW3, Giblin, throughout the Class Period Giblin reported directly to Settersten.

172. According to one Twitter post on January 10, 2018 by Twitter user @trayleesi, the reason Ulta instructs employees to return used product is "because the company is REALLY strict about damages and will crack down if your store has too many even though it's [U]lta's return policy that's the problem." @trayleesi further recalled that "Loss prevention came into our store and lectured us about damaging too much product."

173.    Both Geier and Turner confirmed that they discussed Ulta's policy of reselling used products with Chad Huntsinger of loss prevention who visited their stores on occasion. Geier recalled one visit from Huntsinger and his boss, Robin Perez, at the end of summer 2015, during which they looked in the damage bins, pulled out used products and instructed Geier to touch them and re-shelve them to be sold as new.

## VIII.    ULTA FORMER EMPLOYEES BLOW THE WHISTLE

174.    On January 9, 2018, an unknown former Ulta employee tweeted about Ulta's unsanitary inventory resale practices.  The former employee, who uses the handle @fatinamxo, stated that used products returned to Ulta are made to "look new" – but not sanitized – and put back on the shelf to sell to unsuspecting customers.  Providing just a handful of examples, @fatinamxo posted the pictures below of used foundation sticks and liquid lipsticks, which Ulta repackaged to be sold as if they were new. [23]

---

[23] @fatinamxo has since deleted these and other tweets related to Ulta's deceptive practices, however many of the tweets can be found in contemporaneous news articles, such as the following: https://www.revelist.com/beauty-news-/ulta-makeup/11147, last visited September 10, 2018.



175.   @fatinamxo claimed that Ulta staff were trained to "restore" products, and that managers kept a close eye on whether "items in the damage bin [] looked resell able [sic]." Furthermore, she stated that Ulta managers "even taught [employees] how to clean eyeshadow [sic] palettes and let it dry overnight [sic] so it can be repackaged and sold the next day."

176.   @fatinamxo's allegations prompted responses from numerous Ulta employees from various different Ulta retail locations across the country which she published on her own timeline.  The Ulta employees who responded to @fatinamxo divulged that similar practices took place at the stores where they worked.[24]

177.   These employees complied with Ulta's policy for fear of retaliation, including the loss of their jobs.

---

[24] All pictures reproduced herein are screenshots, which have been copied exactly as they appeared online in @fatinamxo's original tweets.  Any words or images that have been crossed out or otherwise altered were in the original.



178.    Many employees disclosed that, even when they tried to push back against these "disgusting" policies, managers would insist that products should be put back on the shelf and resold:



> Hello I read your thread on ulta and I used to work there. My manger would actually write us up if we put "re sellable" items in the damage bin. I would get into arguments with my managers about lip sticks and eye-shadow and how they're clearly used. It's bad

10:50 AM

179.    Within one day of her first post regarding Ulta's return practices, @fatinamxo received messages from current and former Ulta employees from stores throughout the country – including California, Washington, Texas, Florida, Michigan, South Carolina, Wisconsin, and Ohio – all of whom confirmed that similar practices occurred in those locations.  The list continues to grow.



> Can 100% confirm this is true. Shopping at any ULTA in Frisco, Mckinney, Denton, Sherman, Allen, basically the entire Dallas area and around they train every single employee to do this. All the stores in this area do this.

> I work at the one in Seattle and whenever they do that I say "that's disgusting you already know I'm done shopping here"
>
> 1:38 AM

> I've been working at an Ulta in Texas for 3 years & they do the same. It's honestly so disgusting and I'm glad you shared it with everyone. I hate having to play dumb when a customer comes in saying "it looks like it has been used", Ulta can afford to just damage it so I don't understand why they make us resell it
>
> 1:52 PM

> And like you, my managers would get mad as well if they saw a product that was in the damage bin that could be "saved". At some point I was like fuck it, this is gross and would just damage it but my managers would refuse to initial it.
>
> 1:54 PM

      180.    One Twitter user responded that he or she had worked at three different Ulta locations all of which resold used products:



Yep we did the same thing at my Ulta I worked at. I've actually worked at 3 different ULTA's and they all did this with returns...😢

181.    Multiple employees claim that the practices described by @fatinamxo and others were created by complaints that the stores were "damaging [out] too much product."

182.    Even if a particular employee attempted to "damage" a product when it was returned, some managers would still put the used products back on the shelves:



Same at the ULTA I work at.. Honestly this is one of many reasons why I am over this job.. it's disgusting.. I literally had to check myself because I found myself "seeing" if it could be sold knowing it was used. I damage out anything that has been used even if one time. Unfortunately even when we damage it out at the cash wrap it still has to go through management who actually does the damaging and they will literally put it back on the shelf. I hate it! It's inconsiderate/selfish...

183.    Soon after @fatinamxo's original tweet, former employees would expose Ulta's alleged practices across myriad social media outlets.  For example, former employee Michell

Rahima ("Rahima"), a sales representative at an Ulta store in the San Francisco Bay area, posted a video on YouTube describing her experience with Ulta's return policy.[25]  Rahima states, in pertinent part:

> "I remember we had a visit from someone higher up in the company, and they were getting really on the store about like our number of damages.  And that's basically items that are either broken or items that have been returned.  And they came in, and they picked up our damages, and they started going through our damaged stuff, and they were pretty much telling us, like 'Oh, you know, this, like, looks fine.  Like, this doesn't look like it's been used.' Or like, 'this you could like, just clean it up a little bit and still try to sell it.'  And even though I'd heard a lot of people say to them, like 'hey you know, like, that was returned, someone brought it home,' like, they didn't really seem to care.  They were pretty much just like 'No. It looks fine.  Put it back out on the floor.'  And of course, when there is a higher up manager there, you're [going to] listen to them."

184.    Obviously, since the "higher up" managers that Rahima refers to came to visit the store from the outside, those manager must have been at the District Manager level or higher.

## IX.    ULTA CHANGES ITS POLICY

185.    CW6 stated that once the public controversy of Ulta selling damaged returned products was disclosed, the biggest change that followed was that Ulta removed damaged goods as an element of how shrink was measured in regards to how shrink bonuses were calculated.  In essence, by no longer including damaged products as part of the shrink bonus calculation, the "temptation" for employees to try and reduce their shrink numbers by reselling damaged returned products was eliminated.

186.    CW1 confirmed that once the alleged scheme became known Ulta changed its method of calculating employees' shrink bonuses by removing damaged returned products as a component of shrink for purposes of calculating the shrink bonus.

---

[25] *See* https://www.youtube.com/watch?v=PQWjQxYFxqE, last visited September 10, 2018.

187. On February 14, 2018, if not earlier, Ulta posted the following language on its website:

> "**Returned Merchandise Policy** We take protecting the integrity of the products we sell very seriously. ***Ulta Beauty's policy does not permit the resale of used, damaged or expired products. Our policies, training and procedures are aimed at ensuring that only the highest quality products are sold in our stores and online.*** Our associates are trained to catalogue and then properly dispose of any returned items that have been used, damaged or expired. For more information, please click here.

188. Noticeably absent from this disclosure is any statement claiming Ulta's policy before this did not permit or require the sale of used products.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

189. In order to conceal the Company's true financial condition from investors throughout the Class Period, Defendants issued a series of pervasive and material misstatements and omitted material facts in the Company's public filings, press releases, conference calls, investor presentations and other documents. These material misstatements and omissions created the false impression that Ulta was selling new, quality products, when in reality it was surreptitiously engaged in a nationwide scheme designed to reduce inventory shrink by reshelving used, dirty products and selling them as new.

190. Throughout the Class Period, Defendants made the following categories of material misstatements and omissions concerning Ulta's undisclosed policy and practice of selling used products that the Company passed off as new, including, Ulta's: (A) compliance with the Company's Code of Business Conduct; (B) compensation program; (C) product quality; (D) net sales, net income, net inventory and profitability; (E) internal policy related to inventory and the shrink reserve; and (F) internal controls over financial reporting. The alleged material false and misleading statements and omissions are bolded and underlined below.

I.  **MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S COMPLIANCE WITH THE COMPANY'S BUSINESS CODE OF CONDUCT**

191.   On April 20, 2016, the first day of the Class Period, Ulta filed its Definitive Proxy Statement on Schedule 14A (the "2016 Proxy Statement"), signed by Ulta's General Counsel, Jodi Caro.

192.   In Ulta's 2016 Proxy Statement to shareholders, the Company touted that all of Ulta's corporate employees have complied and would continue to comply with the Company's Code of Business Conduct, stating, in pertinent part:

Code of Business Conduct

**All Ulta Beauty employees, officers and members of the Board of Directors must act ethically at all times and in accordance with the policies comprising the Ulta Beauty Code of Business Conduct.** All corporate employees, officers and members of the Board of Directors have signed a certificate acknowledging that they have read, understand **and will continue to comply with the policy**, and all corporate employees and officers are required to read and acknowledge this policy on an annual basis. Ulta Beauty includes the Code of Business Conduct in new hire materials for all corporate employees. The policy is published and any amendments or waivers thereto will be published under "Corporate Governance" in the Investor Relations section of the Ulta Beauty website located at *http://ir.ulta.com.*

193.   The applicable Code of Business Conduct at the time, which was incorporated to the 2016 Proxy Statement by reference and maintained continuously throughout the Class Period on the "Investor Relations" section of Ulta's website, also touted to investors that Ulta employees have complied and would continue to comply with the Code of Business Conduct stating that "**[Ulta] expects all Company employees to adhere to these standards**."

194.   Further, the last page of the Code of Business conduct contained a certification for employees to sign acknowledging that:

"I acknowledge that I received a copy of the Ulta Code of Business Conduct (the "Code"), that I have read the Code and that I understand it.  **I will comply with the Code.**  If I learn that there has been a violation or suspected violation of the Code, I will contact my manager, the Senior Vice President of Human Resources of the Ethics Hotline."

195.    The Code of Business Conduct stated, in relevant part:

The Company seeks to outperform its competition fairly and honestly. The Company seeks competitive advantages through superior performance, never through unethical or illegal business practices . . . **Each employee should endeavor to respect the rights and deal fairly with the Company's customers** . . . No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other illegal trade practice.

Our business success depends upon our ability to foster lasting customer relationships. **The Company is committed to dealing with customers fairly, honestly and with integrity. Information we supply to customers should be accurate and complete to the best of our knowledge. Employees should not deliberately misrepresent information to customers . . . .**

196.    Ulta's Definitive Proxy Statement on Schedule 14A filed with the SEC on April 19, 2017 (the "2017 Proxy Statement"), contained the same materially false and misleading statements concerning compliance with Ulta's Code of Business Conduct as contained in the 2016 Proxy Statement alleged above.

197.    The above statements were materially false and misleading when made because, unbeknownst to Ulta investors: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; (ii) Ulta employees were supplying false information to customers (*e.g.*, that used products were new and unused), subjecting Ulta to consumer, investor and regulatory actions, as well as reputational harm; and, thus, (iii) Ulta was in violation of the Company's Code of Business Conduct.

## II.    MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S COMPENSATION PROGRAM

198.    In the 2016 Proxy Statement, Ulta also falsely represented that the Company ensured its compensation policies and practices did not improperly incentivize employees to engage in conduct harmful to Ulta's business:

The Company reviewed its compensation plans, practices and policies and determined that **it does not have any such plans, practices and policies that create risks that are reasonably likely to have a material adverse effect on the Company** based on the following:

- the Company's variable compensation programs are linked to specific performance goals set by the compensation committee for executive officers and for other employees by supervisors **consistent with the Company's compensation philosophy and business goals**;

*     *     *

- **the mix between fixed and variable pay is balanced so as to neither discourage proper risk taking, nor encourage excessive risk taking**; . . . .

199. The 2017 Proxy Statement contained the same materially false and misleading statements concerning compensation policy and practices as contained in the 2016 Proxy Statement alleged above.

200. The above statements were materially false and misleading when made because Ulta's compensation admittedly incentivized employees to engage in the unsanitary practice of reselling used products by paying at least managers at the RVP level and below a shrink bonus essentially based on the number of used products they were able to resell as new products and threatening employees' jobs and promotions if they did not comply with Ulta's policy of reselling used products. Thus, in violation of Ulta's compensation policy, Ulta encouraged, not discouraged improper and excessive risk taking.

## III. MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S FINANCIAL PERFORMANCE

201. In the 2016 Proxy Statement, Defendants reported that:

Fiscal year 2015 was a strong year for us. We:

- **increased net sales by 21.1% to $3.9 billion;**
- **increased net income by 24.5% to $320.0 million;**
- **increased income per diluted share by 25.1%**; . . . .

202.     The above statements were materially false and misleading when made because: (i)
Ulta senior management was instructing and enforcing an undisclosed corporate policy that
required Ulta employees to resell used products, passing them off as new, in order to decrease
shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the
Company's financial performance was not sustainable.  Indeed, according to Ms. Ludwig and Ms.
Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50%
reduction in shrink expense, increased inventory by approximately the same amount and
contributed significantly to net sales—all of which was not disclosed to investors.

203.     On May 26, 2016, Ulta issued a Press Release reporting the Company's first quarter
2016 results for the period ending April 30, 2016 (the "May 26, 2016 Press Release").  The May
26, 2016 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on May 26, 2016
and signed by Jodi Caro, General Counsel.

204.     In the May 26, 2016 Press Release, Ulta reported the following:

- **Net sales increased 23.7% to $1,073.7 million from $868.1 million in
  the first quarter of fiscal 2015.**

- **Net income increased 37.4% to $92.0 million compared to $66.9
  million in the first quarter of fiscal 2015**.

- **Merchandise inventories at the end of the first quarter of fiscal 2016
  totaled $843.5 million, compared to $662.9 million at the end of the
  first quarter of fiscal 2015, representing an increase of $180.6
  million. Average inventory per store increased 14.5%, compared to
  the first quarter of fiscal 2015**. . . .

205.     That same day, Ulta held a conference call with analysts (the "May 26, 2016
Conference Call"). During the May 26, 2016 Conference Call, Defendant Settersten touted Ulta's
purported "healthy product margins" stating: "Gross profit increased 150 basis points. The
improvement was driven by strong leverage on store rent and occupancy expenses, **as well as by**

**healthy product margin expansion**, offset by planned supply chain deleverage related to investments in new distribution centers and core merchandising systems."

206.     Defendant Settersten further stated that "Inventories were up 14.5% on a per store basis, slightly below the comp rate. **This growth was driven by investments in inventory to keep up with better than expected top line growth**, new brand additions, and the accelerated expansion of prestige boutiques."

207.     On June 2, 2016, Ulta filed its First Quarter 2016 Form 10-Q for the period ending April 30, 2016 (the "2016 First Quarter Form 10-Q"), signed by Defendants Dillon and Settersten. The 2016 First Quarter Form 10-Q contained the same false and misleading financial statements concerning Ulta's net sales, net income and inventories as contained in the May 26, 2016 Press Release.

208.     The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable.  Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

209.     On June 14, 2016, Defendants attended a William Blair Growth Stock Conference. During the conference, Defendant Settersten responded to an analyst question about Ulta's shrink, stating:

> It is an issue for all retailers. I am sure you see the stories. I mean it is crazy the amount of losses that US retailers take every year on theft, whether it be internal,

external or just what they call administrative loss. There are so many products and so many locations that you can't -- it is difficult to track everything accurately all the time. **We are not seeing anything extraordinary from what we have had historically so there is certainly a good amount of shrink, what we call shrink embedded in our base and we haven't seen anything and we are continuing to add more resources and more new technologies to try to mitigate loss as best as we can**.

210.     The above statement was materially false and misleading when made because: (1) according to CWs 4, 5, 8 and Ludwig, at the time of Defendant Settersten's statement in June 2016, Ulta's shrink was significantly increasing; (ii) Ulta was not adding more resources to decrease shrink and, in fact, according to CW5, Ulta refused to hire additional personnel, including security guards, to reduce the theft aspect of shrink; and (iii) Ulta was, in fact, mitigating shrink losses through an undisclosed practice of reselling used products.

211.     On August 25, 2016, Ulta issued its second quarter Press Release for the period ending July 30, 2016 (the "August 25, 2016 Press Release").  The August 25, 2016 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on August 25, 2016 and signed by Jodi Caro, General Counsel.

212.     In the August 25, 2016 Press Release, Ulta reported the following:

- **Net sales increased 21.9% to $1,069.2 million from $877.0 million in the second quarter of fiscal 2015.**

- **Net income increased 21.3% to $90.0 million compared to $74.2 million in the second quarter of fiscal 2015**.

- **Merchandise inventories at the end of the second quarter of fiscal 2016 totaled $930.2 million, compared to $705.7 million at the end of the second quarter of fiscal 2015, representing an increase of $224.5 million**. **Average inventory per store increased 18.7%, compared to the second quarter of fiscal 2015. . . .** . . . .

213.     Also on August 25, 2016, Ulta filed its Second Quarter 2016 Form 10-Q for the period ending July 30, 2016 (the "2016 Second Quarter Form 10-Q"), signed by Defendants Dillon

and Settersten.  The 2016 Second Quarter Form 10-Q contained the same false and misleading financial statements concerning net sales, net income and inventories  as contained in the August 25, 2016 Press Release.

214.     The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable.  Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

215.     On December 1, 2016, Ulta issued its third quarter Press Release for the period ending October 31, 2016 (the "December 1, 2016 Press Release").  The December 1, 2016 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on December 1, 2016 and signed by Jodi Caro, General Counsel.

216.     In the December 1, 2016 Press Release, Ulta reported the following:

- **Net sales increased 24.2% to $1,131.2 million from $910.7 million in the third quarter of fiscal 2015.**

- **Net income increased 23.2% to $87.6 million compared to $71.1 million in the third quarter of fiscal 2015**.

- **Merchandise inventories at the end of the third quarter of fiscal 2016 totaled $1,137.0 million, compared to $884.4 million at the end of the third quarter of fiscal 2015, representing an increase of $252.6 million. Average inventory per store increased 16.5%, compared to the third quarter of fiscal 2015**. . . .

64

217.    On December 1, 2016, Ulta also filed its Third Quarter 2016 Form 10-Q for the period ending October 31, 2016 (the "2016 Third Quarter Form 10-Q"), signed by Defendants Dillon and Settersten.  The 2016 Third Quarter Form 10-Q contained the same false and misleading statements concerning net sales, net income and inventories as contained in the December 1, 2016 Press Release.

218.    The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable.  Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

219.    On March 9, 2017, Ulta issued its fourth quarter Press Release for the period ending January 30, 2017 (the "March 9, 2017 Press Release").  The March 9, 2017 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on March 9, 2017 and signed by Jodi Caro, General Counsel.

220.    In the March 9, 2017 Press Release, Ulta reported the following:

- **Net sales increased 24.6% to $1,580.6 million from $1,268.3 million in the fourth quarter of fiscal 2015.**

- **Net income increased 30.0% to $140.2 million compared to $107.8 million in the fourth quarter of fiscal 2015**.

- **Merchandise inventories at the end of the fourth quarter of fiscal 2016 totaled $944.0 million, compared to $761.8 million at the end of the fourth quarter of fiscal 2015, representing an increase of $182.2 million**. . . .

221.    The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable.  Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

222.    On March 28, 2017, Ulta filed the Company's Form 10-K for the fiscal year-ended January 30, 2016 with the SEC (the "2016 Form 10-K"), signed by Defendants Dillon and Settersten, as well as the Ulta Board of Directors.  The 2016 Form 10-K and the 2017 Proxy Statement contained the same materially false and misleading statements regarding Ulta's net sales, net income and inventory as the March 9, 2017 Press Release.

223.    In addition, the 2016 Form 10-K reported a Shrink Reserve roll-forward as follows:

| Shrink Reserve | Year-ended January 30, 2016 |
| --- | --- |
| Balance at beginning of period | $15,259 |
| Charged to costs and expenses | $35,505 |
| Deductions[26] | ($31,699) |
| Balance at end of period | $19,065 |

---

[26] "Deductions" represents inventory write-offs, while "Charged to costs and expenses" represents the estimated provision for inventory shrinkage.

224.    The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; (ii) as a result of Ulta's improper undisclosed practices, the Company's shrink was worse than publically disclosed; and, thus, (iii) Ulta's financial performance was not sustainable.    Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense.

225.    On May 25, 2017, Ulta issued a Press Release announcing the Company's first quarter 2017 financial results for the period ending April 29, 2017 (the "May 25, 2017 Press Release"). The May 25, 2017 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on May 25, 2017 and signed by Jodi Caro, General Counsel.

226.    In the May 25, 2017 Press Release, Ulta reported the following:

- **Net sales increased 22.5% to $1,314.9 million from $1,073.7 million in the first quarter of fiscal 2016.**

- **Net income increased 39.4% to $128.2 million compared to $92.0 million in the first quarter of fiscal 2016**.

- **Merchandise inventories at the end of the first quarter of fiscal 2017 totaled $1,048.4 million, compared to $843.5 million at the end of the first quarter of fiscal 2016, representing an increase of $204.9 million. Average inventory per store increased 11.2%, compared to the first quarter of fiscal 2016.**. . . .

227.    On June 1, 2017, Ulta filed its First Quarter 2017 Form 10-Q for the period ending April 29, 2017 (the "2017 First Quarter Form 10-Q"), signed by Defendants Dillon and Settersten. The 2017 First Quarter Form 10-Q contained the same false and misleading statements about Ulta's net revenue, net income and inventory as the May 25, 2017 Press Release.

228. The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable. Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

229. On August 24, 2017, Ulta issued a Press Release announcing the Company's second quarter 2017 financial results for the period ending July 29, 2017 (the "August 24, 2017 Press Release"). The August 24, 2017 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on August 24, 2017 and signed by Jodi Caro, General Counsel.

230. In the August 24, 2017 Press Release, Ulta reported the following:

- **Net sales increased 20.6% to $1,289.9 million from $1,069.2 million in the second quarter of fiscal 2016.**

- **Net income increased 26.9% to $114.2 million compared to $90.0 million in the second quarter of fiscal 2016**.

- **Merchandise inventories at the end of the second quarter of fiscal 2017 totaled $1,144.7 million, compared to $930.2 million at the end of the second quarter of fiscal 2016, representing an increase of $214.5 million. Average inventory per store increased 10.5% compared to the second quarter of fiscal 2016**. . . .

231. On August 24, 2017, Ulta held a conference call with analysts (the "August 24, 2017 Conference Call"). During the August 24, 2017 Conference Call, when asked by analyst Jason Matthew Gere of KeyBanc Capital Markets Inc. for clarity on the drivers for expected

improvement in Ulta's margins and bottom line, Defendant Settersten cited a reduction of shrink as one of the key drivers:

> And as far as, I guess, P&L line drivers, right, Jason, just directional. So we said for the third quarter, gross profit, slight deleverage; and SG&A, flattish. I mean, the biggest driver is the preopening expense deleverage year-over-year, which again, I want to make people understand that's a good thing, right. I mean, it's a near-term headwind for us, but we're pulling stores forward, right, from where we had planned earlier in the year. And so those stores will get open sooner. They'll start generating profits quicker, and they'll help our store teams be more prepared going into holiday. It helps a litany of things, **shrink among many other things that we deal with day to day.** So that's a good investment from an investor perspective.

232.    On August 31, 2017, Ulta filed its Second Quarter 2017 Form 10-Q for the period ending July 29, 2017 (the "2017 Second Quarter Form 10-Q"), signed by Defendants Dillon and Settersten.  The 2017 Second Quarter Form 10-Q contained the same false and misleading statements as the August 24, 2017 Press Release.

233.    The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; (ii) Defendants failed to disclose that the anticipated reduction in shrink was actually attributable to Ulta's undisclosed practice of reselling used products in a Company-wide, pervasive practice directed by upper management; and (iii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable. Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

234.    On November 30, 2017, Ulta issued a Press Release announcing the Company's third quarter 2017 financial results for the period ending October 28, 2017 (the "November 30, 2017 Press Release"). The November 30, 2017 Press Release was attached to Ulta's Form 8-K filed, filed with the SEC on November 30, 2017 and signed by Jodi Caro, General Counsel.

235.    In the November 30, 2017 Press Release, Ulta reported the following:

- **Net sales increased 18.6% to $1,342.2 million from $1,131.2 million in the third quarter of fiscal 2016. The Company estimates that Hurricanes Harvey and Irma resulted in approximately $14 million in lost sales.**

- **Net income increased 19.5% to $104.6 million compared to $87.6 million in the third quarter of fiscal 2016**.

- **Merchandise inventories at the end of the third quarter of fiscal 2017 totaled $1,349.7 million, compared to $1,137.0 million at the end of the third quarter of fiscal 2016, representing an increase of $212.7 million. Average inventory per store increased 6.5% compared to the third quarter of fiscal 2016**. . . .

236.    On November 30, 2017, Ulta also filed its Third Quarter 2017 Form 10-Q for the period ending October 28, 2017 (the "2017 Third Quarter Form 10-Q"), signed by Defendants Dillon and Settersten. The 2017 Third Quarter Form 10-Q contained the same false and misleading statements as the November 30, 2017 Press Release.

237.    The above statements were materially false and misleading when made because: (i) Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new, in order to decrease shrinkage and increase sales; and (ii) as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable. Indeed, according to Ms. Ludwig and Ms. Geier, Ulta's undisclosed practice of reselling used products accounted for an approximate 50%

reduction in shrink expense, increased inventory by the same amount and contributed significantly to net sales—all of which was not disclosed to investors.

## IV.    MATERIAL MISSTATEMENTS AND OMISSIONS RELATED TO ULTA'S PRODUCT QUALITY

238.    As discussed above, Ulta's business is dependent upon the "customer experience" to drive customers into the Company's stores.  Thus, throughout the Class Period, Defendants repeatedly, assured investors that Ulta's success was the result of offering a wide variety of quality products to its customers.  In reality, however, Ulta was engaged in a Company-wide, pervasive practice of selling its customers used products.

239.    For example, during the May 26, 2016 Conference Call with analysts, Defendant Dillon falsely attributed Ulta's purported strong financial performance and increased sales and earnings for the First Quarter of 2016 to "**the guest experience**" at Ulta's stores:

> **In terms of the drivers, honestly, it's really a combination of a lot of factors . . . Then in addition, of course, it's about what we sell in the store, and the service that we give, and the services and the guest experience.**

240.    This statement was materially false and misleading when made because Ulta senior management was instructing and enforcing an undisclosed corporate policy that required Ulta employees to resell used products, passing them off as new.  Thus, the products Ulta was selling in its retail and online store were not enhancing the guest experience in the manner customers and investors came to expect, in violation of Ulta's Business Code of Conduct.

241.    Similarly, Defendant Dillon was quoted in the August 25, 2016 Press Release as attributing Ulta's success in large part to the "newness" of its products:

> The Ulta Beauty team achieved another quarter of excellent top and bottom line performance, while making significant progress on many elements of our growth strategy. **Our second quarter results reflect a strong pipeline of newness and innovation in merchandising**, progress in growing our brand awareness, major

71

milestones related to our loyalty program, continued rapid growth in our e-commerce business, and successful execution of our supply chain investments.

242.    This statement was materially false and misleading when made because Ulta's purported pipeline "of newness" actually reflected sales of used products to unsuspecting consumers. Thus, the products Ulta was selling in its retail and online store were not enhancing the guest experience in the manner customers and investors came to expect, in violation of Ulta's Business Code of Conduct.

243.    On December 1, 2016, Ulta held a conference call with analysts (the "December 1, 2016 Conference Call"). During the December 1, 2016 Conference Call, Defendant Dillon, again, touted Ulta's "guest experience" as a key factor to Ulta's success:

> On the systems side, we're starting to see benefits from the core merchandise systems we recently implemented. SWIFT, our new forecasting replenishment tool, continues to ramp up and help us optimize inventory. **Our store level in stocks are improving and more of our inventory is in our stores, versus in our DCs, improving the guest experience**. We now have all of the tools in place to help us make better, more data based assortment and inventory decisions.

244.    In response to a question by analyst Matthew Fassler of Goldman Sachs during the December 1, 2016 Conference Call about the "primary catalyst to drive" sales momentum in the third quarter, Defendant Dillon responded:

> Honestly, I would say it's a convergence of multiple factors, some of which you just said. So we've been on a path for a while to drive increased brand awareness, that obviously starts with that. People need to know who we are. I would say the assortment of products of brands, the acceleration of new brands and the, frankly the great performance of newness, of new brands **and newness within existing brands has been a key factor**. . .
>
> *          *          *
>
> So in store, the experience we think just gets better. Our associates have done a fantastic job of converting guests into our loyalty program, and obviously our loyalty members are driving the majority of our sales. And of course our in stocks are getting better all the time and supply chain and systems **and teams behind those are working to just make sure that guests have what they want.** So I hate

72

to throw the laundry list at you. But it's really a combination of all of those factors working in concert.

245.     When asked by analyst Adrienne Yih of Wolfe Research about how 2016's Black Friday stats compared to the prior year, Defendant Dillion, again, touted the purported "newness" of Ulta's products and the guest experience:

> I would say there's kind of a few things, **that one is that really, it's about what we sell, what we offer. So I mentioned some of this already, but we've really got great new brands, existing brands with great newness**. And then I would say we just keep raising our game as it relates to whether it's partnering with our brand partners and exclusives and great holiday kits, or really raising our own game, like on our Ulta Beauty collection blockbusters and products.
>
> So that, I would say, is a continuation of just improving. It's not new, but it's what we do, but doing it better. Even our gift with purchase is stronger than a year ago. And then really pull together in a really fantastic 360-degree marketing plan. So more to come in the holiday and I'm pleased with how it's starting in store and online, frankly. **And again, I said that our store teams and our supply chain working together to make sure that the experience is great for the guest**.

246.     These statements were materially false and misleading when made because Ulta's pipeline "of newness" actually reflected sales of used products to unsuspecting consumers. Thus, the products Ulta was selling in its retail and online store were not enhancing the guest experience in the manner customers and investors came to expect, in violation of Ulta's Business Code of Conduct.

247.     On November 30, 2017, Ulta held a conference call with analysts (the "November 30, 2017 Conference Call"). During the November 30, 2017 Conference Call, Defendant Dillon assured investors that Ulta was focusing on "cost optimization" as it related to inventory and "guest experience" while failing to tell investors that the purported cost optimization included reselling used products and, thus, Ulta was not delivering "exceptional guest experiences:"

> And finally to update you on our supply chain operations. We continue to develop capabilities and leverage economies of scale in our distribution network **to deliver exceptional guest experiences while focusing on cost optimization**.

248.     The above statement was materially false and misleading when made because the purported cost optimization included reselling used products and, thus, Ulta was not delivering "exceptional guest experiences:"

## V.     MATERIAL MISSTATEMENTS AND OMISSIONS CONCERNING ULTA'S INTERNAL CONTROLS OVER FINANCIAL REPORTING

249.     Throughout the Class Period Defendants had a duty to design and/or supervise Ulta's internal controls over financial reporting.

250.     In the Code of Business Conduct, which was incorporated by reference into the 2016 Proxy Statement as well as the 2017 Proxy Statement, Ulta stated that:

**XVII. Record-Keeping, Financial Controls and Disclosures**

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must accurately and honestly reflect all transactions, must comply with applicable legal requirements and generally accepted accounting principles, and must conform to the Company's system of internal controls. No false or misleading entries may be made in the books, records or accounts. No undisclosed or unrecorded funds or assets may be established or maintained, directly or indirectly, for any purpose. Employees are required to maintain and adhere to the Company's internal control procedures. Employees are also required to retain and destroy records in accordance with the Company's record retention policies.

Employees are expected to provide full, fair, accurate, timely and understandable disclosures in reports or documents filed with, or submitted to, the SEC or any stock exchange, as well as in press releases or public communications. Dishonest or unethical reporting is strictly prohibited.

Employees are expected to fully cooperate with and provide complete information as requested by the Company's independent auditor **and to avoid any action that** may coerce, manipulate or fraudulently influence the independent auditors, or that **could cause the Company's financial statements to be materially misleading**.

251.     In the First Quarter Form 10-Q, Defendants falsely claimed to have controls and procedures in place to ensure all material information is known to the officers who certify Ulta's financial reports and that Ulta's controls were "effective:"

We have established disclosure controls and procedures to ensure that material information relating to the Company is made known to the officers who certify our financial reports and to the members of our senior management and Board of Directors. **Based on management's evaluation as of April 30, 2016, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, are effective** to ensure that the information required to be disclosed by us in our reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

252.     Defendant Dillon also signed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 that Ulta's First Quarter 2016 Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact:

### CERTIFICATION PURSUANT TO
### RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES
### EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Mary N. Dillon, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Ulta Salon, Cosmetics & Fragrance, Inc.;

2.  Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.  Based on my knowledge, **the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.**

b) **Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;**

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: June 2, 2016                    By: /s/ Mary N. Dillon _____
                                          Mary N. Dillon
                                          Chief Executive Officer and Director

253.    Defendant Settersten made the same false and misleading statements regarding

Ulta's internal controls in a nearly identical Sarbanes-Oxley certification pursuant to Section 302.

76

254.    Defendant Dillion further certified pursuant to Section 906 of the Sarbanes-Oxley

Act of 2002 that:

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to 18 U.S.C. §1350 (adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002), I, the Chief Executive Officer and Director of Ulta Salon, Cosmetics & Fragrance Inc. (the "Company"), hereby certify that the Quarterly Report on Form 10-Q of the Company for the quarterly period ended April 30, 2016 (the "Report"), **fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company**.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Date: June 2, 2016                              By: /s/ Mary N. Dillon
                                                    Mary N. Dillon
                                                    Chief Executive Officer and Director

255.    Defendant Settersten made the same false and misleading statements regarding

Ulta's internal controls in a nearly identical Sarbanes-Oxley certification pursuant to Section 906.

256.    The 2016 Second Quarter Form 10-Q,  2016 Third Quarter Form 10-Q, 2016 Form

10-K, 2017 First Quarter Form 10-Q, 2017 Second Quarter Form 10-Q and 2017 Third Quarter

Form 10-Q contained identical material misrepresentations made by Defendants Dillon and

Settersten as set forth above in paragraphs 252, 254 regarding Ulta's internal controls.

257.    In the 2016 Form 10-K, Defendants further misrepresented that:
Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is a process designed by, or under the supervision of, the principal executive officer and principal financial officer and effected by the Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial

statements for external purposes in accordance with GAAP. Under the supervision and with the participation of our principal executive officer and our principal financial officer, management evaluated the effectiveness of our internal control over financial reporting as of January 28, 2017, based on the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO). **Based on this evaluation, our principal executive officer and principal financial officer concluded that our internal controls over financial reporting were effective as of January 28, 2017.**

258. The above statements were materially false and misleading when made because Defendants: (i) engaged in an undisclosed practice to resell used products, passing them off as new, and incentivized and/or threatened employees to comply with the practice, which caused the Company's financial condition to be misrepresented and overstated; (ii) violated Ulta's Code of Business Conduct; (iii) violated Ulta's own internal accounting policies relating to inventory; (iv) failed to adhere to Ulta's compensation philosophy; and (v) as a result of (i) through (iv) above, Ulta's internal controls were not effective and the deficiencies of Ulta's internal controls were well-known by Ulta's employees.

## VI. MATERIAL MISSTATEMENTS AND OMISSIONS CONCERNING ULTA'S COMPLIANCE WITH INTERNAL POLICIES RELATED TO SALES RETURNS, INVENTORY AND THE SHRINK RESERVE

259. The 2016 First Quarter Form 10-Q misleadingly represented that Ulta's "**[m]erchandise sales are recorded net of estimated returns**." With respect to shrink, the 2016 First Quarter Form 10-Q misrepresented that "**[c]ost of sales includes: … shrink and inventory valuation reserves**." The 2016 Second Quarter Form 10-Q and 2016 Third Quarter Form 10-Q contained identical material misrepresentations.

260. The above statements were materially false and misleading when made because Ulta was engaged in the undisclosed practice of selling used products as new in order to reduce shrink. Thus, Merchandise Sales and Cost of Sales were actually being recorded net of estimated

returns, offset by approximately 50% of those returns being resold as new and, thus, the Company's reported financial results and prospects were unsustainable.

261.    The 2016 Form 10-K, First Quarter 2017 Form 10-Q and 2017 Second Quarter Form 10-Q similarly falsely stated that Ulta's "**Stores and e-commerce merchandise sales are recorded net of estimated returns**" and "**[c]ost of sales includes: … shrink and inventory valuation reserves.**"

262.    The 2017 Third Quarter Form 10-Q similarly and misleadingly stated that **"[r]etail store and e-commerce sales are recorded net of estimated returns**" and "**[c]ost of sales includes: … shrink and inventory valuation reserves.**"

263.    The above statements were materially false and misleading when made because Ulta was engaged in the undisclosed practice of selling used products as new in order to reduce shrink.  Thus, Merchandise Sales and Cost of Sales were actually being recorded net of estimated returns, offset by approximately 50% of those returns being resold as new and, thus, the Company's reported financial results and prospects were unsustainable.

264.    In addition, with respect to the Company's internal inventory valuation policy, the 2016 Form 10-K misrepresented that:

> Inventories are adjusted for the results of periodic physical inventory counts at each of our locations.  **We record a shrink reserve representing management's estimate of inventory losses by location that have occurred since the date of the last physical count. This estimate is based on management's analysis of historical results and operating trends**.
>
> **We do not believe that there is a reasonable likelihood that there will be a material change in the future estimates or assumptions we use to calculate our lower of cost or market or shrink reserves**.  Adjustments to earnings resulting from revisions to management's estimates of the lower of cost or market and shrink reserves have been insignificant during fiscal 2016, 2015 and 2014. An increase or decrease in the lower of cost or market reserve of 10% would have had no material impact on our pre-tax income for fiscal 2016. **An increase or decrease in the**

**shrink rate included in the shrink reserve calculation of 10% would have had
no material impact on our pre-tax income for fiscal 2016**.

265.    The above statements were materially false and misleading when made because: (i) Ulta was engaged in the undisclosed practice of selling used products as new in order to reduce shrink; (ii) thus, Merchandise Sales and Cost of Sales were actually being recorded net of estimated returns, offset by approximately 50% of those returns being resold as new; (iii) the shrink reserve did not represent management's best estimate of inventory losses or historical trends because it was based upon an inaccurate and unsustainable practice of reselling returned, used products; and (iv) as a result of (i) through (iii) above, there would be, and was, a material change to future estimates of the shrink reserve, as demonstrated by the $4 million, or 20% reduction to the shrink reserve in 2017 due to Ulta's unsanitary practices.

### THE TRUTH IS REVEALED THROUGH A SERIES OF
### PARTIALLY CORRECTIVE DISCLOSURES

266.    On January 10, 2018, during trading hours multiple media outlets reported on the firestorm of tweets that went viral on Twitter after @fatinamxo blew the whistle on the Company's practice of reshelving used returns.[27]   The market first began to absorb the extent of the fraud, however that news was tempered by the Company's false denials as shown above.

267.    On these reports, Ulta's share price fell from a closing price of $232.92 on January 9, 2018 to a closing price of $230.45 on January 10, 2018.

---

[27] *See* https://www.elitedaily.com/p/does-ulta-sell-used-makeup-these-former-employees-claim-yes-twitter-is-not-happy-7852773, last visited September 10, 2018; *see also* http://www.revelist.com/beauty-news-/ulta-makeup/11147/ulta-has-responded-to-many-of-the-twitter-users-with-these-complaints-to-confirm-that-the-brand-does-not-condone-the-resale-of-used-makeup/11, last visited September 10, 2018.

268.    On February 9, 2018, at market close, media outlets including the *Chicago Tribune*[28] and *The State Journal-Register*[29] reported that a consumer class action lawsuit had been filed against Ulta, alleging that the Company engaged in the "widespread and surreptitious" practice of repackaging returned cosmetics and re-shelving them alongside unblemished products to sell at full price.  According to the lawsuit, "dozens of other current and former Ulta employees from retail location all over the country confirmed that substantially similar practices also occurred at the Ulta stores where they worked."

269.    On this news, Ulta's share price fell $9.07, or 4.15%, to close at $209.48 on February 12, 2018, the following trading day.

270.    Then, on February 23, 2018 *CBS News*[30] published a story on its website entitled "Former Ulta Beauty employee says she felt pressured to resell used products," reporting on statements made by multiple former Ulta employees, including Ludwig, to the effect that Ulta store managers frequently pressured the Company's employees to clean and resell used products.  The article stated in relevant part:

> "'We were told by managers to repackage/reseal the item and put it back on the shelf' the social media post reads.  'They would resell EVERYTHING. (makeup, hair care, skincare, fragrance, hair tools, etc.)," the associate wrote in another post.
>
> The former employee included photos of products.  In one example, she alleges that Ulta employees would clean a used foundation stick with a Q-Tip and resell it.  Other people joined in, posting their experiences from around the country.
>
> 'I felt duped,' Brown said.  'For somebody to come forward like that is a pretty big deal, it sends a big red flag in my book.'
>
> ***

---

[28]    *See*        http://www.chicagotribune.com/business/ct-biz-ulta-lawsuit-resold-used-cosmetics-20180209-story.html, last visited September 10, 2018.

[29]    *See*    http://www.sj-r.com/news/20180210/lawsuit-alleges-ulta-resold-used-cosmetics-as-new, last visited September 10, 2018.

[30]    *See*    https://www.cbsnews.com/news/ulta-beauty-former-manager-admits-to-reselling-used-products/, last visited September 10, 2018.

But the former Ulta Beauty store operations manager Brittany Ludwig says at one store she saw them 'cleaning' lip products and eye shadows.

At another, she said, shampoos, lotions, and other items in bottles were put back on the shelf.

She says some of that she did herself because higher-level managers pressured the stores to keep the dollar amount for damaged or returned goods down.

'We had other managers come in from other stores and they were saying 'OK, yeah, you need to clean all these returns, you need to clean this, this is how you're going to get your numbers down' it was all a numbers game' she said. 'I don't feel so great about doing it now, but at the time that's what I was told to do my job.''

271.     On this CBS News report, Ulta's share price fell $8.18 per share or 3.94%, to close at $198.93 on February 26, 2018.

272.     Having been exposed on Twitter, Defendants reacted not by disclosing the full extent of the truth, but rather by doubling down and issuing false denials of their deceptive conduct. Indeed Ulta, as shown below, issued multiple responses to individuals on Twitter on January 10, 2018 claiming that "we do not sell used products."



273.     As evidenced by the allegations of the plaintiffs in the Consumer Class Action and former Ulta employees, these statements were false and misleading because the fraud continued until at least March 2018.

274.     Moreover, on February 14, 2018, if not earlier, Ulta posted the following language on its website:

> "**Returned Merchandise Policy** We take protecting the integrity of the products we sell very seriously. ***Ulta Beauty's policy does not permit the resale of used, damaged or expired products. Our policies, training and procedures are aimed at ensuring that only the highest quality products are sold in our stores and online.*** Our associates are trained to catalogue and then properly dispose of any returned items that have been used, damaged or expired. For more information, please click here."[31]

---

[31] *See* https://web.archive.org/web/20180214203735/https://www.ulta.com/ulta/guestservices/guestServicesCenterDetails.jsp, last visited September 10, 2018.

275.    Upon information and belief, Ulta has displayed substantially similar language on Ulta.com denying the resale of "used, damaged or expired products" ever since.[32]  When users click on the link that is attached to the text reading "please click here," they are brought to a page containing an embedded video of Steelman.[33]  Steelman asserts that Defendants are "aware of, have been reviewing, and taking actions in response to the claims that were shared on social media."  Tellingly, Steelman does not claim that the alleged conduct violated Ulta's policies at the time such conduct occurred.  Rather, Steelman issues a negative pregnant denial, stating only that the claims that were shared on social media "represent a clear departure from our *current* policies."

276.    Similarly, rather than a full-throated disavowal of the existence of the practice during the Class Period, Dillon gave the same sort of negative pregnant denial during an earnings call on March 15, 2018.  Specifically, Dillon stated "we do not sell used, damaged or expire products . . . ."  Dillon's statement rings hollow, and can only be viewed as an after-the-fact remedial measure implemented once Defendants' fraud was exposed.  Unsurprisingly, when a market analyst inquired about the exposure of the alleged practice, and any relation that practice might have to Ulta's more "narrow" price guidance, he was conveniently cut off the line without explanation.

277.    The statements in the preceding paragraphs were false and misleading when made because the fraud continued until at least March 2018, and were intended, at least in part, to mislead shareholders and prevent them from discovering the entire truth.  Moreover, Defendants' decision to publicly disseminate return policies on its website evidences that Defendants consider the

---

[32]  *See e.g.*, https://www.ulta.com/guestservices/guestServicesCenterDetails.jsp, last visited September 10, 2018.
[33]  *See* https://www.ulta.com/policy-against-reselling-used-makeup/, last visited September 10, 2018.

existence such policies, and their substance, to be information that Ulta's stakeholders, including its investors, find material.

## VII.    INJURED CONSUMERS FILE SUIT

278.    As Defendants' scheme became exposed, various stakeholders asserted claims that corroborate its pervasiveness and extent.  On January 26, 2018, Kimberly Laura Smith-Brown filed an action in this district captioned *Smith-Brown v. Ulta Beauty, Inc.*, and bearing docket number No. 18-cv-610 (JLA) (MDW).  Ms. Smith-Brown asserts various causes of action against Ulta on behalf of herself and all similarly situated Ulta customers.  On February 8, 2018, Meghan DeVries filed a class action alleging similar claims in the Circuit Court of Cook County, Illinois, that was removed to this district on February 16, 2018.[34]  On March 7, 2018, Paula M. Ogurkiewicz filed a class action alleging similar claims in the Circuit Court of Cook County, Illinois, that was removed to this district on April 5, 2018.[35]  The *DeVries* and *Ogurkiewicz* actions were consolidated with the *Smith-Brown* action on April 19, 2018 (collectively *Smith-Brown*).

279.    The operative complaint in *Smith-Brown* is a Second Amended Class Action Complaint (Docket No. 91, the "*Smith-Brown* SAC") that was filed on June 6, 2018.  The *Smith-Brown* SAC contains 22 named plaintiffs from 18 different states.  Allegations of a subset of those plaintiffs are more fully set forth as follows.

280.    Kimberly Laura Smith-Brown, a plaintiff in the *Smith-Brown* action and a resident of the State of California, alleges that she purchased dozens of products at an Ulta store in Sherman Oaks, California, as recently as December 22, 2017.  In November 2017, Ms. Smith-Brown avers

---

[34] *DeVries v. Ulta Beauty, Inc.*, No. 18-cv-2445 (JLA).
[35] *Ogurkiewicz v. Ulta Beauty, Inc.*, No. 18-cv-2445 (JLA).

that she was treated for a sty on her eyelid which was caused by used eye makeup from Ulta. The sty allegedly left a scar on Smith-Brown's eyelid.

281.    Kris Dane, a plaintiff in the *Smith-Brown* action and a resident of the State of Nevada, alleges that she purchased dozens of products at an Ulta Store in Henderson, Nevada, as recently as February 2018. Ms. Dane alleges that after she purchased and applied a face exfoliate from an Ulta store in May 2017, it stung and burned her face, smelled bad, and caused a rash to develop. Ms. Dane asserts that the item was used and resold, given that she had used the same exfoliate product previously without a negative reaction.

282.    Karen Eonta, a plaintiff in the *Smith-Brown* action and a resident of the Commonwealth of Pennsylvania, alleges that she regularly purchased items at Ulta stores, as recently as February 2018. Ms. Eonta asserts that she purchased used products at Ulta stores multiple times that caused her to suffer skin irritation and infections.

283.    Valarie Hitchison, a plaintiff in the *Smith-Brown* action and a resident of the State of Wisconsin, alleges that she regularly purchased items at Ulta stores. Ms. Hutchison asserts that purchased mascara from Ulta in 2016 that was used and caused her to suffer an eye infection. Ms. Hutchison's injuries required treatment from a physician.

284.    Kristen Jackson, a plaintiff in the *Smith-Brown* action and a resident of the State of Indiana, alleges that she regularly purchased items from Ulta stores in Indiana, including the Noblesville, Carmel, and Muncie locations. Ms. Jackson asserts that she purchased products from Ulta as recently as December 2017. During that December 2017 visit to an Ulta store she allegedly observed an item on the shelf containing pressed powder foundation with applicator sponges that visibly appeared to have been used and resealed.

285.    Cristina Kovacs, a plaintiff in the *Smith-Brown* action and a resident of the State of Illinois, alleges that she regularly purchased items from Ulta at a store located in Chicago, Illinois. Ms. Kovacs asserts that in December 2017, she purchased a used eye shadow palette from Ulta. One of the colors in the palette was allegedly of a different texture than the other, in that it was worn down and looked as though it was disrobed by someone placing a finger or makeup brush onto the eye shadow.

286.    Michelle Musk, a plaintiff in the *Smith-Brown* action and a resident of the State of Rhode Island, allegedly purchased dozens of products from an Ulta store in Warwick, Rhode Island in 2017. Ms. Musk asserts that in 2017, Ulta sold her: used mascara that had a build-up of mascara on the brush; used foundation that already had makeup on the puff; and visibly used eyeshadow.

287.    Paula Ogurkiewicz, a plaintiff in the *Smith-Brown* action and a resident of the State of Illinois, alleges that she regularly purchased products from Ulta. Ms. Ogurkiewicz asserts that she purchased moisturizer from Ulta that was used and caused her to suffer skin irritation.

288.    Veronica Sanders, a plaintiff in the *Smith-Brown* action and a resident of the State of Georgia, alleges that she regularly purchased products from Ulta, as recently as February 2018. Ms. Sanders asserts that in February 2018 she purchased mascara from Ulta that was used and caused her to suffer an eye infection.

289.    Deanna Shaw, a plaintiff in the *Smith-Brown* action and a resident of the State of Washington, alleges that she regularly purchased products from Ulta, as recently as December 12, 2017. Ms. Shaw asserts that she purchased moisturizer from Ulta that she could tell was used as it did not contain the usual seal that would normally be on the inside lid. Ms. Shaw asserts that the used moisturizer caused her to suffer a bacterial infection that formed spots and rashes on her

face. Ms. Shaw alleges that she was required to visit a physician, undergo treatment with antibiotics, and miss work. Additionally, Ms. Shaw asserts that she purchased brow makeup and eyeliner from Ulta that was dried out, as if used.

290. Shasta Swaney, a plaintiff in the *Smith-Brown* action and a resident of the State of South Carolina, alleges she regularly purchased products at Ulta, most recently on March 8, 2018. On that date, Ms. Swaney asserts that she purchased lip balm from Ulta. When she returned home with the item, Ms. Swaney observed that someone had touched the lip balm with a finger as pictured:



291. Allison Sot, a plaintiff in the *Smith-Brown* action and a resident of the State of New Jersey, alleges that she regularly shopped for herself and her daughter at the Company's Watchung, New Jersey location for the last three to four years. Ms. Sot's daughter would occasionally purchase products from Ulta using her Ulta rewards account information. Ms. Sot asserts that in the winter of 2017 either she or her daughter purchased used mascara from the Watchung Ulta store which was contaminated and caused her daughter to suffer an eye infection. Her daughter had allegedly used that particular brand of mascara on numerous prior occasions without incident.

292. Colleen Thornton, a plaintiff in the *Smith-Brown* action and a resident of the State of New York, alleges that she regularly purchased products from Ulta at its Watertown and Syracuse, New York stores, as well as its Chicago, Illinois store. Ms. Thornton asserts that in mid-September 2017 she purchased eye makeup from Ulta in New York that was used and caused her to suffer an eye infection.

293. Jessica Tift, a plaintiff in the *Smith-Brown* action and a resident of the State of Washington, alleges that she regularly purchased products from Ulta, as recently as February 9, 2018. Ms. Tift asserts that on that date she purchased used mascara from Ulta. Ms. Tift asserts that the mascara was contaminated and caused her to suffer pink eye. Ms. Tift allegedly was required to visit a physician, undergo treatment with antibiotics, and miss work.

294. Tammy Walker, a plaintiff in the *Smith-Brown* action and a resident of the State of Alabama, alleges that she purchased dozens of products at an Ulta store in Mobile, Alabama. Ms. Walker asserts that in November 2017, she purchased a mascara from Ulta that she could tell was used as it was already dried out the first time she opened it. If the mascara had never been opened, it would not have been dried out. The fact that the mascara was dry indicates that it was repeatedly opened and exposed to air or that someone had previously used up most of the liquid inside.

295. Donna Williams, a plaintiff in the *Smith-Brown* action and a resident of the Commonwealth of Virginia, alleges that she purchased products from Ulta on numerous occasions. Ms. Williams asserts that she purchased eyeliner from Ulta that was used and caused her to eyes to become irritated and redden.

296. In support of their claims, the plaintiffs in the *Smith-Brown* action obtained sworn declarations from former Ulta employees who confirmed that they were directed by their superiors to retouch and reshelf used products pursuant to Ulta's policy to minimize shrink at all cost. *See*

Exhibits A (Tammy Geier), B (Kami Turner), C (Ella Soto), D (Laura Hornick), and E (Michael Fisher), hereto. All five of the former employees who submitted declarations in the *Smith-Brown* action describe how they were instructed to reshelf used products for resale.

## ADDITIONAL SCIENTER ALLEGATIONS

297.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

298.    The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Ulta and thus controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

299.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price and profit from insider sales of large blocks of their personal holdings of Ulta stock. The Individual Defendants' scienter may be imputed to Ulta as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

## I. THE INDIVIDUAL DEFENDANTS INTENTIONALY, KNOWINGLY AND/OR RECKLESSLY MADE FRAUDULENT REPRESENTATIONS

### A. The Widespread and Pervasive Extent of Defendants' Fraud Supports an Inference of Scienter

300.    As set forth above, Defendants' fraudulent conduct permeated throughout each region of the country from coast to coast.  Plaintiffs have confirmed through confidential sources that Ulta's practice of reselling used products occurred at the overwhelming majority of the Company's stores.  Although Plaintiffs were unable to confirm the directive for all Ulta regions, upon information and belief, Plaintiffs believe that this practice was being directed by RVPs of all Ulta regions.

301.    Given the widespread and pervasiveness of Defendants' misconduct, there is a strong inference that Defendants intended, knew, or recklessly turned a blind eye to the alleged improper and unsanitary practice of reselling used products.  The vast breadth of Defendants' scheme evidences that Ulta employees, who at all times were conducting themselves within the scope of their employment, were acting in furtherance of Ulta's goal of reducing shrink by retouching, reshelving, and reselling returned merchandise.  Indeed, the magnitude of Defendants' misconduct is so broad it is virtually inexplicable absent fraud.

### B. The "Planogram" On Ulta's Internal Website Is An Admission That Defendants Were Aware of Ulta's Pervasive Practice of Reselling Used Products At the Direction of Top Executives

302.    Ludwig and CW5 confirmed that Ulta maintained an internal website called "Ultanet" where the Company posted a planogram detailing how each retail store's damages area should be organized and equipped.  The planogram required six damages bins, one for every product category, a return to shelf bin and materials to touch up used products for resale, including

paper towels and alcohol. Moreover, CW5 stated that the planogram was kept in the damages area so that it was viewable at all times by Ulta personnel while processing damages.

303. The planogram is effectively an admission and approval of Ulta's Class Period unsanitary practice of reselling used products in order to reduce shrink.

## C. Ulta's Ultanet Reported on Damages and Shrink on the Dashboard, Which Defendants Dillon and Settersten Admit to Reviewing On A Weekly Basis

304. Ludwig, CW1, and CW5 all confirmed that Ulta maintained reports on shrink losses and damages in a Damages Report and Shrink Report. The Damages Report, which reported on damaged products by category (*e.g.*, prestige, PCA, fragrance, etc…) by store, district and region, was updated at least weekly and sometimes daily as damages bins were processed and the Shrink Report was updated twice per year after Ulta's physical inventory counts and, according to CW3 and Ludwig, weekly to update for daily cycle counts of specific types of product on the store shelf.

305. According to these witnesses, Ulta employees had access to the reports depending on level. Specifically, General Managers had access to information for all stores within their district, while all District Managers had access to all stores and all districts in their region and RVPs and above, including Defendants Settersten and Dillon, had access to all reports on damages and shrink.

306. Indeed, Defendants admit in the Company's own SEC filings that they monitor inventory levels, which includes additions to inventory and deductions from damages and shrink:

> To ensure our inventory remains productive, our planning and replenishment group, ***along with senior executives, monitor*** the levels of clearance and aged inventory in our stores on a weekly basis. . . .

307. Accordingly, Defendants admittedly monitoring inventory damages and shrink on a weekly basis and thus were aware, or recklessly disregarded that the Company's grotesque

92

practice of reselling used products cut shrink levels in half during the Class Period.  Moreover, Defendants must have been aware given Ulta reduced the Shrink Reserve by over 20% in one year.

> **D.  Defendants Created a Corporate Culture That Rewarded Employees Who Followed the Unsanitary Practice By Paying Them A "Shrink" Bonuses, Approved by Defendant Dillon**

308.    According to CW4, reducing shrink was one of the key metrics that Regional Vice Presidents, District Managers and General Managers were required to focus on.  Thus, CW1, CW4, CW5, CW6, Ludwig, Geier, Turner and others all confirmed that throughout the Class Period, Ulta paid its employees a "shrink bonus" if they met or exceeded the targeted shrink goals set by Ulta's executives.  Shrink bonuses were paid to store-level managers, District Managers and RVPs.

309.    CW5 recalled that there was a minimum shrink level that had to be achieved to get a bonus at all and then a "scalable" escalation of increasing bonus amounts depending on what shrink levels were achieved.

310.    The Shrink Bonus was paid annually and *was approved by Defendant Dillon*.

311.    Defendants rewarding of employees who engaged in the alleged practice of reselling used products further supports scienter.

> **E.  The Directive By Dave Carrol and Regional RVPs, and Sanctioned by Steelman, Supports an Inference of Corporate Scienter**

312.     Multiple witnesses revealed that they were routinely instructed by Dave Carroll, VP of Stores for half of Ulta's retail stores, their RVPs, District Managers and General Managers during store walkthrough visits to touch up, return to shelf and resell used products as new.  *See* Section VI.B., *supra*.  CW5 recalled one store visit by Carroll, Steelman and Meyer (CW5's RVP) during which Carroll specifically instructed CW5 to resell used products in the presence of Steelman, who acquiesced to the conduct.

313. On many occasions, RVPs and District Managers physically showed the employees how to touch up the used products for resale.

314. Moreover, according to CW3, CW5, and Ludwig, District Managers took pictures, or instructed that pictures be sent to them, of the damages bins before and after damages were processed and that the pictures would be sent to other employees in their district as part of a design to intimidate and pressure employees into engaging in the practice. According to CW3, the photos in CW3's district were posted on the GroupMe app.

315. During the Class Period the RVPs reported directly to one of two or three VPs of Store Operations, including Carroll, all of whom reported directly to Steelman, a member of the Company's senior executive team, who reported directly to Dillon. Thus, the directive given by VP of Stores Carroll and RVPs Meyer, Mollicone, Lakritz, Shaw, and Carroll (while he was acting as an interim RVP), as well as Steelman's acquiescence can be attributed to Ulta. Moreover, that the Company's policies regarding returns came from the top (senior executives such as the Individual Defendants) down is obvious given that senior executives gave directives to reduce shrink every year at the annual General Manager Conference.

316. Further, the directives to engage in the alleged scheme by senior level SVP Carroll, RVPs, as well as the Steelman's acquiescence, evidences that Ulta employees, who at all times were conducting themselves within the scope of their employment, were acting in furtherance of Ulta's goal of reducing shrink by retouching, reshelving, and reselling returned merchandise.

**F. The Material Impact of Shrink and Damages on Ulta's Bottom Line Supports an Inference of Scienter**

317. As discussed above, losses from shrink cost retailers an estimated $49 billion per year. Accordingly, several confidential sources confirmed that shrink was a major focus at Ulta that was discussed during: (i) the annual sales conferences; (ii) weekly conference calls among

General Managers; (iii) weekly calls among District Managers; and (iv) at all store walkthroughs by SVPs and VPs of Stores.

318.     Indeed, Shrink represented nearly 10% of Ulta's net income.  The importance of shrink to Ulta's business and bottom line further supports scienter.

## II.  THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE FRAUDULENT REPRESENTATIONS

319.     The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts throughout the Class Period in order to inflate Ulta's common stock price and maximize their personal profits from selling their shares of Ulta stock at inflated prices. Defendants Dillon and Settersten's trading patterns before, during, and after the Class Period show that the Defendants' trades were anything but routine and instead were directly motivated by a desire to profit from a fraudulent scheme designed to mask the unsanitary shrink and return practices of the Company.

320.     As detailed below, the Company collectively granted Defendants over 207,000 Ulta securities that were fully vested prior to the Class Period.  Yet, Defendants did not make a single sale until the Class Period. Indeed, during the Class Period, Defendants Dillon and Settersten suddenly *exercised a collective 107,849 options and sold the resulting shares of Ulta common stock over a mere four trading days*, generating proceeds of *over $28.3 million*.  These profits amounted to between *3.5 and 7 times the amount of the Individual Defendants' annual salaries* during the respective years the sales were made.

321.     As further explained below, there trades were highly unusual both in timing and amount and correlated with market moving events or dates on which the Defendants would likely be in possession of material non-public information.  None of these sales were pursuant to a Rule 10b5-1 trading plan.

A.     **Defendant Dillon's Suspicious Sales**

322.     During the Class Period, and over a mere three sales, Defendant Dillon exercised and sold 85,840 stock options for a whopping $22,462,690.35 in gross proceeds and ***over $13.1 million in profits***. These sales represent ***over 55% of Dillon's total stock options*** that would become fully vested and exercisable by the end of the Class Period, and approximately ***39.5% of Dillon's total holdings*** in common stock and vested stock options combined. Notably, none of the Dillon's sales were pursuant to a 10b-5 trading plan.

323.     Specifically, Dillon was appointed CEO of Ulta in June of 2013 and did not sell a single share of Ulta common stock until August 30, 2016, when she exercised and sold 28,920 stock options for $245.68 per share, generating gross proceeds of $7,105,065.60 and profits of $4,247,086.80. The next day, Dillon exercised and sold an additional 22,965 stock options for $245.80 per share, generating gross proceeds of $5,644,797.00 and profits between $3,371,032.35 and $3,376,122.75.[36] Collectively, these transactions represented a sale of approximately ***73.5%*** of her 70,593 stock options that had vested as of August 31, 2016.  These sales, which collectively generated over $7.6 million in profits, were ***over seven and a half times Dillon's $1 million salary in 2016***.

324.     The August 2016 sales mentioned above were strategically timed to occur just days after the Company announced its second quarter 2016 results on August 25, 2016.  The August 25, 2016 press release and conference call discussing the second quarter results stated that Ulta

---

[36] Dillon exercised 33,062 stock options on August 31, 2016 – 28,517 at a strike price of $99.01, and 4,545 at a strike price of 97.89.  The information regarding the trades that was filed by Dillon on SEC Form 4 fails to specify which of the 33,062 exercised options resulted in the 22,965 shares of stock that were sold.  The above range in profits reflects the difference between whether the 4,545 shares with the lower strike price were sold, or if Dillon only sold shares that were exercised at the $99.01 strike price.

intended to open 40 stores in Q3 and 25 stores in Q4. While these statements were perceived by investors as evidence of the Company's success, unbeknownst to investors, Ulta's perceived improved performance was not sustainable once it was discovered that Ulta was reselling used products, putting consumers' health and the Ulta brand at risk.

325. Rather than sit and wait for this news to become public, Defendant Dillon decided to swiftly sell substantial amounts of her Ulta holdings before the repercussions of such practices came to light. As a result of the calculated timing of her sales, Defendant Dillon was able to sell her shares while they were still trading in the $250 per share range, a price range which the Company began trading at only one month earlier, on July 8, 2016. After Dillon sold her shares, Ulta's stock gradually fell from a closing price of $254.85 on August 26, 2016, to $232.99 on September 15, 2016.

326. Defendant Dillon's third and final Class Period sale occurred on March 20, 2017, when she exercised and sold 33,955 shares of Ulta common stock for $286.05 per share, generating gross proceeds of $9,712,827.75 and profits of $5,470,867.98. This single sale generated ***nearly five times Dillon's $1,117,000 salary in 2017.*** The combination of Dillon's August 2016 sales and her March 20, 2017 sale resulted in the liquidation of approximately 55.35% of Dillon's 155,095 stock options that had vested as of March 20, 2017.

327. As with her prior sales, this sale was strategically timed. Dillon's March 20, 2017 sale occurred after the Company announced its fourth quarter and fiscal year 2017 results on March 9, 2017, which touted Ulta's stronger than expected increase in net sales by 24.6% for the fourth quarter and 23.7% for the 2017 fiscal year, compared to the same time periods in 2016. The March 9, 2017 announcement also commented that the average increase in inventories across Ulta's stores averaged 11.2% in the fourth quarter and that the Company planned to open 100 new stores in

fiscal year 2017. During the accompanying earnings call, held on the same day, Defendant Dillon complemented the supply chain operations team as doing "a great job keeping up with the higher-than-expected-demand." As a result of this announcement, Ulta's common stock climbed $12.65 per share, from a closing price of $273.77 on March 9, 2017 to a closing price of $286.42 on March 10, 2017. This was Ulta's first time trading at a stock price at or above $280 per share and Defendant Dillon seized the opportunity to gain a substantial profit for herself.

### B. Defendant Settersten's Suspicious Sales

328. During the Class Period, over two swift sales, Defendant Settersten exercised and sold a total of 22,009 stock options for $5,894,446.80 in gross proceeds and ***$4,648,002.32 in profits.*** These sales represented approximately ***44% of Defendant Settersten's vested and exercisable stock options*** and approximately ***37% of his common stock and stock options*** held during the Class Period. Neither of Settersten's sales were made pursuant to a 10b-5 trading plan.

329. Defendant Settersten's trading history is nearly identical to Defendant Dillon's. Defendant Settersten joined Ulta in 2005 as a Director of Financial Reporting and obtained his most recent title as CFO, Treasurer and Assistant Secretary in March 2013. Like Dillon, Settersten did not engage in a single share of Ulta common stock until August 30, 2016, when he exercised and sold 10,490 stock options for $251.37 per share, generating gross proceeds of $2,636,871.30 and profits of $2,387,040.40. This sale represented approximately 24.17% of Defendant Settersten's vested stock options and generated a profit of ***over four times his $580,030 salary in 2016.*** As discussed above, this sale was strategically timed to occur following the announcement of positive second quarter 2016 results but prior to the materialization of the risk caused by Ulta's deceptive shrink practices.

330.    Following Defendant Dillon's lead once again, Defendant Settersten's second and final Class Period sale occurred on March 29, 2017, when he exercised and sold 11,519 stock options for $282.80 per share, generating $3,257,575.50 in gross proceeds and $2,261,081.49 in profits.  This sale generated a profit that was **_over 3.5 times his $615,006 salary in 2017._** Settersten's March 29, 2017 sale was strategically timed to occur shortly after the Company's March 9, 2017 announcement touting Ulta's allegedly impressive sales and growth numbers which drove Ulta common stock to close at or above $280 per share, a new all-time closing high. The combination of Settersten's two sales represented the liquidation of 44% of Settersten's stock options that had vested as of March 29, 2017.

### C. Additional Insider Sales by Ulta's Officers and Directors

331.    Defendants Dillon and Settersten were not the only Ulta insiders to capitalize on the Company's artificially inflated stock price. On August 30, 2016, the same day that both Dillon and Settersten sold millions in Ulta stock, Robert F. DiRomualdo ("DiRomualdo"), a member of Ulta's Board of Directors, sold 20,000 shares of common stock for gross proceeds of over $5.7 million.

332.    Similarly, within days of Defendant Dillon's and Settersten's March 2017 sales, three members of Ulta's Board of Directors and an officer of the Company also dumped their holdings in exchange for millions of dollars. Specifically, on March 14, 2017, DiRomualdo sold 50,000 shares of common stock for gross proceeds of approximately $14.3 million. Three days later, on March 17, 2017, Lorna Nagler sold 4,167 shares for gross proceeds of approximately $1.2 million and a profit of approximately $1.16 million. Over the course of four sales between March 15, 2017 and March 27, 2017, Dennis Eck sold 36,401 shares of Ulta common stock for gross proceeds of over $10.4 million. Similarly, on March 30, 2017, David Kimbell, the Chief

Merchandising and Marketing Officer of Ulta, also sold 14,335 shares of Ulta common stock for $284.99 per share, for gross proceeds of $4,085,335.95. As noted above ¶ 329, the March 2017 sales were strategically timed to occur to maximize the insiders' individual profits.

333. Throughout the Class Period, as set forth in the table below, Ulta's Board of Directors collectively sold 1,089,125 shares of Ulta common stock generating gross proceeds of *$259,731,990.30*. Not a single sale occurred under a 10b-5 trading plan:

| Director | Date Sold | Quantity Sold | Gross Proceeds |
|---|---|---|---|
| **Lorna E. Nagler** | | | |
| | 3/17/17 | 4,167 | $1,198,530.46 |
| **Total:** | | **4,167** | **$1,198,530.46** |
| | | | |
| **Robert F. DiRomualdo** | | | |
| | 6/3/16 | 2500 | $592,725.00 |
| | 8/30/16 | 20,000 | $5,050,200.00 |
| | 3/14/17 | 50,000 | $14,257,575.00 |
| | 6/2/17 | 20,000 | $6,180,972.00 |
| **Total:** | | **92,500** | **$26,081,472.00** |
| | | | |
| **Dennis K. Eck** | | | |
| | 3/15/17 | 20,000 | $5,751,306.00 |
| | 3/16/17 | 4,900 | $1,414,386.96 |
| | 3/20/17 | 5,101 | $1,455,485.16 |
| | 3/27/17 | 6,400 | $1,801,742.72 |
| | 6/5/17 | 30,000 | $9,389,223.00 |
| **Total:** | | **66,401** | **$19,812,143.84** |
| | | | |
| **Catherine Halligan** | | | |
| | 9/21/16 | 400 | $95,760.00 |
| | 4/11/17 | 157 | $44,902.00 |
| | 6/5/17 | 500 | $156,182.00 |
| **Total:** | | **1,057** | **$296,844.00** |
| | | | |
| **Charles Heilbronn** | | | |
| | 9/14/16 | 900,000 | $206,604,000.00 |
| | 9/14/16 | 25,000 | $5,739,000.00 |
| **Total:** | | **925,000** | **$212,343,000.00** |

## **LOSS CAUSATION**

334.     During the Class Period, the Defendants named in this Action materially misled the investing public, thereby inflating the price of Ulta's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Ulta's business, operations, and compliance as alleged herein.

335.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Ulta, its finances, and operational and compliance policies.

336.     During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of Ulta shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Ulta shares was removed, and the price of Ulta shares fell, including:

- On January 10, 2018, in response to media articles reporting on the January 9th Twitter posts exposing for the first time that Ulta was engaged in a widespread practice of reselling used products, the Company's stock price decreased from a closing price of $232.92 on January 9, 2018 to a closing price of $230.45 on January 10, 2018.

- On February 9, 2018, after the market closed, it was reported that a consumer fraud class action had been commenced against Ulta on behalf of injured consumers across the country, further elaborating on the extent and specific details of Ulta's "widespread and surreptitious" practice of reselling used products and upon this news, Ulta's stock price fell $9.07 per share to close at $209.48 per share on February 12, 2018.

- On February 23, 2018, *CBS News* published a story on its website entitled "Former Ulta Beauty employee says she felt pressured to resell used products," further detailing the alleged scheme initially reported on Twitter and confirming that Ulta store managers and above frequently pressured the Company's employees to clean and resell used products. Upon this news Ulta's share price fell $8.18 per share to close at $198.93 on February 26, 2018.

337. As a result of their purchases of Ulta shares during the Class Period at artificially inflated prices, Plaintiffs, and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price decline in Ulta's shares negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

338. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Ulta publicly traded securities between April 20, 2016 and February 23, 2018, inclusive, seeking to pursue remedies under the Securities Act and the Exchange Act (the "Class"). Excluded from the Class are Ulta and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

339. Because Ulta securities were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number

of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Ulta or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

340.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

341.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

    a.   Whether Defendants violated the federal securities laws as alleged herein;

    b.   Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Ulta's business and operations;

    c.   Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.   Whether the Individual Defendants caused Ulta to issue false and misleading SEC filings and public statements during the Class Period;

    e.   Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

    f.   Whether the prices of Ulta securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

342.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

343.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Ulta who knew that the statement was false when made.

## APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE

344.    The market for Ulta securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Ulta securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of the market price of Ulta and market information relating to the Company, and have been damaged thereby.

345.    During the Class Period, the artificial inflation of Ulta securities was caused by the material misrepresentations and/or omissions particularized in this Amended Class Action Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Ulta's business, operations, and financial statements. These material misstatements and/or omissions created an unrealistically positive assessment of Ulta and its business, operations, and prospects, thus causing the price of the Company's stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. The Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

346.    At all relevant times, the market for Ulta securities was an efficient market for the following reasons:

a.    Ulta common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.  As a regulated issuer, Ulta filed periodic public reports with the SEC and the NYSE;

c.  Ulta communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.  During the Class Period, on average, over tens of millions of Ulta shares were traded on a weekly basis. On news days, the Company's trading volume increased into the hundreds of millions, reflecting an active trading market for Ulta common stock and investors' expectations being impounded into the stock price; and

e.  The proportion of statistically significant stock price movement days for Ulta common stock on news days is significantly over the proportion of non-news days and, thus, Ulta common stock is more likely to have a statistically significant return on a day with news than no-news, consistent with an informationally efficient market.

## <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Ulta and the Individual Defendants**

347.  Plaintiffs reallege each allegation as if fully set forth herein.

348.  This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Ulta, Dillon and Settersten (the "Count I Defendants").

349.  The Count I Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which

operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

350.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

351.    The Count I Defendants acted with scienter in that they knew, ordered, and/or approved that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

352.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

353. The Individual Defendants made and/or issued, or ordered and/or approved of, the making or issuance of the above actionable false statements and omissions, by perpetrating the deceptive scheme alleged herein and by ordering their employees to furnish information for the making or issuance of such actionable false statements and omissions, or by approving the furnishing thereof. At all times, such employees engaged in the deceptive scheme alleged herein were operating within the scope of their employment and in attempted furtherance of Defendants' goals.

354. As a result of the foregoing, the market price of Ulta securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Ulta securities during the Class Period in purchasing Ulta securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

355. Had Plaintiffs and the other members of the Class been aware that the market price of Ulta securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Ulta securities at the artificially inflated prices that they did, or at all.

356. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial.

357. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to

the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Ulta securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

358.    Plaintiffs reallege each allegation as if fully set forth herein.

359.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Dillon and Settersten (the "Count II Defendants").

360.    Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Ulta, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.  The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs and the Class' investments in Ulta securities within the meaning of §20(a) of the Exchange Act.  Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

361.    The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

362.    The Count II Defendants knew or recklessly disregarded the fact that Ulta's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

363.    By virtue of their high-level positions and their participation in and awareness of Ulta's operations and public statements, the Count II Defendants were able to and did influence and control Ulta's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

364.    The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

365.    As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Count II Defendants are also liable pursuant to §20(a) of the Exchange Act.

366.    As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Ulta securities.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: September 10, 2018                    Respectfully submitted,


                                             /s/ Shannon L. Hopkins
                                             **LEVI & KORSINSKY, LLP**
                                             Shannon L. Hopkins*
                                             Gregory M. Potrepka*
                                             733 Summer Street
                                             Suite 304
                                             Stamford, CT 06901
                                             Phone: (203) 992-4523
                                             shopkins@zlk.com

                                             *Admitted pro hac vice

                                             Counsel for Plaintiffs and Lead Counsel for the
                                             Proposed Class

                                             **SALAS WANG LLC**
                                             Jeffrey M. Salas
                                             73 West. Monroe, Suite 219
                                             Chicago, IL 60603
                                             Phone: (312) 803-4963
                                             jsalas@salaswang.com

                                             Liaison Counsel for Plaintiffs and the Proposed
                                             Class

## <u>CERTIFICATE OF SERVICE</u>

I, Shannon L. Hopkins, the undersigned attorney, hereby certify that on the 10th day of September, 2018, I caused to be served a copy of the via the Court's CM/ECF system, on all counsel of record.

<u>/s/ *Shannon L. Hopkins*</u>
Shannon L. Hopkins

112