# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BARBARA CHANDLER, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>         v.<br><br>ULTA BEAUTY, INC., et al.,<br><br>         Defendants. | Case No. 18-cv-1577<br><br>Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

In this putative class action, lead plaintiffs Lawrence Banker, Danny Hurlbut, Marlene Hurlbut, and Cynthia Busse (together, "Plaintiffs") allege that defendants Ulta Beauty, Inc. and Ulta Salon and Cosmetics & Fragrance, Inc. (together, "Ulta") engaged in a widespread practice of reshelving returned, used cosmetics products and reselling the products as new. Plaintiffs contend that Ulta's CEO Mary Dillon and CFO Scott Settersten (together with Ulta, "Defendants") were aware of this practice and made dozens of misleading statements by failing to disclose it. Plaintiffs assert that Defendants' actions amount to securities fraud. Defendants moved to dismiss, arguing that the amended complaint fails to state a claim because it does not adequately allege a materially misleading misrepresentation or omission and does not set forth facts showing that Defendants acted with scienter. For the reasons that follow, Defendants' motion is granted and the complaint is dismissed without prejudice.

## BACKGROUND

The following facts are taken from the amended complaint [68][1] and accepted as true, with all reasonable inferences drawn in Plaintiffs' favor.

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph numbers. Page numbers refer to the CM/ECF page number.

### A.    Factual Background

### 1.    Ulta's Organization

Founded in 1990 and headquartered in Bolingbrook, Illinois, Ulta is a publicly traded company that "purports to be the largest beauty retailer in the United States." [68] ¶¶ 1, 54.  Ulta states that it provides "unmatched product breadth, value and convenience in a distinctive specialty retail environment." [71-8] at 6.  Ulta operates in 48 States, the District of Columbia, and online at Ulta.com. [68] ¶ 56.

Defendant Dillon was appointed as Ulta's Chief Executive Officer in June 2013 and is a member of Ulta's Board of Directors.  *Id.* ¶¶ 35, 323.  Defendant Settersten joined Ulta in 2005 as a Director of Financial Reporting.  *Id.* ¶ 36. Settersten became Ulta's Chief Financial Officer in March 2013 and serves as the company's Assistant Secretary.  *Id.* ¶¶ 36, 329.

The complaint alleges that Ulta has a centralized reporting structure, which "flows in direct succession from the CEO (Dillon) all the way down to store level employees."  *Id.* ¶ 66.  As stated in Ulta's Annual Report for the fiscal year ended January 28, 2017:

> The management team in each store reports to the general manager. . . . Each general manager reports to a district manager, who in turn reports to a Regional Vice President of Operations, who in turn reports to the Senior Vice President of Store Operations, who in turn reports to our Chief Store Operations Officer, who in turn reports to the Chief Executive Officer.

*Id.* ¶ 66.

During the relevant time period, April 20, 2016, through February 28, 2018 (the "Class Period"), Ulta's Chief Store Operations Officer was Kecia Steelman.  *Id.* ¶¶ 53, 69.  Below Steelman were two, and later three, Senior Vice Presidents of Store Operations: Dave Carroll, Kelly Cusick-Dropchinski, and, from March 2017 forward, Aimee Bayer-Thomas.  *Id.* ¶ 69.  The Vice Presidents of Store Operations oversaw the Regional Vice Presidents of Operations.  During the relevant time period there were either six or seven Regional Vice Presidents.  *Id.* ¶ 2.  Each Regional Vice President was responsible for a subset of Ulta's sales regions, which included: Central, Northeast (at times, divided into two regions), Northwest, Southcentral, Southeast, and Southwestern (at times, divided into two regions).  *Id.* ¶ 67.  The Regional Vice Presidents were responsible for all aspects of store operations in their region, including training employees, implementing Ulta's policies, and overseeing activities affecting sales, profit, and expenses.  *Id.* ¶¶ 67– 68.

The allegations in the complaint rely on statements provided by five named witnesses and six confidential witnesses. All eleven witnesses are former Ulta employees—six worked at the store level, four were district managers (who reported to the Regional Vice Presidents), and one was a director (who reported to the Vice President of Loss Prevention, a corporate Vice President).

The named witnesses include:

- <u>Brittany Ludwig</u>: Associate Manager of Operations at Ulta's Carlsbad, California store from February 2017 through September 2017. *Id.* ¶ 43.

- <u>Tammy Geier</u>: Ulta employee from 2006 through February 2016, and General Manager of Store 80 in Georgia from January 2015 through February 2016. *Id.* ¶ 44.

- <u>Kami Turner</u>: Ulta employee from 2010 through July 2015, and General Manager at a Chattanooga, Tennessee store from July 2014 through July 2015. *Id.* ¶ 45.

- <u>Ella Sota</u>: Ulta employee from 2015 through October 2017 and, at some point, "Prestige Advisor" in Bluffton, South Carolina.[2] *Id.* ¶ 46.

- <u>Laura Hornick</u>: Ulta employee from June 2012 through April 2014 and for most of that time, Prestige Manager in Brandon, Florida, reporting to the store's General Manager. *Id.* ¶ 47.

The confidential witnesses include:

- <u>CW1</u>: From 2014 through 2018, District Manager responsible for 14 stores in Ulta's Southcentral region. *Id.* ¶ 48.

- <u>CW2</u>: From 2012 through April 2016, District Manager responsible for 28 stores in Ulta's Pacific Northwest Region, who reported to Regional Vice President Colleen Morse until October 2015 and then Morse's replacement, Kelly Meyer. *Id.* ¶ 49.

- <u>CW3</u>: From 1997 through July 2016, Director of Loss Prevention, who reported to the Chief of Store Operations until November 2015, and then to Julie Giblin, the Vice President of Loss Prevention. *Id.* ¶ 50.

- <u>CW4</u>: From 1993 through May 2016, District Manager in Ulta's Southwestern Region, who reported to Regional Vice President Yvonne

---

[2] "[T]he Prestige Advisor position is a client-facing role that 'maximize[s] sales' by working with clients to select and purchase prestige merchandise by performing makeup applications, skincare analyses, and product demonstrations." [68] ¶ 46.

Stewart until December 2015, and then to Dave Carroll, one of Ulta's three Senior Vice Presidents of Stores. *Id.* ¶ 51.

- <u>CW5</u>: From 2009 through 2016, a Market Trainer and then General Manager at Ulta's Lakewood, Colorado store, who reported to Kelly Meyer. *Id.* ¶ 52.

- <u>CW6</u>: Ulta employee from 2007 through May 2018, and from approximately 2013 on, a District Manager responsible for stores in multiple central and southern states. CW6 reported to Regional Vice President Natalie Lakritz from 2013 through 2017 and from 2017 through 2018, Regional Vice President Ariel dela Cruz. *Id.* ¶ 53.

### 2. Ulta's Shrink Problem

By 2017, Ulta was operating over 1,000 stores in the United States, each carrying more than 20,000 beauty products. *Id.* ¶¶ 56–59. Ulta continued to grow throughout the relevant time period, growing from 874 stores at the end of 2015 to 1,074 stores by the end of 2017 and opening more than 100 stores each year—103 in 2015, 100 in 2016, and 116 in 2017. *Id.* ¶¶ 56–57. Ulta's retail sales grew from over $3.4 billion in January 2016 to more than $5 billion in February 2018, its salon services sales grew from $209 million to $277 million, and its e-commerce sales grew from $221 million to $568 million. *Id.* ¶¶ 60, 62, 65.

As Ulta's stores and sales grew, so did its product returns and inventory losses—or as referred to throughout the complaint, its "inventory shrink." *Id.* ¶¶ 103–112. "Inventory shrinkage is the difference between the inventory recorded in the accounting records on the balance sheet and the physical inventory. Inventory shrinkage is comprised mainly of losses on inventory from used and/or damaged goods and theft." *Id.* ¶ 94. In its financial statements, Ulta recorded estimated losses due to inventory shrinkage as "a decrease to net inventory and an increase to cost of sales." *Id.* ¶ 100. As a result, the recorded losses reduced Ulta's total profits. *Id.* ¶ 101.

Ulta's inventory losses were due in part to its "very liberal return policy," its increasing number of stores, and an increase in theft. *Id.* ¶¶ 85, 104–06. Ulta's return policy allowed customers to return any product, regardless of use, within sixty days, and to return items after the sixty-day deadline or without a receipt for store credit. *Id.* ¶ 85.

The complaint alleges that Ulta monitored and attempted to reduce its inventory shrink in a number of ways. First, Ulta implemented a "store warehouse inventory fulfillment tool ('SWIFT') to improve the Company's in-stock rates" and a product information system ("PIM"), which "centrally maintains all of the information about all of the products that Ulta sells." *Id.* ¶¶ 74, 75. Second, Ulta "maintained an internal, Company-wide internet site," called the "Ultanet," which

contained reports on sales, damaged products, and inventory shrink. *Id.* ¶ 77. Ultanet had a Dashboard with weekly "sales numbers and statistics for damaged products (the 'Damages Report')," and a "Shrink Report" with inventory shrink information that was typically updated every six months. *Id.* Third, Ulta's "planning and replenishment group, along with senior executives, monitor[ed] the levels of clearance and aged inventory in [Ulta's] stores on a weekly basis." *Id.* ¶ 306. Fourth, Ulta implemented certain strategies aimed at reducing shrink: it formed a shrink committee, which met at corporate headquarters; it set annual shrink goals for its district and general managers; it told employees they would not be promoted and would potentially lose their jobs if they did not decrease shrink; and it paid annual bonuses to its store and district managers for reducing the shrink at their stores. *Id.* ¶¶ 114, 120–27. Ulta's confidential witnesses recalled Ulta setting a shrink goal of around 1% per store, even though some of their stores had closer to 3% in shrink losses. *Id.* ¶¶ 107–08. Finally, Plaintiffs allege that Ulta attempted to reduce shrink by instructing employees to retouch and resell used products as new. *Id.* ¶¶ 129–137.

### 3. Reselling Used Products

According to the complaint, beginning around 2015 and continuing throughout at least 2018, Defendants "instructed Ulta personnel to retouch used and dirty returned products and resell them as new in order to reduce inventory losses." [68] ¶ 119. As alleged in the complaint, store-level employees from different parts of the country, including witnesses Turner (Tennessee), Soto (South Carolina), Hornick (Florida), and CW5 (Colorado), described the retouching and reselling practices as a company policy. [68] ¶ 131.

In addition, according to Ludwig (store-level manager in California), returns were processed by Ulta's cashiers, who determined whether each returned product should be designated as "Return to Shelf" or "Damaged." *Id.* ¶¶ 87–88. Products designated as "Damaged" were placed in the store's "Damaged bins," and the store managers were responsible for inspecting the Damaged bins and determining whether those products "could not be touched up and resold." *Id.* ¶¶ 89–90. According to Ludwig and Geier (store-level manager in Georgia), employees were instructed to designate as many products "Return to Shelf" as possible; if a product "did not look acceptable enough to blend in with other new products" but could be altered to look that way, employees were instructed to clean the product and designate it "Return to Shelf." *Id.* ¶¶ 133–34.

The complaint also cites witnesses who reported to four of Ulta's six or seven Regional Vice Presidents (the Northwest, Southcentral, Southeast, and Southwestern regions). *Id.* ¶¶ 140–68. According to the witnesses, those four Regional Vice Presidents instructed stores in their regions to resell used products. *Id.* ¶ 139. For example, witnesses Geier and Turner, both working in the Southeast region, assert that the Southeast Regional Vice President, Chrissie Mollicone,

instructed district managers, general managers, and store employees to resell used products. *Id.* ¶ 154. According to the complaint, Mollicone and district manager Sara Ramsey allegedly visited Geier's Georgia store often and "frequently" took Geier to the damage bins to demonstrate "how to make products look new again and put them back on the shelves to be re-sold." *Id.* Geier said that she had frequent communications with Mollicone and Ramsey, including conference calls, meetings, and emails, during which Mollicone and Ramsey instructed Geier to "put returned beauty products back on the shelves for sale" and provided Geier with "tips and tricks" on how to make damaged products look new. *Id.* ¶ 155.

The complaint also alleges that Dave Carroll (one of three Vice Presidents of Stores) conducted store walkthroughs with the Regional Vice Presidents, where Carroll and the Regional Vice Presidents instructed employees to "touch up, return to shelf and resell used products as new." *Id.* ¶ 312. According to CW5, around November 2015, Steelman (Ulta's Chief Store Operations Officer), Carroll, and Kelly Meyer visited CW5's store in Colorado. *Id.* ¶ 146. During the visit, Carroll and Meyer "rifl[ed] through CW5's store's Damaged bins, observing clearly used returns and t[old] CW5 that CW5's shrink was 'out of control.'" *Id.* Allegedly, both Carroll and Meyer told CW5 that CW5 "needed to 'find ways' to 'clean up' returned products and put them back on the store shelves," and "instructed CW5 as to how the company expected employees to 'clean up' used returned products, including by using spray bottles of alcohol so that products could then be resold." *Id.*

As alleged in the complaint, these reselling practices were also used to reduce Ulta's shrink losses and improve its financial performance. For example, Ludwig represented that, by reselling used products, she was able to reduce shrink in her store by approximately 50%. *Id.* ¶ 109. Ludwig also represented that her district manager, Michelle Kurgan, directed Ludwig to send a nightly email "setting forth how much Ludwig had been able to save by retouching and reshelving damaged goods." *Id.* Ludwig stated Kurgan circulated a weekly email to employees throughout the district "that contained the shrink percentages of the different stores in that district in an effort to embarrass and put pressure on store employees." *Id.* ¶ 150. As alleged, Kurgan put pressure on employees in the Carlsbad store to resell items from the Damaged bin and reduce the store's shrink. *Id.* Ludwig estimated the Carlsbad store reduced its shrink from approximately $6,000 per month to $3,000 or $4,000 per month after Kurgan's visit. *Id.* ¶¶ 109, 148, 150. Similarly, according Geier, prior to leaving Ulta in February 2016, she reduced shrink in her Georgia store from 3.9% to 1.45% as a result of reselling used products. *Id.* ¶¶ 108, 158.

The complaint further alleges that each Ulta region had a loss prevention representative who visited the stores within the region to reinforce the reselling practices and help reduce shrink. *Id.* ¶¶ 169–70. According to CW1 (district manager), Ulta's Vice President of Loss Prevention Julie Giblin—who reported

directly to defendant Settersten—communicated to employees that "'the number one' method of reducing shrink was to 'reduce damages.'" *Id.* ¶ 171.

### 4. Public Reveal of Ulta's Alleged Practices

The alleged retouching and reselling practices entered the public spotlight on January 9, 2018, when a woman claiming to be a former Ulta employee posted on Twitter: "[W]henever a customer would return a product, [Ulta employees] were told by managers to repackage/reseal the item and put it back on the shelf." *Id.* ¶ 11. The woman also posted pictures of used beauty products and additional commentary describing how she was told to touch up the products. *Id.* ¶ 174. Various Twitter users posted responses claiming that the same practices occurred at other Ulta stores. *Id.* ¶¶ 174–82.

The following day, January 10, 2018, Ulta issued multiple Twitter responses stating things like, "We do not sell used products. We assure you, we're currently looking into this," and "We're investigating these claims accordingly, as we do not sell used products." *Id.* ¶ 272. That same day, Ulta's share price dropped from $232.92 to $230.45 per share. *Id.* ¶¶ 12, 267.

Litigation followed. On January 26 and February 8, 2018, two groups of Ulta customers filed consumer fraud complaints against the company in this district. *See Smith-Brown v. Ulta Beauty, et al.*, Case No. 1:18-cv-00610 (N.D. Ill.); *DeVries v. Ulta Beauty, Inc.*, No. 18-cv-2445 (N.D. Ill.). A third complaint was filed on March 7, 2018. *Ogurkiewicz v. Ulta Beauty, Inc.*, No. 18-cv-2445 (N.D. Ill.). The three suits were consolidated in April 2018.

Following the first two class actions, on February 9, 2018, at market close, media outlets, including the Chicago Tribune, "reported that a consumer class action lawsuit had been filed against Ulta, alleging that the company engaged in the 'widespread and surreptitious' practice of repackaging returned cosmetics and re-shelving them alongside unblemished products to sell at full price." *Id.* ¶ 268. The following trading day, February 12, Ulta's stock price fell by $9.07, closing at $209.48. *Id.* ¶¶ 14, 269. On February 23, CBS News published a related story online, reporting on statements from former Ulta employees regarding the pressures they felt to clean and resell used beauty products. *Id.* ¶ 270. And by February 26, Ulta's share price had dropped another $8.18 per share, closing at $198.93. *Id.* ¶¶ 15–16.

The complaint alleges that Ulta took a series of corrective steps following these public allegations. First, Ulta changed its methodology for calculating shrink bonuses by removing damaged returned products as a component of shrink. *Id.* ¶¶ 185–86. Second, by February 14, 2018, Ulta's website contained the following statement: "We take protecting the integrity of the products we sell very seriously. Ulta Beauty's policy does not permit the resale of used, damaged or expired

products. Our policies, training and procedures are aimed at ensuring that only the highest quality products are sold in our stores and online." *Id.* ¶ 187. Third, during a March 15, 2018 earnings call, Dillon stated, "we do not sell used, damaged or expire[d] products . . . ." *Id.* ¶ 276.

## B.    Procedural History

Following the consumer fraud complaints, on March 2, 2018, Plaintiffs filed this putative securities class action. [1]. Four movants sought appointment as lead plaintiff and lead counsel, and following briefing, the court appointed Lawrence Banker, Cynthia Busse, Danny Hurlbut, and Marlene Hurlbut as lead plaintiffs. [58]. Plaintiffs filed an amended complaint. [68]. Defendants moved to dismiss the amended complaint. [71]. In August 2019, the case was reassigned to this judge. Both plaintiffs and defendants moved for leave to file supplemental authority, which was granted. [95]; [100]; [107]; [110]. Defendants filed a request for judicial notice, which Plaintiffs opposed. [104]; [106].

## LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all factual allegations in the complaint and draw[s] all permissible inferences in plaintiff['s] favor." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 365–66 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 366 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Federal pleading standards do "not require detailed factual allegations, but [they] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "[N]aked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (second alteration in original, internal quotation marks omitted).

Claims alleging fraud must satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), which requires a party to state with particularity the circumstances constituting fraud or mistake. Particularity "means describing the who, what, when, where, and how of the fraud." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (internal citations omitted). Securities fraud claims must also meet the "exacting pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, *et seq. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

## DISCUSSION

Defendants contend that the complaint does not state a claim for securities fraud because Plaintiffs allege neither a material misrepresentation or omission nor scienter. And, because the complaint does not state a claim for securities fraud, Defendants argue the complaint also does not state a claim for control person liability.

## I.     Violation of § 10(b) of the Exchange Act and Rule 10b–5 (Count I)

To establish a violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Here, Defendants contend that Count I fails to state a claim for securities fraud because the complaint does not adequately allege (1) a material misrepresentation or omission or (2) scienter.

### A.     The Complaint Does Not Allege A Material Misrepresentation or Omission

The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). "Claiming that a particular statement was untrue is not enough. Plaintiff must explain, with particularity, the factual basis for his assertion that the statement was untrue." *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 933 (N.D. Ill. 2015). "[T]he relevant question is whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *rev'd on other grounds*, 551 U.S. 308 (2007) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n. 1 (2d Cir.2000)).

For omissions in particular, "[s]ilence is not 'fraud' without a duty to disclose." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007). A company does "not have a freestanding legal duty to disclose . . . scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017). Similarly, "[f]ederal securities law 'do[es] not create an affirmative duty to disclose any and all material information.'" *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)) (alteration in original). An omission is only actionable if the omitted facts were "necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

Any misrepresentation or omission must also be "*misleading* as to a *material* fact." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Tellabs I*, 437 F.2d at 596; *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (statement is material if "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information"). "If the statement amounts to vague aspiration or unspecific puffery, it is not material." *Tellabs I*, 437 F.2d at 596. Puffery includes "(1) indefinite predictions of growth; (2) optimistic rhetoric and hype; (3) subjective statements; and (4) vague statements." *Van Noppen*, 136 F. Supp. 3d at 940. Statements of pure opinion are also generally not actionable. *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong." (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015))).

Assessment of materiality is generally "for the trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Comp. Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (internal quotation marks omitted). But immateriality can serve as a basis to dismiss a complaint if "the alleged misstatements or omissions . . . are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *see, e.g.*, *Singh v. Cigna Corp.*, 918 F.3d 57, 63–64 (2d Cir. 2019) (affirming grant of motion to dismiss because alleged misrepresentations were not material); *Van Noppen*, 136 F. Supp. 3d at 941–43 (holding that statements were "immaterial puffery" and "not actionable" at motion to dismiss stage); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (collecting "appellate decisions affirming dismissal at the pleadings stage because the allegedly false or misleading statements were immaterial as a matter of law").

The PSLRA also provides a safe harbor for certain forward-looking statements. "[A] person . . . shall not be liable with respect to any forward-looking statement . . . if and to the extent that" the statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial . . . ." 15 U.S.C. § 78u–5(c)(1)(A). Defendants contend that many of the alleged misrepresentations are protected by the safe harbor because they were accompanied by cautionary

statements. Plaintiffs dispute whether the cautionary statements were adequate. Because resolution of this issue is unnecessary to resolve Defendants' motion, the court does not address this issue.

The complaint identifies five categories of alleged material misrepresentations and omissions related to Ulta's "[1] compliance with the Company's Code of Business Conduct; [2] compensation program; [3] product quality; [4] net sales, net income, net inventory and profitability; . . . and [5] internal controls over financial reporting." [68] ¶ 190.

### 1.   Compliance with Ulta's Code of Business Conduct

The complaint alleges that Defendants made statements regarding Ulta's compliance with its Code of Business Conduct that were false and misleading. Specifically, "Ulta's 2016 Proxy Statement to shareholders" published on April 20, 2016, stated that:

> **All Ulta Beauty employees, officers and members of the Board of Directors must act ethically at all times and in accordance with the policies comprising the Ulta Beauty Code of Business Conduct**. All corporate employees, officers and members of the Board of Directors have signed a certificate acknowledging that they have read, understand **and will continue to comply with the policy**, and all corporate employees and officers are required to read and acknowledge this policy on an annual basis. Ulta Beauty includes the Code of Business Conduct in new hire materials for all corporate employees. The policy is published and any amendments or waivers thereto will be published under "Corporate Governance" in the Investor Relations section of the Ulta Beauty website located at *http://ir.ulta.com*.

[68] ¶¶ 191–92 (emphases in complaint). Ulta's Code of Business Conduct stated that:

> The Company seeks to outperform its competition fairly and honestly. The Company seeks competitive advantages through superior performance, never through unethical or illegal business practices . . **. Each employee should endeavor to respect the rights and deal fairly with the Company's customers** . . . No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other illegal trade practice.
>
> Our business success depends upon our ability to foster lasting customer relationships. **The Company is committed to dealing with customers fairly, honestly and with integrity. Information we supply to customers should be accurate and complete to the best**

> **of our knowledge. Employees should not deliberately misrepresent information to customers . . . .**

*Id.* ¶ 195 (emphases and ellipses in complaint). Ulta's Code of Business Conduct "at the time" also stated that "**[Ulta] expects all Company employees to adhere to these standards**." *Id.* ¶ 193 (emphasis and alteration in complaint). The Code also contained a certification for employees to sign:

> I acknowledge that I received a copy of the Ulta Code of Business Conduct (the "Code"), that I have read the Code and that I understand it. **I will comply with the Code.** If I learn that there has been a violation or suspected violation of the Code, I will contact my manager, the Senior Vice President of Human Resources of [*sic*] the Ethics Hotline.

*Id.* ¶ 194 (emphasis in complaint). Ulta's proxy statement published on April 19, 2017, allegedly "contained the same materially false and misleading statements." *Id.* ¶ 196.

Defendants assert that these statements regarding compliance with Ulta's Code of Business Conduct are inactionable because statements related to codes of conduct such as these are puffery and forward-looking statements. They also contend that the complaint does not allege facts showing that it is untrue that "[a]ll corporate employees, officers and members of the Board of Directors have signed a certificate acknowledging that they have read, understand and will continue to comply with the policy, and all corporate employees and officers are required to read and acknowledge this policy on an annual basis." *Id.* ¶ 192 (emphasis omitted). Plaintiffs respond that these statements are false because Ulta employees were engaged in reshelving used products, meaning that they were not (i) "act[ing] ethically at all times; (ii) acting 'in accordance with the Code' because they were intentionally deceiving consumers to buy dirty, used products; and (iii) 'continu[ing] to comply with the policy.'" [72-2] at 2 (alterations in original). Plaintiffs also allege that these representations were misleading for omitting Ulta's policy of reselling used products.

These statements about Ulta's Code of Business Conduct are immaterial as a matter of law. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (internal quotation marks omitted). Here, Defendants' statements regarding Ulta's Code of Conduct are general promises to "act ethically," [68] ¶ 192, and "deal[] with customers fairly, honestly and with integrity," *id.* ¶ 195. These are precisely the types of general promises and commitments that other courts have held to be immaterial puffery as a matter of law. *See, e.g.*, *Singh*, 918 F.3d at 63

("statements[] which amount to general declarations about the importance of acting lawfully and with integrity" are "textbook example[s] of 'puffery'"); *Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 755 (statements touting company's "'trustworth[y]' culture, its commitment to 'integrity,' its 'compliance with the laws,' its 'fundamental values such as transparency, ethics, clarity of information and responsibility for Supply decisions,' and its commitment to 'transparency and good corporate governance practices'" were "inherently immaterial puffery" (citations omitted, alterations in original)); *see also Ong v. Chipotle Mexican Grill*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements that company is "'committed to serving safe, high quality food to [its] customers' and that its 'food safety programs are also designed to ensure that [the Company] compl[ies] with applicable federal, state and local food safety regulations'" were "inactionable puffery"). It is not that these statements lack meaning, but that they lack enough specificity to make them actionable here.

The cases cited by Plaintiffs where codes of conduct were actionable are inapposite here, as in those cases the "statements contained in a code of conduct" were "directly at odds with the conduct alleged in [the] complaint." *See Holwill v. AbbVie Inc.*, No. 18-cv-06790, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (company was alleged to have "bribe[d] and influence[d] physicians" to prescribe a drug and made "unqualified statements . . . [that] 'We never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an AbbVie product'"); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 727 (D. Minn. 2019) (statements in code of conduct were "directly contrary to facts [defendants] knew were occurring"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (representations "that the company 'bases . . . decisions solely on a person's [merit]" were "directly contravened by allegations in the [complaint] that the company conditioned employment decisions on whether female employees acceded to sexual demands" (alterations in original)). That is not the case here, where none of the statements cited by Plaintiffs are directly contradicted by Ulta's alleged practice of reselling used products.

Further, the statements in the Code itself are also "inherently aspirational." *Holwill*, 2020 WL 5235005, at *4; *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183 (a "qualifier[] such as . . . 'should'" makes a statement "explicitly aspirational"); *Tellabs I*, 437 F.3d at 596 ("If the statement amounts to vague aspiration or unspecific puffery, it is not material."); *see* [68] ¶ 195 ("The Company *seeks* to outperform its competition fairly and honestly. . . . Each employee *should* endeavor to respect the rights and deal fairly with the Company's customers . . . No employee *should* take unfair advantage of anyone * * * Information . . . *should* be accurate and complete . . . . Employees *should not* deliberately misrepresent information to customers." (emphases altered)). As a corollary, the statements regarding compliance with the Code of Conduct are also necessarily aspirational.

*See, e.g.*, [68] ¶¶ 192–94. Other statements are also forward-looking and aspirational. *See, e.g., id.* ¶ 193 ("[Ulta] *expects* all Company employees to adhere to these standards." (emphasis altered)).

Significant portions of the statements about the Code are also not alleged to be false. For example, the complaint does not allege that Ulta's "employees, officers and members of the Board of Directors" did not actually "sign[] a certificate acknowledging that they have read, understand and will continue to comply with" the Code of Conduct. [68] ¶ 192 (emphasis omitted); *see also id.* ¶ 194 (similar).

Altogether, the complaint does not adequately allege a material misrepresentation or omission regarding the statements made about Ulta's Code of Conduct.

### 2. Compensation Program

The Complaint also alleges that Ulta "falsely represented that the Company ensured its compensation policies and practices did not improperly incentivize employees to engage in conduct harmful to Ulta's business." [68] ¶ 198. Ulta's 2016 proxy statement stated that:

> The Company reviewed its compensation plans, practices and policies and determined that **it does not have any such plans, practices and policies that create risks that are reasonably likely to have a material adverse effect on the Company** based on the following:
>
> - the Company's variable compensation programs are linked to specific performance goals set by the compensation committee for executive officers and for other employees by supervisors **consistent with the Company's compensation philosophy and business goals**;
>
> \*      \*      \*
>
> - **the mix between fixed and variable pay is balanced so as to neither discourage proper risk taking, nor encourage excessive risk taking**; . . . .

*Id.* (emphasis and alterations in complaint). Ulta's 2017 proxy statement allegedly "contained the same materially false and misleading statements." *Id.* ¶ 199.

Defendants argue that the complaint does not set forth facts showing that these statements are false. Plaintiffs contend that they are false and misleading because Ulta employees were reselling used products and Ulta "did not disclose to consumers that they were buying used products . . . in violation of numerous

regulatory and consumer protection laws, thereby creating the risk of injury to consumers and lawsuits." [73-1] at 6.[3]

The complaint does not allege facts sufficient to reasonably infer that these statements are false or misleading. The complaint does not allege that Ulta did not "review[] its compensation plans, practices and policies," nor does it allege that Ulta "determine[d] that . . . such plans, practices and policies" were in fact "reasonably likely to have a material adverse effect on the Company." [68] ¶ 198. Nor does the complaint set forth facts from which it could be reasonably inferred that Ulta determined that its "variable compensation programs" were not "consistent with the Company's compensation philosophy and business goals"—in fact, the complaint does not allege what Ulta's "compensation philosophy and business goals" were. *Id.* Ulta had a business goal of reducing shrink, but the alleged bonuses for reducing shrink are consistent with achieving that goal. *See, e.g.*, [68] ¶¶ 113–14 (alleging that Ulta lost millions each year due to shrink and that it was "of such import to Ulta that the Company maintained a 'Shrink Committee'"). Nor does the complaint allege anything about "the mix between fixed and variable pay," let alone facts sufficient to state a plausible claim that "mix" was not "balanced so as to neither discourage proper risk taking, nor encourage excessive risk taking." *Id.* And the complaint also lacks any factual allegations from which it could reasonably be inferred that the alleged shrink bonuses encouraged "excessive" risk taking as opposed to "proper" risk taking. *Id.* Finally, read as a whole, the statement is plainly discussing only Ulta's "*compensation* plans, practices and policies." *Id.* ¶ 198 (emphasis added). Aside from the shrink bonuses already addressed, the alleged practice of reselling used products is not so closely tied to compensation that it could reasonably be inferred that disclosure of the practice was necessary to prevent the statement from being misleading.

### 3.       Product Quality

Plaintiffs allege that Defendants also misrepresented to "investors that Ulta's success was the result of offering a wide variety of quality products to its customers." [68] ¶ 238. Plaintiffs cite six specific statements they allege are false.

First, during a May 26, 2016 conference call with analysts, Dillon stated: "In terms of the drivers [of sales and earnings], honestly, it's really a combination of a lot of factors . . . Then in addition, of course, it's about what we sell in the store, and the service that we give, and the services and the guest experience." *Id.* ¶ 239 (emphasis omitted). Defendants argue that the complaint does not allege that this statement is false and that, even if so, it is immaterial puffery. Plaintiffs contend that the statement is false because Ulta's practice of reselling used products was "not enhancing the guest experience in the manner customers and investors came to

---

[3] [73-1] is a chart prepared by Defendants that contains all of the alleged misstatements, as well as both parties' arguments as to why each statement is (or is not) false or misleading.

expect," *id.* ¶ 240, and Ulta failed to disclose that stores were reselling used products, [73-1] at 16. Plaintiffs do not contest that the statement is immaterial puffery.

This statement is not alleged to be false and, even if it was, it is puffery. Dillon's statement asserts that Ulta's "services and guest experience" are merely two of "a lot of factors" that drove Ulta's sales and earnings. [68] ¶ 239. The complaint does not plead any facts related to whether this was false, and Plaintiffs cite none. The complaint also does not allege facts showing that the sale of used products was so significant relative to Ulta's total sales figures that it was misleading to not disclose the practice. Nor does the complaint explain how reselling used products could, in and of itself, drive sales (particularly when the complaint alleges that this practice actually created negative experiences for customers) or earnings. Further, the statement is immaterial; it is "so vague" and "so lacking in specificity . . . that no reasonable investor could find [it] important to the total mix of information available." *Van Noppen*, 136 F. Supp. 3d at 940 (quoting *Midway Games*, 332 F. Supp. 2d at 1164).

Second, in an August 25, 2016 press release, Dillon allegedly said:

> The Ulta Beauty team achieved another quarter of excellent top and bottom line performance, while making significant progress on many elements of our growth strategy. **Our second quarter results reflect a strong pipeline of newness and innovation in merchandising**, progress in growing our brand awareness, major milestones related to our loyalty program, continued rapid growth in our ecommerce business, and successful execution of our supply chain investments.

*Id.* ¶ 241 (emphasis in complaint). Defendants argue again that the complaint does not plead facts showing that this statement is false and that the statement is also puffery. Plaintiffs respond that it is false for the same reasons as the statement addressed above, and because "Defendants falsely misattributed Ulta's financial performance to factors other than" reselling used products and Dillon "omitted that many items Ulta sold were adulterate[d] used products" when touting products' "newness." [73-1] at 16–17.

The complaint does not adequately allege that this statement is false. The complaint does not set forth facts from which it could be reasonably inferred that Ulta's second quarter 2016 results did not "reflect a strong pipeline of newness and innovation in merchandising" in addition to the other factors listed. Indeed, Plaintiffs do not cite any specific allegations in the complaint that make such a statement false. The complaint does not address many of these factors or their contribution to Ulta's sales (*e.g.*, "brand awareness," Ulta's "loyalty program," and "supply chain investments"), making it is impossible to infer whether the resale of used products was so significant for Ulta's "second quarter results" that it was

misleading (let alone materially) to not mention such sales. Further, the statement's reference to "newness" appears to be referring to the sale of new types of products (for example, a new variety or version of a product), not new, unused products. It is not reasonable to infer that Dillon was touting Ulta's products as being "new"—as opposed to used—because such a statement would only make sense if investors believed that Ulta was selling used products. But the complaint alleges that Ulta's alleged practice of selling used products was hidden from the public until it was revealed on Twitter in January 2018. Properly understood, that statement is not alleged to be false because the complaint does not allege that Ulta did not have a "strong pipeline" of new products (*i.e.*, new types of products and goods). Even assuming that Dillon is referring to selling new, unused products, the complaint does not allege that Ulta's alleged sale of used products was so significant (in terms of sales) relative to the sale of unused products as to render it untrue or misleading for Dillon to say that Ulta still had a "strong pipeline of newness and innovation in merchandising" that drove the second quarter results. Also, for the same reasons as the previous statement, the complaint does not allege that it was misleading not to disclose the alleged practice of reselling used products.

Third, on a December 1, 2016 call with analysts, Dillon allegedly stated:

On the systems side, we're starting to see benefits from the core merchandise systems we recently implemented. SWIFT, our new forecasting replenishment tool, continues to ramp up and help us optimize inventory. **Our store level in stocks are improving and more of our inventory is in our stores, versus in our DCs, improving the guest experience**. We now have all of the tools in place to help us make better, more data based assortment and inventory decisions.

*Id.* ¶ 243 (emphasis in complaint). Defendants assert that the complaint does not set forth facts showing that this statement is false or misleading and that, regardless, it is puffery. Plaintiffs respond that it is materially false and misleading because reselling used products (not just the use of SWIFT) was improving Ulta's stock inventory and that practice was making the guest experience worse, not improving it. [73-1] at 17.

The complaint does not plead sufficient facts to reasonably infer that this statement is untrue or misleading, and it is puffery. The fact that allegedly reselling used products may have helped increase Ulta's inventory does not mean it was false for Dillon to state that stock inventory levels were improving. Also, the complaint does not allege facts to reasonably infer that increased inventory was not improving the guest experience as Dillon claimed—even if some of that increased inventory consisted of used products that caused negative experiences. The complaint simply does not provide facts from which it can be reasonably inferred that, at the time Dillon made the statement, used products comprised a significant

portion of the increase in inventory, or that there were so many used products being resold that the negative customer experiences caused by such products overwhelmed whatever positive experiences were created by other inventory improvements. Even if the complaint alleged facts to show this statement was false, it is both "vague" and "optimistic rhetoric and hype," *i.e.*, puffery. *Van Noppen*, 136 F. Supp. 3d at 940.

Fourth, on the same December 1, 2016 call, Dillon was asked about the "'primary catalyst to drive' sales momentum in the third quarter" and Dillon responded:

> Honestly, I would say it's a convergence of multiple factors, some of which you just said. So we've been on a path for a while to drive increased brand awareness, that obviously starts with that. People need to know who we are. I would say the assortment of products of brands, the acceleration of new brands and the, frankly the great performance of newness, of new brands **and newness within existing brands has been a key factor**. . .
>
> \*　　\*　　\*
>
> So in store, the experience we think just gets better. Our associates have done a fantastic job of converting guests into our loyalty program, and obviously our loyalty members are driving the majority of our sales. And of course our in stocks are getting better all the time and supply chain and systems **and teams behind those are working to just make sure that guests have what they want**. So I hate to throw the laundry list at you. But it's really a combination of all of those factors working in concert.

*Id.* ¶ 244 (emphasis and alterations in complaint). Defendants again contend that the complaint does not allege sufficient facts to reasonably infer that this statement is false and that it is puffery. Plaintiffs' response is identical to their response to the previous statement, although they also argue that "tout[ing] the 'newness' of Ulta's products" was misleading because Dillon omitted that many products had already been used. [73-1] at 18.

The complaint does not adequately allege that this statement is false and, in any event, it is puffery. The complaint does not allege facts to reasonably infer that any of the factors recited by Dillon did not contribute to "driv[ing] sales momentum." [68] ¶ 244 (internal quotation marks omitted). And, for the same reasons discussed with respect to the previous statement, the complaint does not allege that Ulta's stock inventory was not improving, that the guest experience was not improving, or that there was not "newness within existing brands"—even taking the resold used products into account. *Id.* Nor does the complaint allege that

18

supply chain and systems teams were not "working to just make sure that guests have what they want." *Id.* The second half of the statement is also puffery, which Plaintiffs do not dispute.

Fifth, on the same call, Dillon was asked "about how 2016's Black Friday stats compared to the prior year" and Dillon allegedly stated:

> I would say there's kind of a few things, **that one is that really, it's about what we sell, what we offer. So I mentioned some of this already, but we've really got great new brands, existing brands with great newness.** And then I would say we just keep raising our game as it relates to whether it's partnering with our brand partners and exclusives and great holiday kits, or really raising our own game, like on our Ulta Beauty collection blockbusters and products.
>
> So that, I would say, is a continuation of just improving. It's not new, but it's what we do, but doing it better. Even our gift with purchase is stronger than a year ago. And then really pull together in a really fantastic 360-degree marketing plan. So more to come in the holiday and I'm pleased with how it's starting in store and online, frankly. **And again, I said that our store teams and our supply chain working together to make sure that the experience is great for the guest**.

*Id.* ¶ 245 (emphasis in complaint). The parties raise identical arguments regarding this statement. The complaint does not allege this statement to be false or misleading for the same reasons as the previous statement. The second half of this statement is also undisputed puffery.

Finally, on a November 30, 2017 call with analysts, Dillon stated: "And finally to update you on our supply chain operations. We continue to develop capabilities and leverage economies of scale in our distribution network **to deliver exceptional guest experiences while focusing on cost optimization**." *Id.* ¶ 247. Again, the parties raise the same arguments regarding this statement as they did against the previous two statements.

The complaint's allegations are insufficient to raise a reasonable inference that this statement was false or misleading. The complaint fails to allege that Ulta was not "continu[ing] to develop capabilities and leverage economies of scale in [its] distribution network to deliver exceptional guest experiences while focusing on cost optimization." *Id.* (emphasis omitted). Nor was it misleading for Dillon not to mention the resale of used products when discussing Ulta's supply chain operations, an unrelated topic that the complaint does not allege is connected to the practice of selling used products. Even if the statement was false or misleading, it is vague, optimistic puffery.

### 4.    Financial Performance

The complaint alleges that Defendants made a litany of false and misleading statements regarding Ulta's financial performance.

#### a.    Sales, Income, and Inventory

The complaint alleges numerous misrepresentations and omissions regarding Ulta's publicly reported sales, income, and inventory.  For example, the complaint alleges that Ulta's 2016 proxy statement stated:

Fiscal year 2015 was a strong year for us.  We:

- **increased net sales by 21.1% to $3.9 billion**;

- **increased net income by 24.5% to $320.0 million**;

- **increased income per diluted share by 25.1%**; . . . .

[68] ¶ 201 (emphasis and alteration in complaint).  Similarly, in a May 26, 2016 press release, Ulta reported that:

- **Net sales increased 23.7% to $1,073.7 million from $868.1 million in the first quarter of fiscal 2015.**

- **Net income increased 37.4% to $92.0 million compared to $66.9 million in the first quarter of fiscal 2015.**

- **Merchandise inventories at the end of the first quarter of fiscal 2016 totaled $843.5 million, compared to $662.9 million at the end of the first quarter of fiscal 2015, representing an increase of $180.6 million.  Average inventory per store increased 14.5%, compared to the first quarter of fiscal 2015**. . . .

*Id.* ¶ 204 (emphasis and alteration in complaint); *see also id.* ¶ 207 (alleging Ulta's 2016 first quarter Form 10-Q "contained the same false and misleading financial statements").  The complaint also cites twelve other nearly verbatim statements regarding Ulta's net sales, net income, and merchandise inventories—the only significant differences being the dates and specific financial figures.  *See id.* ¶¶ 212–13, 216–17, 220–22, 226–27, 230–32, 235–36.

Defendants contend that the complaint does not allege that any of these reported figures is false, or that Ulta should have reported different sales, income, or merchandise inventory numbers.  Plaintiffs contend that the statements are false because the statements do not disclose the policy of reselling used products and that

"as a result of Ulta's improper undisclosed practices, the Company's financial performance was not sustainable." *Id.* ¶ 202; [73-1] at 7–15. Plaintiffs also argue that the statements "falsely misattributed Ulta's financial performance to factors other than the alleged conduct." [73-1] at 7–15. Finally, Plaintiffs assert that the financial figures were not accurate because Ludwig, Geier, and CW5 "quantified the reduction in shrink from the Company's improper reselling of used products as approximately 50%." [72] at 14 (citing [68] ¶¶ 107–09).

The complaint does not allege facts from which it could be reasonably inferred that these statements about Ulta's sales, income, and inventory are false or misleading. The complaint never alleges what the correct sales, income, and inventory figures purportedly were that Ulta should have reported, nor does it even give a general indication of what those figures should have been. *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 588 (E.D. Va. 2006) (complaint failed to adequately allege falsity because it "fail[ed] to allege even a general figure" regarding what accurate financial numbers would have been if properly reported). According to the Plaintiffs, Ludwig, Geier, and CW5 contend that "reselling used products accounted for an approximate 50% reduction in shrink expense, increased inventory by approximately the same amount and contributed significantly to net sales." [68] ¶ 202; [72] at 14. But this does not mean that the reported figures were materially inaccurate even if adjusted for the allegedly resold products. Again, the complaint simply gives no indication of what impact a recalculation of the shrink expense or net sales would have on the reported financial numbers.

The complaint's allegations, however, do not even support an inference that 50% of Ulta's shrink expense reduction was the result of reselling used products, because the witnesses Plaintiffs cite only claim that they reduced the shrink rate at two stores (out of "over 1,000 retail stores") by approximately 50%.[4] *Id.* ¶¶ 1, 107–09. The allegation cited by Plaintiffs about CW5's recollection does not actually allege that any store reduced its shrink by 50% through reselling used products. It

---

[4] The complaint also alleges that "[a]s a result of its undisclosed practice of reselling used beauty products, Ulta was able to reduce its shrink reserve by more than 20% in 2017, alone." [68] ¶ 7. The complaint alleges that the entire shrink reserve reduction in 2017 was slightly over 20%. *Id.* ¶ 113. As phrased, it is unclear if the complaint is alleging that the entire reduction in shrink in 2017 was attributable to the resale of returned products, or if reselling such products merely contributed to some portion of the reduction. Plaintiffs do not cite this allegation in their briefing on the issue of falsity—presumably because they do not allege that the entire reduction is due to reselling used products. *See* [72] at 14 (arguing that the reduction in shrink from selling used products was "approximately 50%"). Accordingly, this allegation does not help illustrate the ultimate impact of selling used products on Ulta's reported financial figures.

alleges only that one store with a 3% shrink rate had a set goal of 1%.[5]  [68] ¶ 107. Plaintiffs do not explain or cite factual support in the complaint for how the shrink reduction at two stores through the resale of used products was representative or indicative of shrink reduction at all 1,000+ Ulta retail stores, such that it could reasonably be inferred that 50% of shrink expense reduction could be attributed to the resale of used products.  Nor does the complaint allege that the shrink reductions at those two stores was significant enough to render Ulta's company-wide reported net sales, net income, and merchandise inventories inaccurate, let alone materially so.  And, although the complaint includes other allegations that reselling used products was widespread across Ulta stores, those allegations do not quantify the number of used products that were actually reshelved or resold— meaning it is impossible to know how much this practice contributed to or affected Ulta's reported financial figures and thus, whether such figures were false or misleading.

For the same reasons, it cannot reasonably be inferred that disclosure of the reselling policy was necessary to prevent the statements from being misleading because, again, there are simply no facts alleged from which it could reasonably be inferred that reselling used products (even if improper) occurred at such a scale as to render the reported numbers materially inaccurate.  And the alleged misrepresentations cited by Plaintiffs do not say anything about whether Ulta's promulgated figures were "sustainable," nor do the statements imply that these figures would be achieved again in the future.

The complaint also alleges that Settersten stated on a May 26, 2016 conference call that "Inventories were up 14.5% on a per store basis, slightly below the comp rate. **This growth was driven by investments in inventory to keep up with better than expected top line growth**, new brand additions, and the accelerated expansion of prestige boutiques." *Id.* ¶ 206 (emphasis in complaint). The complaint does not allege facts showing that this statement was false for the same reasons as the other statements addressed above.  The complaint also does not allege facts from which it can be inferred that the reported 14.5% increase in inventories is an inaccurate figure, or that the increase was not "driven by

---

[5] The complaint is also inconsistent as to whether the 50% reduction at Geier's store was attributable to reselling used products.  *Compare* [68] ¶ 108 ("Geier stated that the shrink at her store reached 3.9% in 2015 but that she was able to reduce it to 1.45% at the time of her departure in February 2016 as a result of reselling used products."), *with id.* ¶¶ 154–58 (although Geier was "instructed . . . to touch up and resell used products," she was "berated *for not reselling used products* in the damage bins, despite the fact that Geier had reduced her overall shrink in Store 80 from 3.9% to 1.45%" (emphasis added)).  The court takes all reasonable inferences in Plaintiffs' favor and assumes that the reduction at Geier's store was entirely due to reselling used products.

investments in inventory . . . new brand additions, and the accelerated expansion of prestige boutiques." *Id.* (emphasis omitted).

Specific numbers aside, the complaint also alleges that Ulta generally misrepresented its sales, inventory, and shrink reserve calculations by improperly accounting for allegedly resold products. For example, the complaint alleges that Ulta's 2016 first quarter Form 10-Q stated that "[m]erchandise sales are recorded net of estimated returns" and "[c]ost of sales includes: . . . shrink and inventory valuation reserves." *Id.* ¶ 259 (emphasis omitted); *see also id.* ¶¶ 261–62 (alleging nearly verbatim misrepresentations in Ulta's 2016 Form 10-K, 2017 first quarter Form 10-Q, 2017 second quarter Form 10-Q, and 2017 third quarter Form 10-Q). Defendants contend that, just as with the statements regarding the financial figures, the complaint does not plead facts to show that these statements are false. Plaintiffs' response raises the same arguments addressed above (that the figures were off because 50% of used products were being resold and the financial figures were therefore unsustainable) and also contends that it was misleading to omit the reselling of used products because it affected "sales," "estimated returns," and "shrink." [73-1] at 26.

The complaint does not plead sufficient facts from which it can be reasonably inferred that these statements are false. The alleged falsity of both statements is premised on the fact that used products that are put onto store shelves to be resold (or are actually resold) should be included in "estimated returns" but not in "shrink and inventory valuation reserves." [68] ¶ 259. But the complaint does not actually levy this allegation or put forth facts to support such a conclusion. The complaint pleads only the conclusion that such figures were "offset by approximately 50% of . . . returns being resold as new." [68] ¶ 260; *see In re First Chi. Corp. Sec. Litig.*, 769 F. Supp. 1444, 1453 (N.D. Ill. 1991) ("Vague and conclusory allegations that the defendant's representations were not true . . . are insufficient."). If, as a matter of accounting, it was appropriate for Ulta to treat the reshelved and resold used products as it did, then Ulta's representation about how its merchandise sales and cost of sales were calculated is not misleading or inaccurate. The complaint does not allege that the accounting methodology Ulta applied should have treated the reshelved and resold used items any differently than Ulta did. It also cannot be reasonably inferred that reshelved or resold products should be accounted for differently because, according to the complaint, Ulta's "shrink reserve represent[s] management's estimate of inventory losses." *Id.* ¶ 100. Reshelved used items cannot reasonably be accounted for as "losses" if they could be (and allegedly were) resold for full value—unless there is some other accounting principle Ulta applied (or purported to apply or should have applied) that required different treatment. The sale of a used product is still a sale as far as basic accounting is concerned, and a reshelved used product is (for strictly accounting purposes) no different than a new product on the same shelf. Reselling used makeup products without informing consumers is reprehensible; nonetheless, without some allegation of how Ulta's application of its accounting methodology was inaccurate, the complaint fails to

23

plead that these representations are false.  *Cf. Christidis v. First Penn. Mortg. Tr.*, 717 F.2d 96, 100 (3d Cir. 1983) (affirming dismissal of complaint under Rule 9(b) where complaint alleged company's reserves had been improperly reported because complaint did not allege "[w]hat [reasonable accounting practices were] and how they were departed from" in the company's reports).

Separately, the cited statements make no reference to whether the figures are sustainable or not, as they merely state how merchandise sales and cost of sales are calculated.

The complaint also alleges that Ulta misrepresented its inventory valuation policy in its 2016 Form 10-K.  The 10-K stated that:

> Inventories are adjusted for the results of periodic physical inventory counts at each of our locations.  **We record a shrink reserve representing management's estimate of inventory losses by location that have occurred since the date of the last physical count.  This estimate is based on management's analysis of historical results and operating trends.**
>
> **We do not believe that there is a reasonable likelihood that there will be a material change in the future estimates or assumptions we use to calculate our lower of cost or market or shrink reserves**.  Adjustments to earnings resulting from revisions to management's estimates of the lower of cost or market and shrink reserves have been insignificant during fiscal 2016, 2015 and 2014.  An increase or decrease in the lower of cost or market reserve of 10% would have had no material impact on our pre-tax income for fiscal 2016.  **An increase or decrease in the shrink rate included in the shrink reserve calculation of 10% would have had no material impact on our pre-tax income for fiscal 2016**.

*Id.* ¶ 264 (emphases in complaint).  Defendants assert that the complaint does not allege that this statement is false.  Plaintiffs argue in response that it is misleading because it omits that Ulta was "overstating inventory and understating the shrink reserve" by not disclosing Ulta's alleged practice of reselling used products and, for the same reason, the shrink reserve "did not represent management's best estimate" based on historical results and operating trends.  [73-1] at 27.  Plaintiffs also argue that there was, in fact, a material change in 2017 when the shrink reserve decreased by 20%.  *Id.*

Again, the complaint does not allege sufficient facts from which it can reasonably be inferred that this statement is false.  Regarding the first paragraph, the complaint does not allege that Ulta did not actually record its shrink reserve based on management's estimates using historical results and operating trends.

Nor, for the reasons explained above, does the complaint allege that Ulta's accounting for resold and reshelved used products was improper under the accounting standards applied (or purportedly applied) by Ulta for its shrink reserves when this statement was made. And there are no other alleged facts from which it could be reasonably inferred that the shrink reserve was not calculated by applying the method set forth in the 10-K.

The complaint also does not set forth sufficient facts to reasonably infer that the second paragraph is false or misleading. The complaint does not allege, and Plaintiffs do not point to, any factual allegations that Defendants did not believe when the 10-K was published that there was a reasonable likelihood that there would be a material change in future estimates or assumptions regarding shrink reserves. Plaintiffs claim that the 20% reduction in the shrink reserve in 2017 undercuts this statement, but the complaint alleges no facts from which it could reasonably be inferred that Defendants should have expected (or were otherwise aware of) such a decrease at the time the 10-K was published. The complaint also does not allege what Ulta's estimates were in 2016, so there is no basis to conclude that the 20% reduction in Ulta's shrink reserve in 2017 was materially off from what Ulta had estimated. Further, there are no factual allegations regarding how much, if any, of the 2017 decrease in shrink is actually attributable to reselling used products. The complaint's allegations that levy this charge are conclusory and unsupported by any alleged facts. [68] ¶¶ 7, 265. The complaint also does not allege any facts to reasonably infer that it was incorrect to state that a 10% change in the shrink rate would have had a material impact on Ulta's pre-tax income in 2016.

### b. Shrink

The complaint alleges that Defendants made false or misleading statements regarding Ulta's shrink. On June 14, 2016, at a William Blair Growth Stock Conference, Settersten allegedly responded "to an analyst question about Ulta's shrink" by stating that:

> It is an issue for all retailers. I am sure you see the stories. I mean it is crazy the amount of losses that US retailers take every year on theft, whether it be internal, external or just what they call administrative loss. There are so many products and so many locations that you can't -- it is difficult to track everything accurately all the time. **We are not seeing anything extraordinary from what we have had historically so there is certainly a good amount of shrink, what we call shrink embedded in our base and we haven't seen anything and we are continuing to add more resources and more new technologies to try to mitigate loss as best as we can**.

25

*Id.* ¶ 209 (emphasis in complaint).  Defendants assert that the complaint's allegations do not establish that this statement is false because there are no allegations that Ulta did not add more resources or new technologies to reduce shrink and no factual allegations show that Ulta's shrink in June 2016 was "extraordinary" in comparison to what Ulta "had historically" seen.  Plaintiffs respond that (1) CW4, CW5, CW8, and Ludwig stated that, as of June 2016, shrink was significantly increasing; (2) Ulta refused to hire more personnel to mitigate shrink attributable to theft; and (3) Ulta was trying to reduce shrink through reselling used products.  [68] ¶ 68; [73-1] at 9–10.

The complaint's allegations do not allow for a reasonable inference that this statement is false or misleading.  First, the complaint does not plead facts from which it could be reasonably inferred that Ulta's shrink as of June 2016 was "extraordinary" relative to Ulta's history.  Plaintiffs do not point to any such allegations, and, undercutting Plaintiffs' argument, the complaint alleges that Ulta's "Shrink Write-offs" (Ulta's "losses from shrink") in 2016 were the same percentage of Ulta's net income (8%) that they had been in 2014 and 2015.  [68] ¶ 113.  The complaint also alleges that Ulta's "'shrinkage' significantly increased in 2015"—not 2016—"and continued throughout the Class Period."  *Id.* ¶ 103; *see also id.* ¶ 119 ("excessively high shrink levels beg[an] around 2015").  The allegations regarding CW4, CW5, CW8, and Ludwig are also insufficient to show the statement was false.  CW4 stated that "Ulta was 'getting hammered on shrink'" starting "in 2015."  *Id.* ¶ 104.  CW5 stated that shrink "was a chronic problem."  *Id.* ¶ 105.  And Plaintiffs do not cite any allegations regarding CW8 and Ludwig about shrink drastically increasing around or shortly before June 2016 when Settersten made the statement at issue.

Second, the complaint also does not plead sufficient facts from which it could be reasonably inferred that Ulta was not "add[ing] more resources and more new technologies" to combat shrink.  [68] ¶ 209.  The complaint's sole allegation to support this is a statement from CW5 that Meyer and Carroll stated in November 2015 "that retouching and reshelving damaged returns was 'the most controllable way to control shrink' without expending significant money to hire additional security personnel, which Ulta management was simply not willing to do."  *Id.* ¶ 106.  CW5, however, worked at a single store, *id.* ¶ 52, and there are no allegations that CW5's experience was representative of all Ulta stores, nor are there allegations that Ulta was not adding new resources and technologies at other stores or at Ulta's corporate offices.  Further, there are no allegations about whether Ulta committed new resources or adopted new technologies after November 2015.  And, again, the complaint's allegations undercut Plaintiffs' contention that the statement is false, because the complaint alleges that Ulta did adopt at least some new technology "[i]n 2016."  *Id.* ¶ 74 ("Ulta implemented a new merchandizing planning and forecasting system called the warehouse inventory fulfillment tool . . . to improve the Company's in-stock rates.").

26

The next allegedly false statement regarding shrink was made on an August 24, 2017 conference call. Settersten was asked "for clarity on the drivers for expected improvement in Ulta's margins and bottom line," and he allegedly responded:

> And as far as, I guess, P&L line drivers, right, Jason, just directional. So we said for the third quarter, gross profit, slight deleverage; and SG&A, flattish. I mean, the biggest driver is the preopening expense deleverage year-over-year, which again, I want to make people understand that's a good thing, right. I mean, it's a near-term headwind for us, but we're pulling stores forward, right, from where we had planned earlier in the year. And so those stores will get open sooner. They'll start generating profits quicker, and they'll help our store teams be more prepared going into holiday. It helps a litany of things, **shrink among many other things that we deal with day to day.** So that's a good investment from an investor perspective.

*Id.* ¶ 231 (emphasis in complaint). Defendants argue that the complaint does not allege this statement's falsity and that it is a general, vague statement that is inactionable. Plaintiffs contend it is false or misleading because Ulta did not disclose its policy of selling used products, that the anticipated reduction in shrink was attributable to that policy, and that, as a result, Ulta's performance was not sustainable.

The complaint does not allege that this statement is false or misleading. In context, Settersten was addressing "the biggest driver" for Ulta's profits and losses[6] and stated that Ulta was facing "a near-term headwind" from "preopening expense deleverage" attributable to opening new stores earlier. *Id.* Settersten states that this was nevertheless a "good investment" because the new stores will "start generating profits quicker" and will "help[] a litany of things, shrink among many other things that we deal with day to day." *Id.* (emphasis omitted). The complaint contains no factual allegations from which it could be reasonably inferred that Settersten was incorrect when he stated that this would help address shrink. And, understanding the statement in context, Plaintiffs provide no reason why Settersten would have to mention the alleged practice of reselling used products to make the statement not misleading, or how the statement relates in any way to whether Ulta's profits were "sustainable" (which Settersten did not claim they were). Settersten does not imply that opening new stores more quickly was the primary cause of the reduction in shrink, or even a significant cause.

The last allegedly false statement regarding shrink is from Ulta's 2016 Form 10-K. The Form 10-K "reported a Shrink Reserve roll-forward":

---

[6] "P&L" means "profit and loss." [72-2] at 14.

| Shrink Reserve | Year-ended January 30, 2016 |
| --- | --- |
| Balance at beginning of period | $15,259 |
| Charged to costs and expenses [estimated provision for shrinkage] | $35,505 |
| Deductions [inventory write-offs] | ($31,699) |
| Balance at end of period | $19,065 |

*Id.* ¶ 223. Defendants again contend that the complaint does not plead facts sufficient to infer that this statement was false. Plaintiffs repeat the same argument that the statement is misleading because it does not disclose that Ulta's shrink was worse than publicly reported resulting from Ulta's practice of reselling used products and was not sustainable. *Id.* ¶ 224.

Again, the complaint does not plead sufficient facts from which the court can reasonably infer that this representation is false or misleading. There are no allegations that set forth facts supporting a reasonable inference that the published figures are inaccurate, or that they were not properly calculated under the accounting methodology Ulta used. Plaintiffs cite the allegations from Ludwig and Geier that their stores reduced their shrink by 50% through reselling used products but, as explained above, only two stores reportedly reduced their shrink by 50%, and there are no allegations that the reductions in shrink at those stores were representative or reflective of over 1,000 other stores, or that the shrink reduction at those stores alone caused the published figures to be materially inaccurate. The publication of Ulta's shrink reserve from the year ending January 30, 2016, also does not imply or state anything about whether these figures would be sustainable going into the future.

### c. Product Margins

The complaint alleges that, during a May 26, 2016 conference call, Settersten stated that "Gross profit increased 150 basis points. The improvement was driven by strong leverage on store rent and occupancy expenses, **as well as by healthy product margin expansion**, offset by planned supply chain deleverage related to investments in new distribution centers and core merchandising systems." [68] ¶ 205 (emphasis in complaint). Defendants argue that the complaint does not plead facts showing that this statement was false or inaccurate. Plaintiffs argue that it is false and misleading for the same reasons as the statements regarding Ulta's sales, income, and merchandise inventories addressed above in subsection (a)—that the statement does not disclose Ulta's reselling of used products and that Ulta's financial performance was unsustainable. *Id.* ¶ 208; [73-1] at 8.

28

The complaint fails to allege that this statement was false for the same reasons as the statements ([68] ¶¶ 201, 204) addressed above. Further, the complaint does not allege what the "product margin" is, how it is calculated, or how it would be impacted by Ulta's alleged practice of reselling used products. Nor does the complaint allege facts from which it can reasonably be inferred that the reported increase in gross profit is inaccurate, or that the "improvement" was not driven in part by "healthy product margin expansion," as well as the other factors listed in the statement.

### 5.      Internal Controls

The final category of alleged misrepresentations concerns Ulta's internal controls. The complaint alleges that Defendants falsely represented or certified that Ulta had internal controls in place to ensure that its financial disclosures were accurate. For example, the complaint alleges that Ulta's 2016 first quarter Form 10-Q stated:

> We have established disclosure controls and procedures to ensure that material information relating to the Company is made known to the officers who certify our financial reports and to the members of our senior management and Board of Directors. **Based on management's evaluation as of April 30, 2016, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, are effective** to ensure that the information required to be disclosed by us in our reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

[68] ¶ 251 (emphasis in complaint). The complaint alleges that Dillon signed a form for the 10-Q, certifying that:

> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all

> material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*Id.* ¶ 252 (emphases omitted). Dillon also certified that she and Settersten were responsible for establishing and maintaining Ulta's internal controls over financial reporting and had:

> a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.
>
> b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
>                 \*        \*        \*
>
> d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

*Id.* (emphases omitted). Dillon also certified that the Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.* ¶ 254 (emphasis omitted). The complaint alleges that Settersten made the same alleged misrepresentations, and that other Form 10-Qs in 2016 and 2017 "contained identical material misrepresentations" from both Dillon and Settersten. *Id.* ¶¶ 253, 255–56. The complaint also alleges that Defendants misrepresented in Ulta's 2016 Form 10-K that:

> Under the supervision and with the participation of our principal executive officer and our principal financial officer, management evaluated the effectiveness of our internal control over financial reporting as of January 28, 2017, based on the criteria established in Internal Control – Integrated Framework issued by the Committee of

Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO). **Based on this evaluation, our principal executive officer and principal financial officer concluded that our internal controls over financial reporting were effective as of January 28, 2017.**

*Id.* ¶ 257 (emphasis in complaint). Defendants argue that the complaint does not allege facts showing that these statements were false, because it does not allege that Dillon and Settersten knew Ulta's internal controls were insufficient or that the filings contained material misstatements. Plaintiffs contend that Dillon and Settersten were aware of Ulta's practice of reselling used products and that the internal controls were plainly insufficient given that the practice had gone on for years. [73-1] at 21.

The complaint does not allege facts from which it could be reasonably inferred that these statements are false or misleading. Regarding the certifications that Dillon and Settersten believed Ulta had adequate internal controls, the complaint does not allege any facts showing that they did not believe Ulta's controls were adequate or effective. Even if the practice of reselling used products was widespread and both were aware of it, neither the complaint nor Plaintiffs put forth any facts (or explanation) as to how Ulta's internal controls should have been designed differently. Indeed, the complaint does not identify any facts indicating that the controls themselves were inadequate—including what those internal controls were. Plaintiffs appear to assume that the alleged prevalence of reselling used products is something that effective or adequate internal controls would have caught and reported, but the complaint offers no facts to support such an assumption or from which a reasonable inference of falsity could be drawn.

As to the certifications that Ulta's SEC forms contained no material misrepresentations, the complaint does not put forth facts to reasonably infer that there was a material misstatement in Ulta's filings. Even if Dillon and Settersten were aware used products were being resold, neither the complaint nor Plaintiffs explain how the financial figures in Ulta's filings should have been calculated differently for the reasons previously set forth. Finally, as addressed further in the next section, the complaint does not contain factual allegations from which it can be reasonably inferred that Dillon and Settersten were actually aware of the practice of selling used products so, even if Ulta's SEC filings did contain material misstatements, it was not false for Dillon and Settersten to represent that they were unaware of any material misrepresentations.

## B.     The Complaint's Allegations Do Not Support A Strong Inference of Scienter

For securities fraud claims, the PLSRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind." 15 U.S.C. § 78(u)-4(b)(2)(A). Here, the required state of mind is that the speaker "knew the statement was false or was reckless in disregarding a substantial risk that it was false." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs III*"). Recklessness is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir.2001)) (ellipsis in original). For forward-looking statements, the PSLRA requires "'actual knowledge' of falsity." *Id.* at 705 (quoting 15 U.S.C. § 78u–5(c)(1)(B)(ii)).

"To qualify as 'strong'" under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("*Tellabs II*"). Restated, the court "must engage in a comparative evaluation; it must consider not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* As part of this analysis, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 322. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

When assessing scienter, "allegations from 'confidential witnesses'" will "[u]sually" be "steep[ly]" discounted. *Higginbotham*, 495 F.3d at 757. But "several factors [can] strengthen the inference, including a large number of confidential witnesses, descriptions of their jobs that indicate they had first-hand knowledge of the facts to which they are testifying, corroboration by other sources, and the inclusion of their real names." *In re Supreme Indus., Inc. Sec. Litig.*, No. 3:17CV143PPS, 2018 WL 2364931, at *9 (N.D. Ind. May 23, 2018) (citing *Tellabs III*, 513 F.3d at 712). Setting aside one allegation from CW4 addressed below, the court gives the allegations from confidential witnesses full weight without deciding whether they should be discounted because, even if not discounted, they and the rest of the complaint's allegations are insufficient to establish a strong inference of scienter.

Plaintiffs argue that the complaint adequately alleges scienter for Dillon and Settersten, as well as for Ulta as a corporate entity.

### 1. Dillon and Settersten

The allegations concerning Dillon's and Settersten's scienter can be divided into four general categories related to their alleged (1) participation in the scheme

to resell used products; (2) access to information regarding the practice; (3) roles at Ulta; and (4) sales of Ulta stock.

### a.    Alleged Participation

Plaintiffs contend that Settersten and Dillon directly participated in the alleged scheme to resell used products.  For Settersten, the complaint alleges that he "attended Shrink Committee meetings."  [68] ¶ 114.  The Shrink Committee was "comprised of representatives from a majority of departments within Ulta" and met "at least monthly" through "in-person meetings at Ulta's corporate headquarters." *Id.*  "The purpose of Shrink Committee meetings was to discuss how to decrease and control shrink."  *Id.*

Defendants contend that these allegations are insufficient because the complaint does not identify any specific meetings that Settersten attended, when those meetings occurred, or allege that the resale of used products was ever discussed at such meetings.

The allegations concerning Settersten's involvement in the Shrink Committee are insufficient to establish scienter.  Settersten's alleged attendance at Shrink Committee meetings is insufficient to show that Settersten was aware of the resale of used products.  According to the complaint, "shrink" encapsulates not only "losses from returns" but "things like theft and in-store damage."  [68] ¶ 4; *see also id.* ¶ 94 ("Inventory shrinkage is comprised mainly of losses on inventory from used and/or damaged goods and theft.").  Indeed, "CW4 believed that shrink was increasing as a result of new store openings and an upsurge in break-in thefts," not necessarily just returns.  *Id.* ¶ 104; *see also id.* ¶ 106 (CW5 believed "theft" was "[a]nother major contributor to shrink").  Thus, the fact that Settersten was attending meetings focused on combatting shrink does not mean that the meetings were focused only on losses from returns.

Further, even if the Shrink Committee did discuss losses from returns (as it can reasonably be inferred that it did), the complaint does not include any allegations about what exactly was said or discussed at the meetings.  There are no allegations that reselling used products was ever mentioned at a single meeting, let alone in Settersten's presence.  Even if it could reasonably be inferred that the Committee discussed reselling used items while Settersten was present, the complaint does not allege when these meetings took place aside from that they occurred sometime during the "Class Period," so it cannot be reasonably inferred that Settersten was aware of enough information at the time any of the alleged misrepresentations were made to know that the misrepresentations were, in fact, false.  Thus, Settersten's alleged attendance at Shrink Committee meetings is insufficient to establish scienter.  *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1117 (N.D. Cal. 2009) (allegations that defendants "received weekly briefings [and] attended regular meetings about the topic" at center of alleged fraud were

insufficient because allegations did not "provide particularized facts about what was said in any briefing or meeting"); *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1315–16 (N.D. Ga. 2006) (complaint did "not identify . . . any instances in which Edwards or Jones . . . were present for specifically identified meetings or communications in which channel-stuffing was specifically alleged to have been discussed"); *see also In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 999 (E.D. Wis. 2009) (similar).

For Dillon, the complaint alleges that "CW4 recalled that defendant Dillon approved . . . shrink bonuses." [68] ¶ 125. "[M]eeting shrink goals was a component of a manager's overal[l] bonus package," and "[t]he shrink bonus was performance based, such that an employee could increase the size of his or her shrink bonus by beating their shrink goals by wider margins." *Id.* ¶ 120. The complaint alleges that "a 'shrink bonus' was paid to employees [Regional Vice Presidents] and below," *id.* ¶ 122, and multiple witnesses confirmed that "shrink bonuses were paid to employees who met specific goals based upon overall shrink rates," *id.* ¶ 123; *id.* ¶ 124 ("Ulta paid a 'shrink bonus' to General Managers if their store's 'shrink percentage' was below a certain threshold set by Ulta."). The complaint alleges that, by paying bonuses based upon reducing shrink, Ulta management "put significant pressure on employees to reduce shrink by the unethical means of touching up and reshelving used product for resale." *Id.* ¶ 128.

These allegations regarding Dillon are insufficient to establish scienter. As a threshold matter, the complaint does not allege particularized facts to establish that Dillon actually approved the shrink bonuses. CW4 was a district manager who the complaint does not allege ever interacted with Dillon. *Id.* ¶ 51. As a district manager, CW4 reported to a regional vice president, who reported to a Senior Vice President of Store Operations, who reported to the Chief Store Operations Officer, who reported to Dillon. *Id.* ¶ 66 & n.8. In other words, CW4 was at least four levels removed from Dillon. The complaint also does not allege the basis for CW4 to know that Dillon approved the shrink bonuses, and that knowledge cannot reasonably be inferred based upon CW4's position at Ulta. As a result, the court discounts this allegation. *See Higginbotham*, 495 F.3d at 757.

Even assuming Dillon did approve the shrink bonuses, this is still insufficient to show scienter. As explained above, shrink encompasses a number of different things, not just used items, and the bonus was allegedly tied only to the general reduction of shrink—it did not reward only reselling used items, as opposed to, for example, reducing thefts. Further, the fact that Dillon approved bonuses for reducing shrink does not establish that she was aware that any used products were being resold (or the scale of this practice), such that she knew, or recklessly disregarded, that any of the alleged misstatements were false or misleading.

34

### b. Roles at Ulta

Plaintiffs also contend that Dillon and Settersten must have been aware of the alleged resale of used products because of their roles at Ulta, particularly given how widespread the alleged practice was and that it related to a critical part of Ulta's business plan (reducing shrink). Dillon has been Ulta's CEO and on the company's board of directors since July 2013. [68] ¶ 35. Also, at least as of July 20, 2018, Dillon was Ulta's Chief Operating Decision Maker and "regularly review[ed] Ulta's financial information [f]or purposes of making operational decisions and assessing financial performance." *Id.* (internal quotation marks omitted, second alteration in original). Settersten has been Ulta's CFO and Assistant Secretary since March 2013. *Id.* ¶ 36. Both Settersten and Dillon certified the accuracy of the financial figures published in Ulta's SEC filings and the adequacy of Ulta's internal controls. *Id.* ¶¶ 252–55.

The complaint alleges that the practice of reselling used products was widespread across Ulta stores. Regional Vice Presidents "from four of Ulta's six to seven Regions during the Class Period . . . instructed the stores in their regions to resell used products and threatened managers" who did not do so. *Id.* ¶ 139; *see id.* ¶¶ 140–67. Fully crediting the accounts of the CWs, it can reasonably be inferred that many Ulta stores across the United States were reselling used products, even though some employees did not follow the instructions given to them by management. *Id.* ¶ 158 (Geier was "berated . . . for not reselling used products in the damage bins" at her store); *id.* ¶ 163 (at least some employees in a St. Louis-area store "failed to return damaged items [to shelves] on their own").

Although the complaint alleges that reselling used products was occurring at stores across the country, the complaint does not indicate how many used products were resold or reshelved. At most, two stores reduced their shrink by approximately 50% to 60% each month (a decrease of about $3,000 to $4,000 per month per store) starting in early 2017. *Id.* ¶¶ 108–09, 150. In comparison, Ulta's yearly losses from all shrink (which again includes "losses from returns" as well as "things like theft and in-store damage," [68] ¶ 4) ranged from $10,960,000 in 2013 to up to $37,350,000 in 2017 (ranging from 5% of Ulta's net income to, at most, 8%). *Id.* ¶ 113. The complaint also alleges that reducing shrink was an important goal of the company. *Id.* ¶¶ 101, 114, 129.

Defendants contend that these allegations are insufficient because of the limited number of stores that the complaint actually alleges were engaged in reselling used products. Defendants also argue that none of the managerial and retail-level employees alleges that they had any interactions with Dillon or Settersten regarding this practice, and these employees' knowledge cannot be imputed to Dillon and Settersten. Defendants also argue that Dillon's and Settersten's high-level positions are, in and of themselves, insufficient to infer scienter.

Taking all reasonable inferences in favor of Plaintiffs, these allegations do not establish a strong inference of scienter. The fact that Dillon and Settersten were Ulta's CEO and CFO is an insufficient basis to infer scienter "without additional support from internal documents or communications." *Société Générale Sec. Servs.*, 2018 WL 4616356, at *8; *Pugh*, 521 F.3d at 701 (rejecting argument that complaint alleged scienter "by virtue of [defendants'] positions"); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 884 (N.D. Ill. 2011) ("Conclusory allegations regarding an executive's position within the corporate hierarchy do not satisfy the PSLRA's particularity requirement, and therefore contribute very little, if anything, to a strong inference of scienter.").

Courts have held that scienter can be inferred based on a defendant's executive position at a company but only when "the subjects of the statements or omissions are typically of great importance to the company," *i.e.*, that the subject at issue is "critical to a business's core operations or to an important transaction." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 662 (N.D. Ill. 2020) (internal quotation marks omitted). But this still must be supported by particularized facts. *See In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) (describing arguments basing scienter upon an executive's position as "attempts at an end-run around the requirement that plaintiffs set forth particularized facts").

The complaint does not allege that reselling used products was critical to Ulta's operations. At best, the complaint alleges that addressing shrink *in general* was a key focus of the company, not reselling used products specifically. As already discussed, shrink is not limited to "losses from returns"—it includes "things like theft and in-store damage." [68] ¶ 4; *see also id.* ¶ 94 ("Inventory shrinkage is comprised mainly of losses on inventory from used and/or damaged goods and theft."); *id.* ¶ 104 ("CW4 believed that shrink was increasing as a result of new store openings and an upsurge in break-in thefts."); *id.* ¶ 106 (CW5 believed "theft" was "[a]nother major contributor to shrink"). Nor is reselling used products the only method to reduce shrink. Further, as has been addressed above, although the resale of used products allegedly occurred at many stores, the complaint fails to quantify the scale of the practice relative to Ulta's overall shrink, sales, or income. At most, the complaint alleges that, in 2017, some unknown portion of Ulta's 20% reduction of its shrink reserve was attributable to the resale of used items—but the complaint does not allege any facts regarding whether the practice was responsible for 19.99% or 0.00001%. *Id.* ¶ 7. Thus, while Dillon and Settersten were likely aware of Ulta's general problem with shrink, it does not follow that they must have been aware that retail stores were combating it by selling used items. Without more facts quantifying how significant the practice actually was, it cannot reasonably be inferred that it was so important to Ulta that Dillon and Settersten must have been aware of it, or that it was reckless for them not to know of it.

Even accepting that the allegedly widespread nature of the practice may lend some support to an inference of scienter, under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. That is not the case here. The complaint's allegations fail to draw any connection between the actions of store-level employees, management who were involved in the practice, and Dillon and Settersten. None of the witnesses cited in the complaint who allegedly observed or were instructed to resell used products are alleged to have ever interacted with Dillon or Settersten. In Ulta's organizational hierarchy, the closest person to Dillon and Settersten was CW3, the Director of Loss Prevention, who reported to Julie Giblin, the Vice President of Loss Prevention. [68] ¶ 50. Giblin reported to Settersten, who in turn reported to Dillon. *Id.* ¶ 50. CW3 "was aware that the alleged practice of reselling used products occurred," *id.* ¶ 170, but the complaint does not indicate CW3 discussed the issue with Dillon or Settersten or that Dillon or Settersten were aware of it. Similarly, the complaint alleges that Steelman reported directly to Dillon and that Steelman was present during a store walkthrough where the reshelving practice was discussed and encouraged. *Id.* ¶¶ 69, 146. But, again, there are no allegations that Steelman actually communicated this to Dillon, nor are there any factual allegations from which it could reasonably be inferred that Steelman would have raised or otherwise discussed what she witnessed with Dillon.

These allegations do not tie the sale of used products to Dillon and Settersten. No person was allegedly directed by either to sell used products. No person allegedly ever heard the issue discussed by, or in front of, either. And there are no allegations that the resale of used items was ever brought to the attention of either. There is simply no alleged connection between the practice and Dillon and Settersten, aside from their executive positions at Ulta. Thus, even if the practice was widespread, this does not support a strong inference that Dillon and Settersten were aware of it. *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *11 (N.D. Ill. Oct. 30, 2012) (finding no support for a strong inference of scienter because "Plaintiffs allege no direct interaction that any CW had with Graham [the defendant company's CFO], nor do they allege how he would be privy to information that would make his allegedly misleading statements knowingly or recklessly false" (citation and internal quotation marks omitted)); *cf. Marvin H. Maurras Revocable Tr. v. Bronfman*, No. 12 C 3395, 2013 WL 5348357, at *5 (N.D. Ill. Sept. 24, 2013) ("There is no general rule that corporate officials are presumed to know everything their subordinates know or that they are presumed to be complicit in their underlings' law-breaking.").

Perhaps most problematic is that the complaint wholly fails to allege any facts indicating *why*—even if the resale of used products was rampant across all stores, or if higher-level employees like Carroll and Steelman were aware of and encouraged it—Dillon and Settersten would be aware that retail stores were reselling used products. Aside from the allegation that Dillon "regularly review[ed]

37

Ulta's financial information [f]or purposes of making operational decisions and assessing financial performance," [68] ¶ 35 (internal quotation marks omitted), and that she and Settersten both signed off on SEC statements, there are no allegations regarding either's substantive job responsibilities. No allegation in the complaint provides any reason to think that either Dillon or Settersten was involved in monitoring retail-level store sales or inventory policies, that they reviewed specific financial or inventory information that would have showed used items were being restocked and resold, or that the persons reporting to Dillon and Settersten would have known about the practice and had a reason to tell them (or that either Dillon or Settersten would have asked their subordinates about it).

In the cases that have held that strong inferences of scienter existed as to executives at a company, those complaints included specific allegations detailing exactly how and why those executives should have been (or were) aware of the fraud. *See, e.g.*, *City of Lakeland Emps. Pension Plan v. Baxter Int'l, Inc.*, No. 10 C 6016, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) ("The allegations in the complaint from the confidential witness set forth with specificity how informed the individual defendants were about the operations and financial state of the company including daily and monthly assessments of the amount of blood collected by Baxter and how that fit with projections."); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) ("[T]he complaint specifically alleges that Glickman himself admitted to being deeply involved in every major aspect of the lending process. In light of the complaint's other allegations, Glickman's intimate involvement in the process gives rise to a strong inference that he was aware of Corus's financial troubles and was aware that his statements about the corporation's financial health would be misleading to investors." (citation and internal quotation marks omitted)). Here, the complaint contains no such allegations. Instead, Plaintiffs effectively rely solely on Dillon's and Settersten's job titles without providing any substance as to what their jobs entailed and connecting that substance to the resale of used products. As a result, allegations about the widespread nature of the practice are insufficient to support a strong inference that they had actual knowledge or were reckless. *See Pugh*, 521 F.3d at 700-01 (alleging that defendants were "senior . . . management personnel who should have been intimately aware" of alleged problems was insufficient where complaint gave only titles "with no description of their job responsibilities" and "were not alleged to have been involved with the day-to-day operations and internal controls" regarding allegedly inaccurate financial reports); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund*, 778 F. Supp. 2d 858 ("allegation that Tullman and Davis were top executives charged with overseeing and executing Allscripts' business strategy [was] unhelpful" to showing scienter).

Altogether, the fact that the sale of used products is alleged to effectively be a nationwide practice tends to support an inference of scienter, but the absence of any other allegations supporting an inference that Dillon or Settersten were aware of it,

or had a specific reason to be aware of it, means that this inference is not strong enough to satisfy the PSLRA's requirements.

### c. Access to Information

Next, the complaint alleges that Dillon and Settersten had access to multiple sources of information that revealed stores were reselling used products. Specifically, the complaint alleges that Ulta executives could access shrink reports through a "centrally accessible and managed inventory infrastructure" that "gave senior executives visibility in what was occurring with the Company's sale down to every last item of inventory." [68] ¶ 76. Ulta executives thus had "real time" access to inventory levels. *Id.* (emphasis omitted). Ulta's internal company website "Ultanet" also included a "Dashboard" that "reported sales numbers and statistics for damaged products . . . on a weekly basis" and "shrink after each physical inventory . . . which typically occurred every six months." *Id.* ¶ 77.

The complaint also alleges that Ulta maintained on Ultanet a "'Damages Planogram,' which provided a detailed description of how the damages area in the back of the retail store was to be organized and what materials were to be kept." *Id.* ¶ 132. "The planogram required six damages bins, one for every product category, a return to shelf bin and materials to touch up used products for resale, including paper towels and alcohol." *Id.* ¶ 302.

Defendants argue that these allegations do not support a strong inference of scienter because allegations that a defendant merely had access to information—but did not review it—are insufficient.

These allegations do not support an inference that Dillon and Settersten were aware of the alleged resale of used products. The Seventh Circuit "has determined . . . that a complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information." *Cornielsen*, 916 F.3d at 602; *see also W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 660 (collecting cases). "Mere access to sources of information—without any allegations regarding if, when, and how defendants actually accessed this information—is not enough to contribute to a strong inference of scienter." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund*, 778 F. Supp. 2d at 884. Here, the complaint contains no allegations that Dillon and Settersten ever accessed the alleged shrink reports or Damages Planogram. Nor are there any allegations that Dillon or Settersten had any role in preparing, or directing someone to prepare, the reports or the Planogram. There are no allegations that Dillon or Settersten knew such documents existed.

At best, Plaintiffs cite a statement from Ulta's 2017 Form 10-K that states "senior executives[] monitor the levels of clearance and aged inventory in our stores on a weekly basis." [68] ¶ 71 (emphasis omitted). But the allegation that

unspecified "senior executives" reviewed unspecified reports does not provide the necessary link between the reports and Dillon or Settersten. The Seventh Circuit has "rejected the 'group pleading doctrine'" because the PSLRA requires plaintiffs to "create a strong inference of scienter with respect to each individual defendant." *Pugh*, 521 F.3d at 693. Thus, these allegations do not support scienter. *Cornielsen*, 916 F.3d at 600, 601–02 (allegation "indicating that one or more Individual Defendants may have possessed information that impugned the truth of the representations made" without specifying the particular defendant and specific information "fail[ed] to satisfy the PSLRA's particularity requirements").

Even if there were allegations that Dillon and Settersten accessed such documents, there are no allegations as to when they would have done so or if they would have reviewed specific information that would have meant either knew that any of the alleged misrepresentations were false. *See Higginbotham*, 495 F.3d at 758 ("there is a big difference between knowing about the reports . . . and knowing that the reports are false"). For example, the complaint does not allege that the shrink reports expressly reported the number of used items that had been reshelved, or that these figures were otherwise discernible from the reports. Nor are there allegations showing why it would be reasonable to infer that seeing spaces for paper towels and other cleaning products in the Damages Planogram would alert Dillon or Settersten to the fact that products were being resold. This distinguishes the cases cited by Plaintiffs, as the complaints in those cases alleged that the defendants had actually reviewed specific information revealing the alleged fraud. *See, e.g., In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (allegations "establish[ed] that members of executive-level management, including individual defendants, had access to *and used* reports documenting in real time the decline in sales" (emphasis added)).

### d. Stock Sales

Plaintiffs' final scienter allegations concern stock sales made by Dillon and Settersten. The complaint alleges that they "were motivated to engage in the alleged fraudulent scheme . . . in order to inflate Ulta's common stock price and maximize their personal profits from selling their shares of Ulta stock at inflated prices." [68] ¶ 319. According to the complaint, Dillon and Settersten "did not make a single sale until the Class Period." *Id.* ¶ 320. During the Class Period, Dillon allegedly made three sales. On August 30, 2016, she "sold 28,290 stock options for $245.68 per share, generating gross proceeds of $7,105,065.60 and profits of $4,247,086.80." *Id.* ¶ 323. On August 31, 2016, Dillon "sold an additional 22,965 stock options for $245.80 per share, generating gross proceeds of $5,644,797.00 and profits between $3,371,032.35 and $3,376,122.75." *Id.* (footnote omitted). Together, "these transactions represented a sale of approximately 73.5% of [Dillon's] 70,593 stock options that had vested as of August 31, 2016," and "the $7.6 million in profits[] were over seven and a half times Dillon's $1 million salary in 2016." *Id.* (emphasis omitted). The complaint alleges that the August 2016 sales

"were strategically timed to occur just days after the company announced its second quarter 2016 results on August 25, 2016." *Id.* ¶ 324.

Dillon's third sale "occurred on March 20, 2017, when she exercised and sold 33,955 shares of Ulta common stock for $286.05 per share, generating gross proceeds of $9,712,827.75 and profits of $5,470,867.98." *Id.* ¶ 326. This sale "generated nearly five times Dillon's $1,117,000 salary in 2017." *Id.* (emphasis omitted). And, again, the complaint alleges this sale was "strategically timed" to occur after Ulta "announced its fourth quarter and fiscal year 2017 results on March 9, 2017." *Id.* ¶ 327. Together with her August 2016 sales, Dillon had "liquidat[ed] . . . approximately 55.35% of" her stock options that had vested as of March 20, 2017. *Id.* ¶ 326.

Settersten made two allegedly suspicious stock sales. Although Settersten had worked at Ulta since 2005, Settersten allegedly did not sell any Ulta common stock "until August 30, 2016, when he exercised and sold 10,490 stock options for $251.37 per share, generating gross proceeds of $2,636,871.30 and profits of $2,387,040.40." *Id.* ¶ 329. "This sale represented approximately 24.17% of . . . Settersten's vested stock options and generated a profit of over four times his $580,030 salary in 2016." *Id.* (emphasis omitted). Given that this sale occurred the same day as Dillon's, the complaint alleges it too was "strategically timed to occur following the announcement of positive second quarter 2016 results." *Id.*

Settersten's second sale occurred "on March 29, 2017, when he exercised and sold 11,519 stock options for $282.80 per share, generating $3,257,575.50 in gross proceeds and $2,261,081.49 in profits." *Id.* ¶ 330. "This sale generated a profit that was over 3.5 times his $615,006 salary in 2017" and "was strategically timed to occur shortly after the Company's March 9, 2017 announcement touting Ulta's allegedly impressive sales and growth numbers." *Id.* (emphasis omitted). "The combination of Settersten's two sales represented the liquidation of 44% of Settersten's stock options that had vested as of March 29, 2017." *Id.* "None of the[] sales" made by either Dillon or Settersten "were pursuant to a Rule 10b5-1 trading plan." *Id.* ¶ 321.

Plaintiffs also point out that three members of Ulta's board of directors also sold significant amounts of stock around the same times as Dillon and Settersten in either 2016 or 2017. *Id.* ¶¶ 331–32.

Defendants argue that the stock sale allegations are inadequate to show scienter because the sales were not unusual or suspicious, the timing of the sales was not strange, and there is no basis to conclude that the sales happened when Ulta's stock price was inflated.

Dillon's and Settersten's stock sales do not support a strong inference of scienter. "[B]ecause executives sell stock all the time, stock sales must generally be

unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh*, 521 F.3d at 695. "In determining whether the allegations rise to this level, the Court can consider the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 904 (N.D. Ill. 2020) (internal quotation marks omitted). Of these factors, the Seventh Circuit has emphasized that "the probative value of stock sales depends greatly on timing." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 940 (7th Cir. 2018).

Here, Dillon's and Settersten's trades were all significant in terms of the amount and overall percentage of shares each sold and the profits each made. But the timing of their trades undercuts any inference of scienter. First, the "sales occurred shortly after announcements of quarterly results, a pattern that appears benign on its face, and the opposite of an indication of fraud." *In re Avon Prods., Inc. Sec. Litig.*, No. 05 Civ. 6803, 2009 WL 848017, at *22 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) (citation omitted); *Fryman*, 462 F. Supp. 3d at 904 (despite first-time stock sales generating "significant amounts of profit," allegations did not "raise a compelling inference" of scienter because "[t]he sales [were] . . . close[] to [company's] release of its third quarter financial results"). Indeed, the complaint expressly alleges that both the August 2016 and March 2017 sales were "strategically timed to occur just days after the company announced its second quarter 2016 results" and "after the company announced its fourth quarter and fiscal year 2017 results." [68] ¶¶ 324, 327.

Second, the sales are also not close in time to any other significant event (aside from the public release of Ulta's financial performance addressed above). Although the complaint does not allege a specific date or time when Ulta allegedly began selling used products, it does allege that the practice was occurring as early as 2014. [68] ¶ 160; *id.* ¶¶ 47, 131 (Hornick, who worked at Ulta from June 2012 to April 2014, was told "that if a customer returned a beauty product, it should be returned to the shelf and resold as if new"); *see also id.* ¶ 163 (store employees were instructed that "used products were to be resold" in "June or July 2015"). Dillon and Settersten, however, did not start selling their stock until approximately two years later in 2016. The latest sale in March 2017 also occurred roughly ten months before the practice of selling used products was allegedly revealed in January 2018. *Id.* ¶¶ 11, 174. Thus, the stock sales did not closely follow the start of the alleged scheme nor closely precede its public reveal. This strongly weighs against an inference of scienter. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *12 (N.D. Ill. Mar. 27, 2012) (stock sales that "occurred . . . approximately six months before the truth allegedly began to leak into the market" did not support inference of scienter); *Harley-Davidson Sec. Litig.*, 660 F. Supp. 2d at 1002 (sales were "not necessarily suspicious in timing because they occurred nine months before" disclosure of bad news); *see also Pension*

*Tr. Fund for Operating Eng'rs*, 895 F.3d at 940 ("14 month[]" gap between stock sales and disclosure of negative information was "more than long enough for any inference of suspicion to dissipate").

The trades by three other Ulta board members do not bolster the allegations against Dillon and Settersten, because their sales are not suspicious for the same reasons that the trades by Dillon and Settersten are not suspicious. Further, there are no allegations that any of these other board members had any knowledge of the practice of reselling used products. *See Higginbotham v. Baxter*, No. 04 C 4909, 2005 WL 1272271, at *8 n.6 (N.D. Ill. May 25, 2005) (declining to consider stock sales made by non-defendant when there were "no allegations that this officer had any knowledge of the overstated income or was in any way involved in the alleged fraudulent misconduct").

*      *      *

Reviewing the complaint's allegations "collectively," *Tellabs II*, 551 U.S. at 326, the complaint does not raise a strong inference that Dillon or Settersten acted knowingly or recklessly when publishing any alleged misstatements. The complaint lacks any allegations that Dillon or Settersten knew, or were recklessly unaware, of the practice of reselling used products, and the complaint fails to set forth any basis from which their scienter could reasonably be inferred. The strongest allegations in support of such an inference are the allegations that the practice of reselling used products was widespread across most, if not all, Ulta stores and that managers and others encouraged it. But no allegations connect Dillon or Settersten to that practice or provide a reason for either to have been aware of it.

Based upon the complaint's allegations, the plausible, nonculpable explanation is that Ulta was focused on reducing shrink and set employees' compensation, in part, based on shrink reduction that had the unintended effect of incentivizing retail store employees and their managers to resell used products. The inference urged by Plaintiffs that Dillon and Settersten either knew or were recklessly unaware of this practice is not as compelling. Thus, the complaint does not plead a "strong inference" under the PSLRA. *Id.* at 323–24.

### 2.     Corporate Scienter

Plaintiffs also argue that, setting aside Dillon and Settersten, the complaint adequately alleges that it can be inferred that Ulta itself acted with scienter because numerous other Ulta employees (such as Steelman, Carroll, Cusick-Dropchinski, Giblin, Mollicone, Lakritz, and Meyer) were allegedly aware of, and even encouraged, the resale of used products.

Defendants contend that the state of mind of Ulta's other employees cannot be imputed to Ulta for purposes of Plaintiffs' securities fraud claim because they are not alleged to have had any role in promulgating the alleged misrepresentations.

Like with Dillon and Settersten, the complaint has failed to allege a strong inference of scienter with respect to Ulta. "[T]he corporate scienter inquiry must focus on 'the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)," not on "the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Pugh*, 521 F.3d at 697 (quoting *Tellabs III*, 513 F.3d at 708). Here, Dillon and Settersten are the only Ulta employees identified as being responsible for the alleged misrepresentations, so the state of mind of the other employees cited by Plaintiffs cannot be attributed to Ulta. *See In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *20 (N.D. Ill. Jan. 12, 2021) (Baxter's former treasurer Bohaboy "cannot reflect Baxter's scienter" if complaint "fails to include any allegations linking Bohaboy to any particular statement that Lead Plaintiffs attribute to Baxter, whether by alleging that Bohaboy made the statement, approved the statement, or furnished information or language to include in the statement").

It is also theoretically "possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Pugh*, 521 F.3d at 697 n.5 (quoting *Tellabs III*, 513 F.3d at 710). For example:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Tellabs III*, 513 F.3d at 710. The complaint does not allege such dramatic misrepresentations here. *Cf. Baxter Int'l Sec. Litig.*, 2021 WL 100457, at *21 ("statements about [a company's] financial metrics related to FX fluctuations, its compliance with GAAP, and its internal controls over financial reporting are not in the same ballpark as representing the sale of a million products when not one product has been sold").

As explained with respect to Dillon and Settersten, the most cogent explanation for Ulta's alleged conduct is that the resale of used product was an unfortunate and unintentional byproduct of Ulta's focus on reducing shrink, not fully known to the executives who were responsible for publishing the allegedly false or misleading statements. The complaint does not allege a strong inference of Ulta's scienter.

II.   **Violation of § 20(a) of the Exchange Act (Count II)**

"Section 20(a) of the Act [15 U.S.C. § 78t] provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws." *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 850 (N.D. Ill. 2017) (internal quotation marks omitted). "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5." *Pugh*, 521 F.3d at 693.

Because the complaint does not state a claim against Dillon, Settersten, or Ulta for violation of § 10(b) and Rule 10b–5, the complaint also does not state a claim under § 20(a). *Id.* at 698.

## CONCLUSION

The motion to dismiss is granted, the complaint is dismissed without prejudice, and Plaintiffs are granted leave to file an amended complaint by May 2, 2022. Defendants' request for judicial notice [104] is granted.

Dated: March 30, 2022                    /s/ Martha M. Pacold